# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BANCO BRADESCO S.A. SECURITIES LITIGATION | Civil Case No.  1:16-cv-04155 (GHW)<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 2

II.     JURISDICTION AND VENUE .................................................................... 9

III.    PARTIES ....................................................................................................... 10

        A.    Lead Plaintiff ..................................................................................... 10

        B.    Defendants ......................................................................................... 10

              1.    Banco Bradesco S.A. ............................................................... 10

              2.    The Individual Defendants ...................................................... 12

        C.    Relevant Non-Parties ........................................................................ 13

IV.     BACKGROUND ........................................................................................... 16

        A.    Bradesco Accesses the U.S. Capital Markets .................................. 16

        B.    Operation Car Wash .......................................................................... 17

        C.    Bradesco Assures Investors Regarding Its Internal Controls and Anti-
              Corruption Procedures ...................................................................... 18

        D.    Unbeknownst to Investors, Defendants Engaged in a Tax Bribery and
              Corruption Scheme for More than a Decade ................................... 19

V.      BRADESCO'S SCHEME ............................................................................ 22

        A.    The Brazilian Federal Police's "Operation Zealots" Uncovers
              Longstanding Bribery Practices at Bradesco ................................... 22

              1.    Bradesco's Scheme to Illegally Obtain IRPJ and
                    CSLL Tax Credits ................................................................... 23

              2.    Bradesco's Continued Payments From 2007 to 2015 ............. 26

              3.    Bradesco's 2014 Bribery Schemes ........................................ 27

        B.    News of Defendants' Unlawful Conduct Begins to Emerge ............... 40

        C.    A Brazilian Federal Judge Hinders the Progress of Operation Zealots ............. 42

        D.    The CARF CPI Succumbs to Improper Influence ............................. 43

E.      Bradesco's CARF Connections .................................................................44

F.      Defendants Deny Any Wrongdoing After Operation Zealots is
        Publicly Announced.................................................................................46

VI.     DEFENDANTS' MATERIALLY FALSE OR MISLEADING
        STATEMENTS AND OMISSIONS ....................................................................47

A.      Internal Controls Statements....................................................................47

B.      Anti-Corruption Statements .....................................................................52

C.      Code of Ethics Statements .......................................................................55

D.      Disclosure Controls Statements ..............................................................58

E.      Statements in SOX Certifications ............................................................60

F.      Failure to Make Disclosures Required by Item 3 of Form 20-F..........63

G.      Statements Regarding Accuracy of Reference Form Information.......63

H.      Defendants' False Denials Related to Operation Zealots ....................64

VII.    ADDITIONAL SCIENTER ALLEGATIONS .................................................67

VIII.   LOSS CAUSATION...............................................................................................71

IX.     THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE
        APPLIES...................................................................................................................77

X.      THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
        DOCTRINE ARE INAPPLICABLE....................................................................78

XI.     CLASS ACTION ALLEGATIONS .....................................................................79

XII.    CAUSES OF ACTION ..........................................................................................82

XIII.   PRAYER FOR RELIEF ........................................................................................87

Court-appointed Lead Plaintiff, Public Employees' Retirement System of Mississippi ("Mississippi" or "Lead Plaintiff"), by and through its undersigned counsel, brings this action individually and on behalf of all other persons and entities who purchased or otherwise acquired the preferred American Depositary Shares ("PADS" or "ADS") of Banco Bradesco S.A. ("Bradesco" or the "Company") from April 30, 2012 through July 27, 2016, inclusive (the "Class Period"), and were injured thereby (the "Class"). Lead Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based upon, among other things, the ongoing investigation that court-appointed Lead Counsel is conducting under Lead Plaintiff's supervision. This investigation includes, but is not limited to, reviewing and analyzing: (i) documents that Bradesco filed with the United States Securities and Exchange Commission ("SEC") and the Brazilian Comissão de Valores Mobiliários ("CVM"); (ii) securities analysts' reports about Bradesco; (iii) transcripts of Bradesco conference calls; (iv) Bradesco press releases; (v) media reports, including those published in the United States and in Brazil, concerning Bradesco and "Operation Zealots" (alleged in greater detail herein), including online news sources; and (vi) documents, criminal complaints and other evidence submitted by Brazilian prosecutors and other Brazilian governmental authorities in Brazilian federal court proceedings. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after Lead Plaintiff has had a reasonable opportunity to conduct discovery.[1]

---

[1]     All currency amounts are expressed in United States dollars ($), except where indicated as "R$," which refers to amounts in Brazilian Reais. Wherever possible, Lead Counsel has provided the approximate U.S. dollar amount from the contemporaneous exchange rate, as provided by Brazil's Central Bank: http://www4.bcb.gov.br/pec/taxas/ingl/ptaxnpesq.asp?id=quotations.   Many of the sources quoted herein were

## I.    INTRODUCTION

1.    This case arises from a more than decade-long bribery and corruption scheme that has resulted in the criminal prosecution of three of the most senior executives at Bradesco, Brazil's second largest private bank.  On May 31, 2016, Bradesco's Chief Executive Officer, Luiz Carlos Trabuco Cappi ("Trabuco"), its Executive Vice President, Domingos Figueiredo de Abreu ("Abreu"), and its Managing Officer and Investor Relations Officer, Luiz Carlos Angelotti ("Angelotti"), were formally indicted by Brazilian authorities on multiple counts of criminal corruption.  Two months later, on July 27, 2016, Brazilian Judge Vallisney de Souza Oliveira ("Judge Oliveira") sustained the charges against these executives as set forth in a criminal complaint filed before the Brazilian Federal Court (the "Criminal Complaint") and concluded that even though Trabuco, Abreu and Angelotti were entitled to defend themselves against the criminal charges, "in this initial evaluation, there is no relevant clear piece of evidence capable of invalidating the [charges] against them."  As a result, three of Bradesco's senior-most executives are currently embroiled in corruption-related criminal proceedings that could result in their imprisonment for up to 12 years.

2.    The criminal charges filed against Bradesco's sitting executives were the culmination of a multi-year clandestine investigation conducted by the Brazilian Federal Police (the "Federal Police"), which began after they received an anonymous letter in an unmarked envelope exposing the widespread practice of companies bribing Brazilian tax officials in order to receive favorable rulings on tax matters.  The investigation, known as Operação Zelotes ("Operation Zealots"), commenced in the midst of another well-publicized bribery investigation known as Operation Car Wash, and unearthed corruption at all levels of Brazil's tax system.

originally published in Portuguese.  Lead Counsel has made good faith and reasonable efforts to translate these sources into English.  Unless otherwise noted, all emphasis is added.

With respect to Bradesco, Operation Zealots uncovered a corruption scheme that dated back to at least 2004, whereby the Company and its executives paid bribes in order to illegally influence the outcome of tax proceedings that created hundreds of millions of Brazilian Reais in tax credits for Bradesco.

3.      Bradesco's involvement in this corruption scheme stands in stark contrast to its representations to investors throughout the Class Period.  For example, Bradesco assured the market that it was governed by a Code of Ethics that rendered "unacceptable" any "attempt or practice of bribery or corruption," and "prohibited" Bradesco employees from "promis[ing], offer[ing] or giv[ing], directly or indirectly, [any] benefit to [a] public servant or to a third-party related to him."  Likewise, throughout the Class Period, Bradesco's executives, including Trabuco and Angelotti, signed the Company's SEC filings, affirming the effectiveness of Bradesco's internal controls and representing that all known instances of fraud had been disclosed.

4.      Unbeknownst to investors, at the same time that Defendants were touting the Company's ethical conduct and disavowing the existence of bribery, they were actively engaged in a bribery scheme aimed at illegally reducing Bradesco's tax liabilities.  For example, beginning in 2004 and despite the fact that the Company had already retained some of the most renowned tax attorneys in Brazil, Defendants began engaging the services of Mario Pagnozzi Junior ("Pagnozzi"), who purported to provide "tax advice" to the bank.  Over the course of the next decade, Bradesco and Pagnozzi conspired with Eduardo Cerqueira Leite ("Leite"), an auditor at the Federal Revenue Service of Brazil (the "FRS"), to illegally obtain tax credits that Bradesco could then use to reduce its tax liability and improve its financial condition.

3

5.      The scheme worked as follows:  in exchange for a bribe payment from Bradesco to Leite and Pagnozzi, Leite accessed confidential FRS tax data and recommended certain tax credits for which he believed Bradesco should apply.  Leite – in his role as the Head of Tax Guidance and Analysis within the FRS – knew that he would be responsible for ruling on Bradesco's application.  Not surprisingly, Bradesco routinely heeded Leite's advice and applied for the recommended credits, and Leite routinely ruled in the Company's favor.

6.      As an example of the group's illegal scheme, in November of 2004, Pagnozzi and Leite proposed that Bradesco apply for R$200 million (approximately $73,260,000) in tax credits, which Leite had proposed after utilizing confidential information obtained through his access to government tax records.   Shortly thereafter, the duo presented their proposal to Angelotti, Bradesco applied for the tax credits, and Leite, who was positioned as the tax official that would adjudicate Bradesco's request, quickly ruled in the Company's favor.  In exchange for this massive illegally-obtained tax credit, Bradesco paid R$1,250,000 (approximately $458,000) to Pagnozzi and Leite.

7.      For years, Bradesco, Pagnozzi and Leite executed this plan to perfection.  By 2007, Bradesco had reaped the benefit of over R$260 million (approximately $103.6 million) in tax credits in exchange for the payment of R$2.7 million (approximately $1.2 million) in illegal bribes to Pagnozzi and Leite.  In each instance, Leite and Pagnozzi proposed the tax credits, Bradesco then applied for them, and Leite subsequently issued a ruling in the Company's favor.  And each time, the Company paid a bribe for Pagnozzi's and Leite's services.

8.      The scheme continued well into the start of the Class Period, as reflected in an expert report compiled by the Brazilian Federal Police, which indicates that Bradesco made over 450 payments to Pagnozzi between 2007 and 2015, totaling nearly R$13 million (approximately

$5.2 million).  During that same period, Bradesco made 148 additional payments (totaling R$2.1 million – approximately $830,000) to an individual named Jorge Victor Rodrigues ("Victor"), a former tax official who is known by the Federal Police to have facilitated the actual or attempted payment of bribes by Bradesco, Banco Safra, Santander and other Brazilian companies in exchange for advantageous tax rulings.

9.      By 2014, concerns regarding bribery and corruption in Brazil had elevated in light of the allegations of a massive bribery scheme at Petróleo Brasileiro S.A., a Brazilian state-owned oil and gas company.  To quell the market's concerns, and in an effort to ensure compliance with Brazil's newly-enacted anti-corruption laws, Defendants publicly announced that Bradesco had adopted a formal Anti-Corruption Policy to "prevent and fight any corruption," including bribery, "in compliance with the laws and regulations in force in Brazil and in the countries in which we have business units."  Yet at the same time it was touting these efforts to the market, and while the Federal Police were in the midst of pursuing Operation Zealots, Leite, Pagnozzi and Defendants set their sights on illegally securing over R$3 billion (approximately $1.73 billion) in additional tax credits through three separate schemes.  First, in exchange for a 15% bribe, Pagnozzi and Leite proposed a scheme to obtain credits and reimbursements of approximately R$1 billion (approximately $392 million), which Leite would personally approve in his role within the FRS.  Bradesco accepted the proposal but negotiated the bribe amount down to R$30 million (approximately $11.7 million).

10.     Second, Defendants conspired with Leite and Pagnozzi to obtain additional federal tax credits (known as PIS and COFINS credits) of between R$360 million (approximately $144 million) and R$1.5 billion (approximately $600 million).  Consistent with their longstanding course of conduct, Leite proposed to use illicitly-obtained government

5

information to calculate the proposed tax credits, and then rule favorably on the Company's request – all in exchange for an illegal bribe payment. Leite, Pagnozzi, Angelotti, Abreu and Trabuco conducted an in-person meeting on October 9, 2014 at Bradesco's headquarters to iron out the details of the scheme. During a follow-up meeting attended by Pagnozzi, Angelotti, Abreu and Trabuco, Abreu told Pagnozzi that Bradesco was ready "to close that deal," and Trabuco specifically told Pagnozzi to "tell our friend [Leite] we are interested in hiring you to do this." Following the meetings, Leite assembled a proposal explaining why the Company was entitled to the requested corporate tax credits, and he met again with Pagnozzi, Angelotti and others on November 28, 2014 to further discuss the arrangement and the related bribe payment.

11.    Third, beginning in October 2014, Angelotti and Abreu (with Trabuco's knowledge) hatched a plan with Leite and Pagnozzi to manipulate the outcome of a tax appeal worth approximately R$2.7 billion (approximately $1.2 billion). After Bradesco instituted the appeal, it worked with Pagnozzi, Leite and others to devise a way to fix the outcome of the appellate proceedings, which were set to be heard by CARF – the appellate body responsible for adjudicating tax disputes in Brazil. Because Leite could not single-handedly manipulate the outcome of this appellate proceeding, Leite and Pagnozzi enlisted the help of Victor – whom Bradesco had been paying for years – and Lutero Fernandes do Nascimento ("Nascimento"), an FRS analyst with close ties to the President of CARF, Octacílio Cartaxo ("Cartaxo"). During an October 9, 2014 meeting between Leite, Pagnozzi, Angelotti, Abreu, Trabuco and others to discuss how to influence the appellate proceedings, the group offered Defendants something they referred to as the "Midas Touch" – the ability to influence Cartaxo to have the proceedings resolved in Bradesco's favor. During a follow-up meeting in November 2014, Trabuco expressed his gratitude that Pagnozzi and Leite were "helping the bank." Throughout the course

of these negotiations, Leite confirmed his longstanding personal relationship with Bradesco and Defendants, explaining to one of his associates, Jeferson Ribeiro Salazar ("Salazar"), that he was confident that Bradesco would proceed with the illegal scheme because Leite "was already someone known to [Defendants], with whom they had personally interacted."

12.      While Defendants continued to negotiate these illegal schemes with Pagnozzi, Leite, Victor and others well into 2015, their plans came to a screeching halt when Operation Zealots was publicly disclosed on March 26, 2015.  On that day, the Federal Police announced that they were conducting an investigation into bribery allegations related to certain tax proceedings, including tax proceedings involving some of Brazil's banks.  News reports that day also revealed that the tax proceedings in question concerned approximately R$19 billion (roughly $6 billion) in tax liabilities, and that the individuals who improperly bribed tax officials in connection with these proceedings – which included individuals at some of Brazil's largest banks – could face criminal charges for their illegal conduct.  On this news, after accounting for a stock dividend, the price of Bradesco PADS fell from an adjusted close of $8.62 on March 25, 2015 to an adjusted close of $8.05 on March 27, 2015.

13.      Although Defendants had paid bribes to Pagnozzi, Leite and Victor for over a decade, and even though Defendants were in the midst of negotiating numerous unlawful schemes to reduce their tax liability, when news of Bradesco's involvement in Operation Zealots was publicized, Defendants continued to mislead investors by immediately denying any wrongdoing.  For instance, in response to the news concerning Operation Zealots that was disclosed on March 26, 2015, Bradesco issued a press release on March 31, 2015, which it later filed on a Form 6-K with the SEC on April 10, 2015, claiming that the Company was unaware of the investigation and falsely reaffirming that it "adopts strict internal controls to ensure the

compliance of its Anticorruption Corporate Policy." Yet even though Bradesco maintained that its actions were above-board, once Operation Zealots was announced, Defendants ended their negotiations with Pagnozzi, Leite and others and Bradesco abandoned its CARF appeal altogether.

14.     On May 20, 2015, at a public hearing before a subcommittee of the Brazilian House of Representatives, a representative of the Federal Police announced that the police were dividing up Operation Zealots into separate, company-specific investigations in order to expedite the proceedings and further stated that the police would focus first on certain "priority" cases. This announcement paved the way for the speedy criminal prosecution of Bradesco's executives. Federal officials also revealed that the FRS was "clos[ing] [the] taps" that had previously allowed for companies like Bradesco to illegally manipulate the tax system and divert public funds. In response to these revelations, the price of Bradesco PADS declined by $0.37 per share, or 3.7%, from a close of $10.08 per share on May 20, 2015, to a close at $9.71 per share on May 21, 2015.

15.     On May 31, 2016, Trabuco, Angelotti and Abreu were formally charged with multiple counts of violating Brazil's anti-corruption laws for their attempts to improperly influence and/or bribe Brazilian tax officials in connection with the R$2.7 billion (approximately $1.2 billion) CARF proceeding. The price of Bradesco PADS declined by an additional 5.58% in response to news of the indictment, from a closing price of $6.63 per share on May 27, 2016, to a closing price of $6.26 per share on May 31, 2016. Following the announcement of these criminal charges against the Bradesco executives, however, Defendants persisted with their false denials of wrongdoing. Indeed, on June 1, 2016, the day after the indictments were revealed, Bradesco filed a Form 6-K with the SEC stating that it "never promised, offered or gave undue

8

advantage to any person, including public employees, for submission of tax affairs or of any other nature," and "reiterate[ing] its high standards of ethical conduct."

16.     Finally, as noted above, on July 27, 2016 Judge Oliveira sustained the criminal allegations against Trabuco, Angelotti and Abreu set forth in the Criminal Complaint, and expressed his conclusion that the charges that were levied against Defendants were supported by the evidence.  The price of Bradesco's PADS declined by an additional 4.81% in response to this news.

## II.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.  Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

19.     Bradesco maintains an office in this District, sponsors PADS representing the Company's preferred equity that are listed on the New York Stock Exchange ("NYSE"), engaged in the public offering of PADS in this District, and certain of the acts that constitute the violations of law complained of herein, such as the dissemination of materially false or misleading information to the investing public, including in Bradesco's filings with the SEC, occurred in and/or were issued from this District.

20.     In an Amended and Restated Deposit Agreement dated as of November 21, 2001, and filed with the SEC on March 19, 2004 in connection with its PADS, Bradesco represented that "the federal or state courts in the State of New York shall have jurisdiction to hear and

determine any suit, action or proceeding and to settle any dispute between them that may arise out of or in connection with this Deposit Agreement and, for such purposes, [Bradesco] irrevocably submits to the non-exclusive jurisdiction of such courts." The Company further agreed that: "This Deposit Agreement and the Receipts shall be interpreted in accordance with, and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by, the laws of the State of New York[.]" This same language appears in a Deposit Agreement appended to the Company's December 1, 2015 post-effective amendment, filed with the SEC.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of a national securities market.

## III.     PARTIES

### A.     Lead Plaintiff

22.     Lead Plaintiff Mississippi, was established in 1952 and provides retirement and related benefits for all Mississippi state and public education employees, officers of the Mississippi Highway Safety Patrol, and certain elected officials, among others. As of June 30, 2015, Mississippi oversaw approximately $25.4 billion in assets on behalf of more than 394,000 members and their beneficiaries. Mississippi purchased Bradesco PADS during the Class Period, as set forth in the certification attached hereto as Exhibit A, and suffered damages as a result of the federal securities law violations alleged herein.

### B.     Defendants

#### 1.     Banco Bradesco S.A.

23.     Founded in 1943 under the commercial name "Banco Brasiliero de Descontos S.A.," Bradesco has become one of the largest banks in Brazil. Bradesco is headquartered in

Osasco, São Paulo and provides a range of banking and financial products and services to individuals, companies and institutions in Brazil and abroad.  According to Bradesco, the Company has "the most extensive private-sector branch and service network in Brazil." Bradesco offers a variety of commercial banking services, including loans and deposit-taking, credit card issuance, insurance, leasing, payment collection and processing, asset management and brokerage services.  The Company has a number of subsidiaries that operate in the insurance and asset management industries, including Grupo Bradesco Seguros, Bradesco Seguros S.A., Bradesco Asset Management and Bradesco BBI.  Certain of these subsidiaries rank among the largest companies in Brazil within their respective markets.

24.     Bradesco's common and preferred shares are listed and traded on the Bolsa de Valores de São Paulo ("BOVESPA") under the ticker symbols BBDC3 and BBDC4, respectively.

25.     The Company's PADS are listed and traded on the NYSE under the ticker symbol BBD.  The Company also lists its common American Depositary Shares ("CADS") on the NYSE under the ticker symbol BBDO.

26.     Bradesco is subject to the reporting requirements of both the SEC and its Brazilian equivalent, the CVM.

27.     During the Class Period, Bradesco filed SEC Forms 20-F on April 30, 2012 (the "2011 Form 20-F"), April 30, 2013 (the "2012 Form 20-F"), April 30, 2014 (the "2013 Form 20-F"), April 30, 2015 (the "2014 Form 20-F") and April 18, 2016 (the "2015 Form 20-F").  These Forms 20-F are collectively referred to herein as the "Class Period Forms 20-F."  In addition, the Company made a number of filings with the SEC on Forms 6-K during the Class Period.

28.     During the Class Period, Bradesco also filed Reference Forms with the CVM pursuant to CVM Instruction No. 480, approved on December 7, 2009 ("Instruction 480") and Annex 24 thereto.  Bradesco filed each of its Class Period Reference Forms with the SEC:  (i) the Company's May 2012 Reference Form was filed with the SEC on a Form 6-K signed by Angelotti on June 1, 2012 ("May 2012 Reference Form"); (ii) the Company's May 2013 Reference Form was filed with the SEC on a Form 6-K signed by Angelotti on May 31, 2013 ("May 2013 Reference Form"); (iii) the Company's May 2014 Reference Form was filed with the SEC on a Form 6-K signed by Angelotti on May 30, 2014 ("May 2014 Reference Form"); (iv) the Company's May 2015 Reference Form was filed with the SEC on a Form 6-K signed by Angelotti on May 29, 2015 ("May 2015 Reference Form"); and (v) the Company's May 2015 Reference Form was filed with the SEC on a Form 6-K signed by Angelotti on May 31, 2016 ("May 2016 Reference Form").  These Reference Forms are collectively referred to herein as the "Class Period Reference Forms."

### 2.     The Individual Defendants

29.     Trabuco currently serves as the Chief Executive Officer ("CEO") of Bradesco and Vice President of the Company's Board of Directors (the "Board").  In his role as CEO, Trabuco is a member of Bradesco's Board of Executive Officers ("Executive Board").  Trabuco began his career with Bradesco in 1969 and became CEO on March 10, 2009.  Prior to his appointment as CEO, Trabuco served as Bradesco's Vice President beginning in March 1999.  Trabuco made a series of false or misleading statements in SEC and CVM filings during the Class Period.  Trabuco is named as a defendant in the Criminal Complaint for his role in Bradesco's tax bribery scheme.

30.     Angelotti currently serves as Bradesco's Managing Officer and Investor Relations Officer and is a member of the Company's Executive Board.  Angelotti was elected to the

position of Managing Officer in January 2012 and has served on the Company's Executive Committees for Disclosure and Corporate Governance from 2012 to 2016.  He was also responsible for the Company's Tax Audit, General Accounting, Social and Environmental Responsibility, as well as its Planning, Budgeting and Control areas during the Class Period. Prior to his appointment as Managing Officer, Angelotti served as Department Officer from 2002 to 2010 and then Deputy Officer from 2010 to 2012.  Angelotti made a series of false or misleading statements in SEC and CVM filings during the Class Period.  Angelotti is named as a defendant in the Criminal Complaint for his role in Bradesco's tax bribery scheme.

31.     Abreu currently serves as Bradesco's Executive Vice President and is a member of the Company's Executive Board.  He was elected to this position in June 2009.  Abreu served on the Company's Statutory Committees for Ethical Conduct and Internal Controls and Compliance and its Executive Committees for Disclosure and Corporate Governance from 2012 to 2016.  Abreu made a false or misleading statement in an SEC filing during the Class Period. In addition, by virtue of his membership on these committees, Abreu was involved in the preparation and review of the false or misleading statements in Bradesco's SEC and CVM filings.  Abreu is named as a defendant in the Criminal Complaint for his role in Bradesco's tax bribery scheme.

32.     Defendants Trabuco, Angelotti and Abreu are referred to herein as the "Individual Defendants."   The Individual Defendants, together with Bradesco, are referred to herein as "Defendants."

### C.     Relevant Non-Parties

33.     Leite served as an auditor at the FRS, the Brazilian equivalent of the United States Internal Revenue Service.  Specifically, at all relevant times, Leite was the Head of the Tax Guidance and Analysis Division at the Delegacia Especial de Receita Federal de Instituições

Financeiras em São Paolo or Specialized Office for Financial Institutions in São Paulo ("DEINF/SP") – an administrative body within the FRS that is responsible for, among other things, taxation, collection and recovery, as well as verification with respect to financial institution taxpayers.  Leite is named as a defendant in the Criminal Complaint for his role in Bradesco's tax bribery scheme.  According to the Criminal Complaint, and as alleged herein, Leite facilitated Bradesco's efforts to influence the outcome of the Company's CARF proceeding.  As further alleged herein, for over a decade, Leite was instrumental in Bradesco's tax bribery scheme, including his role in making determinations favorable to Bradesco in various actions before the DEINF/SP, in exchange for bribes.

34.     Pagnozzi is a Brazilian businessman and lawyer.  Pagnozzi is affiliated with Pagnozzi, Calazans & Associados Consultoria Empresarial Ltda., which purportedly provided "tax advice" to Bradesco.  Pagnozzi was named as a defendant in the Criminal Complaint.  As detailed below and in the Criminal Complaint, Pagnozzi served as an intermediary for Bradesco's illicit actions, facilitating bribe payments from the Company and the improper provision of confidential information to the Company at both the DEINF/SP and CARF levels. Pagnozzi is named as a defendant in the Criminal Complaint for his role in Bradesco's tax bribery scheme.

35.     José Teruji Tamazato ("Tamazato") is Pagnozzi's business partner at Pagnozzi, Calazans & Associados Consultoria Empresarial Ltda. and serves an accountant and "client winner" at the firm.  Tamazato was also named as a defendant in the Criminal Complaint.  As stated in the Criminal Complaint and alleged herein, Tamazato worked with Pagnozzi to facilitate Bradesco's payment of bribes in exchange for the improper provision of confidential

14

information as well as favorable determinations in various tax proceedings.  Tamazato is named as a defendant in the Criminal Complaint for his role in Bradesco's tax bribery scheme.

36.     Leite, Pagnozzi and Tamazato are referred to herein collectively as the "Bribe Facilitation Group."

37.     Victor formerly served as an FRS auditor and CARF councilor.  Victor is named as a defendant in the Criminal Complaint, which describes his role in working to improperly influence the progression and outcome of Bradesco's CARF appeal.  Victor is named as a defendant in the Criminal Complaint for his role in Bradesco's tax bribery scheme.  Victor has also been implicated in CARF bribery schemes involving Banco Safra, Santander other Brazilian companies.

38.     Cartaxo served as the President of CARF from the middle of 2011 to January 2015.  Prior to his appointment as CARF President, Cartaxo was the Secretary of the FRS from 2009 to 2011.

39.     Nascimento is a former FRS tax analyst and the former Head of the Technical and Legal Advisory Service of CARF.  Nascimento served as a legal adviser to the CARF President, Cartaxo, in 2013 and 2014.  Nascimento is named as a defendant in the Criminal Complaint for his role in Bradesco's tax bribery scheme.

40.     Salazar is a former FRS auditor who had experience in presenting tax cases before CARF and offered to help facilitate Bradesco's CARF proceeding.  Salazar is named as a defendant in the Criminal Complaint for his role in Bradesco's tax bribery scheme.

41.     Mário da Silveira Teixeira Júnior ("Teixeira") was a member of Bradesco's Board from 2002 to 2015.  As detailed in the Criminal Complaint, which names him as a defendant, Teixeira attended at least one meeting between the Individual Defendants, Leite and Pagnozzi,

and encouraged the Bradesco attendees to pay for the "services" that Leite and Pagnozzi were offering so that Bradesco could illegally secure tax advantages.   Teixeira served on the Company's Statutory Committee for Internal Controls and Compliance, acting as the Coordinator of this committee, from 2012 to 2015.

## IV.   BACKGROUND

### A.   Bradesco Accesses the U.S. Capital Markets

42.   On November 21, 2001, Bradesco successfully listed its PADS on the NYSE.   As the Company explained:

> In addition to increasing the liquidity of Bradesco stock, this initiative . . . has provided more transparent information to investors (especially foreign investors). This is because since then Bradesco's financial statements have been prepared in accordance with (to) generally accepted accounting principles in the United States (US GAAP).  As from 2012 (reference date: 2011), the financial statements filed at the US Securities and Exchange Commission, or SEC, will be prepared under International Financial Reporting Standards (IFRS) issued by IASB.

43.   Bradesco further explained that, "[ADS]s are an instrument created to make it easier for U.S. investors to trade shares of companies resident in countries other than the United States," noting that ADS "are priced and traded in U.S. dollars on U.S. stock markets."  The non-voting PADS also allowed Bradesco to attract U.S. investors who are prohibited by the Brazilian constitution from owning voting shares of Brazilian financial institutions, absent a specific exception provided by the Central Bank of Brazil.   The ratio of PADS to the underlying Brazilian preferred shares is one-to-one.

44.   On March 13, 2012, after obtaining authorization from the Central Bank of Brazil to raise the limit of participation of foreign shareholders in the Company's capital stock from 14% to 30%, Bradesco established an ADS program for its common shares.  The ratio of CADS to the underlying Brazilian common shares is one-to-one.

###### B.      Operation Car Wash

45.      In 2014, the public learned of an investigation being conducted by the Federal Police and Federal Prosecutor ("MPF") called Operação Lava Jato ("Operation Car Wash").  In connection with Operation Car Wash, the Federal Police and MPF are investigating allegations of bid-rigging and bribery at Brazil's state-owned oil company, Petróleo Brasileiro S.A.— Petrobras ("Petrobras").  The evidence unearthed by this investigation to date establishes a decades-long corruption scheme, in which third-party contractors were awarded Petrobras contracts based on inflated bids and then kicked-back a certain percentage of the contract value as a bribe payment that was funneled to Petrobras executives and politicians.  Operation Car Wash has resulted in numerous arrests and convictions.

46.      The scandal at Petrobras intensified investors' focus on the policies in place at Brazilian companies to prevent similar misconduct.  In this regard, Bradesco itself noted in its 2014 Form 20-F, filed with the SEC on April 30, 2015, that "the perception of risks and uncertainties surrounding Brazil may also adversely affect our business," and further recognized the following:  "The high-profile nature of these [Operation Car Wash] investigations may have momentarily harmed the reputation of Brazil, which could reduce investor confidence . . . . If uncertainty continues or a reduction in investor confidence as a result of these investigations is material, it may adversely affect the results of our operations."

47.      As Bradesco publicly recognized that a bribery scandal involving another Brazilian company could reduce investor confidence and adversely affect Bradesco's financial results, a bribery scandal involving Bradesco would be even more damaging to the Company and its investors.

C.    **Bradesco Assures Investors Regarding Its Internal Controls and Anti-Corruption Procedures**

48.    In order to maintain the confidence of U.S. investors, Bradesco made routine assurances to the market regarding the adequacy of the Company's internal controls over financial reporting, its disclosure controls and procedures and its Anti-Corruption Policy and procedures.

49.    In each of Bradesco's Forms 20-F filed during the Class Period, the Company represented that its CEO (Trabuco) had evaluated Bradesco's disclosure controls and procedures as well as its internal controls over financial reporting and concluded that such procedures and controls were adequate and effective.  For example, the Company's 2011 Form 20-F represented that:

> Based upon the evaluation referred to above, our Chief Executive Officer and Chief Financial Officer concluded, subject to the limitations noted above, that for the period covered by this annual report, our disclosure controls and procedures were adequate and effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act of the SEC is recorded, processed, summarized and disclosed within the time periods specified in the applicable rules and forms, and that it is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

50.    Bradesco repeated this representation, in sum or in substance, in its other Class Period Forms 20-F.

51.    Bradesco's 2011 Form 20-F, filed on April 30, 2012, similarly represented the following, which was repeated in sum or in substance in the Company's other Class Period Forms 20-F:

> Our Management made an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2011 based on criteria established by the Committee of Sponsoring Organizations of the Treadway Commission's (COSO) "Enterprise Risk Management - Integrated Framework."  Based on its

18

evaluation and those criteria, our management has concluded that our internal control over financial reporting was effective as of December 31, 2011.

52.     In addressing the Company's internal controls, Bradesco also stated in its Form 20-F for the year ended December 31, 2004 that:  "There has been no change in our internal control over financial reporting during 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."   The Company made materially identical representations in its Forms 20-F for the years ended December 31, 2005 through December 31, 2010 and in each of its Class Period Forms 20-F.

53.     With respect to the Company's purported Anti-Corruption Policy and procedures, Bradesco represented in its 2014 Form 20-F that the Company "*carr[ies] out procedures to prevent and fight any corruption acts on an ongoing and permanent basis*" and as part of that representation referenced (i) its "Corporate Anti-Corruption Policy," which Bradesco described as "*establish[ing] guidelines for the prevention and fight against corruption, applicable to management and employees of the Group, comprising Bradesco and its controlled entities in Brazil and abroad*" and (ii) its "Corporate Anti-Corruption Rule," which the Company described as "rules and procedures aimed at preventing and *fighting corruption and bribes*, in conformity with the legislation and regulations currently in force in Brazil and in the countries in which we have business units."   Bradesco further stated that its Anti-Corruption Policy and Anti-Corruption Rule, "provid[e] an effective monitoring of risks and controls."

**D.     Unbeknownst to Investors, Defendants Engaged in a Tax Bribery and Corruption Scheme for More than a Decade**

54.     On May 31, 2016, the Federal Police indicted Bradesco executives Trabuco, Abreu and Angelotti, along with Leite, Pagnozzi, Tamazato, Victor, Salazar, Nascimento and Teixeira, for crimes of active and passive corruption in connection with Defendants' scheme to illegally obtain tax credits for Bradesco and manipulate its CARF proceeding.

19

55.     The indictments of Trabuco, Angelotti, Abreu and others were the culmination of a multi-year investigation conducted by the Federal Police known as Operation Zealots.

56.     Operation Zealots quietly began in late 2013, after an unmarked brown envelope was delivered to the headquarters of the Federal Police in Brasília, Brazil.  An anonymous letter inside the envelope detailed a multi-year scheme whereby councilors at CARF accepted bribes via third parties in exchange for favorable tax rulings.  The ensuing investigation, which the Federal Police conducted in conjunction with Brazil's Ministry of Finance, the FRS and the MPF, revealed that more than seventy Brazilian companies (including banks) and individuals participated in the scheme, cheating the state out of at least R$6 billion (approximately $1.9 billion).  The investigation further revealed that Bradesco, Brazil's second largest private-sector bank, was one of the scheme participants.

57.     A tax proceeding only reaches CARF once it has progressed through a lower-level administrative stage.  Specifically, after the FRS imposes a tax assessment, a taxpayer may file an appeal with the FRS Trial Office (Delegacia da Receita Federal do Brasil de Julgamento or "DRJ") – the lower-level administrative tax court.  Similarly, the FRS may challenge a DEINF/SP decision regarding, among other things, a request for tax credits by filing an appeal with the DRJ.  If either the FRS or the taxpayer is unsatisfied with the DRJ decision, the next step is to lodge an appeal with CARF, which functions as an appellate level administrative tax court.  CARF is set up as a multi-tiered system with three sections and two chambers.  Each one of the three sections is responsible for disputes regarding the following types of taxes:  (i) Corporate Income Tax (Imposto de Renda das Pessoas Jurídicas or "IRPJ") and Social Contribution over Net Profits (Contribuição Social sobre o Lucro Líquido or "CSLL") taxes; (ii) income tax and withholding tax; and (iii) Social Integration and Establishment of Public

Servant's Assets (Programas de Integração Social e de Formação do Patrimônio do Servidor Público or "PIS") and Contribution for the Financing of Social Security (Contribuição para Financiamento da Seguridade Social or "COFINS") taxes, among others.  Each section is divided into four judgment classes and each judgment class is divided into two to four panels of six councilors each – three appointed by the Ministry of Finance, and three appointed by taxpayer-representative confederations and unions.  The three judgment sections together comprise the "Lower Chamber."  CARF also has an "Upper Chamber," referred to as the "Superior Chamber of Tax Appeals – CSRF," which is responsible for review of the Lower Chamber decisions.  The Upper Chamber is comprised of the vice presidents and presidents of the twelve judgment classes.  Within fifteen days of a Lower Chamber decision, the FRS or a taxpayer may file a special appeal with the Upper Chamber asserting that either:  (i) the Lower Chamber decision conflicts with prior Lower Chamber decisions; or (ii) the decision violates Brazilian federal law.  A CARF proceeding is generally decided within two to three years after filing.  Once a final CARF decision is handed down, the FRS has no further recourse.  If, however, the decision is adverse to the taxpayer, the taxpayer is entitled to challenge the decision before the Brazilian judicial courts.

58.     According to information about the CARF bribery scheme uncovered by the Federal Police and MPF, once a proceeding reached the CARF level, the taxpayer participating in the scheme would enlist the services of lawyers and other third party intermediaries and would make payments to these intermediaries under the pretense of paying for tax advisory or consultancy services.  These payments typically amounted to 1% to 10% of the taxpayer's tax debt or tax credit.  The intermediaries would, in turn, funnel a portion of the funds to a selected CARF councilor, in exchange for that councilor's vote in favor of the taxpayer, thereby

inappropriately causing the assessed taxes and fines to be reduced or nullified or the sought-after tax credits to be approved.

59.     As discussed below, Bradesco operated an eleven-year-long bribery scheme to illegally obtain favorable tax determinations, spanning from the DEINF/SP administrative level to the CARF appellate level.

## V.     BRADESCO'S SCHEME

### A.     The Brazilian Federal Police's "Operation Zealots" Uncovers Longstanding Bribery Practices at Bradesco

60.     In connection with the Operation Zealots investigation, the Federal Police discovered that Bradesco had been engaged in an eleven-year scheme, beginning in 2004, to improperly influence the outcome of tax adjudications with billions of Brazilian Reais at stake. Brazilian Federal Prosecutor Frederico Paiva explained that "the relationship between Bradesco and the criminal organization is one of over 10 years.  This [CARF bribery scheme] was not an episodic event."

61.     By no later than 2004, as discussed below, Bradesco had developed an illicit relationship with Pagnozzi and Leite to illegally secure preferential tax treatment in exchange for millions of Brazilian Reais in bribes.  Through his position with the DEINF/SP, Leite had access to confidential information compiled and utilized by the tax authorities and also acquired detailed knowledge regarding the tax legislation applicable to banking institutions, as well as potential loopholes.  In addition, Leite was often responsible for determining the validity of applications for tax credits or reimbursements filed by taxpayers like Bradesco.  This responsibility, coupled with his inside access to confidential information and familiarity with the tax regulations, made Leite a valuable asset to companies in the financial sector that were seeking to either reduce their tax liabilities or obtain valuable tax credits.

62.     Primarily by using Pagnozzi as an intermediary to maintain the illusion of legitimate business dealings, Bradesco became one of Leite's main clients such that between 2004 and 2015, Leite, Bradesco and others engaged in several different schemes in an attempt to improperly influence tax proceedings in the Company's favor.

### 1.     Bradesco's Scheme to Illegally Obtain IRPJ and CSLL Tax Credits

63.     Bradesco's early relationship with Leite, Pagnozzi and Tamazato stemmed from an illegal scheme to reap hundreds of millions of Brazilian Reais in tax credits for the Company's benefit.  Once Bradesco obtained these tax credits, the Company could either use the credits to offset its current tax liabilities, which would increase its net income, or record these credits on the Company's balance sheet as a deferred tax asset, which would increase its total assets.

64.     On several occasions commencing in the early 2000s, Leite accessed confidential tax information related to Bradesco's prior tax filings, as well as information related to other financial institutions and relevant administrative tax proceedings.  Leite conducted this research to identify tax credits for which the Company could apply.  After acquiring the information, Leite provided it to Pagnozzi and worked with Pagnozzi to formulate a written proposal for Bradesco, advising the Company to seek lucrative tax credits.  Pagnozzi presented the proposal to Bradesco, which, in return for favorable determinations in the ensuing tax proceedings, agreed to pay Pagnozzi a percentage of the requested tax credit.  These payments, disguised as remuneration for "tax advice," were passed on to Leite, who then made determinations in Bradesco's favor – effectively approving his own recommendations.  Documents seized by the Federal Police show that Leite and Pagnozzi referred to the written proposals that they provided to Bradesco as their "papers."  Significantly, the Criminal Complaint does not identify a single instance where Leite found against the Company in a DEINF/SP proceeding.  Further

23

underscoring that Bradesco's payments to Pagnozzi were illegal bribes was the fact that Bradesco already had retained some of the most renowned tax legal counsel in Brazil and, thus, did not need Pagnozzi's "tax advice."

65.     As an example of this conduct, the Federal Police discovered that on November 24, 2004, Pagnozzi and Leite proposed to Bradesco that the Company apply for IRPJ and CSLL credits for the 2000 and 2001 calendar years, based on a purported overpayment by the Company and related adjustments to Bradesco's prior tax filings.  IRPJ and CSLL taxes are assessed on the basis of a company's income and net profits, respectively.  A company may be entitled to a credit at the end of a year if it can make certain showings.  In Bradesco's case, however, the Company's ability to make the requisite showings was irrelevant, as Leite was responsible for determining the validity of the IRPJ and CSLL credits, which Bradesco had requested at Leite's suggestion.

66.     Utilizing confidential information that he accessed via his DEINF/SP credentials, Leite crafted the "papers" for Bradesco, proposing how the Company could illegally obtain the tax credits in exchange for a bribe.  In creating these "papers," Leite reviewed the Company's tax returns for 1995 to 1999 to manufacture an overpayment for the 2000 and 2001 fiscal years, such that Bradesco would be able to claim IRPJ and CSLL credits in the amount of R$200,000,000 (approximately $73,260,000).   Pagnozzi then delivered the "papers" – under the guise of providing "tax advice" – to Angelotti, who was the director of Bradesco's tax area.  Bradesco paid Pagnozzi and Leite more than R$1,250,000 (approximately $458,000) for this "tax advice."

67.     Bradesco did exactly as Pagnozzi and Leite instructed and instituted the tax proceeding, Administrative Tax Proceeding ("PAF") No. 16327.000683/2003-11, in which it sought approval for the R$200,000,000 in IRPJ and CSLL credits identified in the "papers."

Leite was responsible for approving Bradesco's request, and, not surprisingly, he granted the Company's request for the nine-figure tax credit.

68.     In 2007, Bradesco again made illegal bribe payments to Leite (through Pagnozzi) and Leite then secured confidential information to prepare additional "papers" for Bradesco, suggesting that the Company apply for further IRPJ and CSLL credits.  As with the 2004 tax credits, Leite was charged with evaluating the applications and made determinations in the Company's favor.

69.     For example, a receipt dated March 7, 2007 in the evidence collected by the Federal Police shows that in connection with Administrative Tax Proceeding No. 16327.001816/2005-21, in which Bradesco sought credits totaling more than R$6,250,000 (approximately $2,970,000), Bradesco paid Pagnozzi R$247,000 (approximately $118,000).  In return, Leite and Pagnozzi created documents for Bradesco, counseling that it request the credits, and then Leite granted the Company's application seeking these same credits.

70.     Likewise, documents seized by the Federal Police show that Bradesco continued to pay bribes to Leite and Pagnozzi in April 2007 in exchange for the grant of millions of Brazilian Reais in tax credits.  For example, according to a receipt dated April 26, 2007 with the subject "PAF No. 10768.009281/00-11," Bradesco paid Pagnozzi a bribe of R$260,000 (approximately $128,700) in connection with Administrative Tax Proceeding No. 10768.009281/00-11, in which Bradesco sought IRPJ and CSLL credits amounting to almost R$14,000,000 (approximately $6,930,000).  Following receipt of this bribe, Leite resolved the proceeding in the Company's favor and granted Bradesco's tax credit request.

71.     Document seized by the Federal Police also show that just a month later, in May 2007, Bradesco paid Pagnozzi almost R$490,000 (approximately $251,000) in connection with

25

Administrative Tax Proceeding No. 10768.020467/00-02, involving Bradesco's subsidiary, Banco Boavista Interatlântico S.A. ("Banco Boavista").   Banco Boavista sought tax credits of roughly R$40,000,000 (approximately $20,513,000) through that proceeding.   The evidence uncovered by the Federal Police further demonstrates that Banco Boavista made at least one payment of R$490,000 (approximately $251,000) to JLT Intermediações de Negócios – the firm in which Tamazato is a partner.   The documents evidencing the payment to Tamazato's firm reference Administrative Tax Proceeding No. 10768.020467/00-02 as the subject of the payment. Following these payments, Leite again granted the Company's eight-figure credit request.

72.     Based on the foregoing evidence collected by the Federal Police, Bradesco profited handsomely from this illegal scheme.   Between 2004 and 2007, Bradesco and its subsidiary Banco Boavista paid Pagnozzi and Leite no less than R$2,717,000 (approximately $1,206,700) in bribes in exchange for more than R$260,250,000 (approximately $103,673,000) in illegally obtained tax credits, which the Company used to offset its tax expenses and to augment its financial statements.

### 2.     Bradesco's Continued Payments From 2007 to 2015

73.     Evidence collected by the Federal Police demonstrates that Bradesco continued to pay millions of dollars to Pagnozzi between 2007 and 2015.   For example, an expert report compiled by the Federal Police establishes that Bradesco made 450 payments to Pagnozzi, totaling R$12,981,421.83 (approximately $5,200,000), from 2007 to 2015.

74.     In addition, Bradesco made more than 100 payments to Victor, a retired FRS Auditor and CARF Councilor involved in the Company's scheme to manipulate Administrative Tax Proceeding No. 16327.000190/2011-83 before CARF (discussed in ¶¶ 90-113 below). Specifically Bradesco made 148 payments to Victor between 2005 and 2013, totaling R$2,073,978.41 (approximately $830,000).

75.     The Federal Police compiled the foregoing information directly from Pagnozzi's and Victor's bank account records.   The Federal Police analyzed and memorialized the information in expert reports dated October 26, 2015 and November 19, 2015, neither of which was made publicly available until after the end of the Class Period.

76.     Bradesco's transfers to Victor and Pagnozzi between 2007 and 2015 demonstrate that Bradesco's bribe payments continued long after the 2007 payments made in connection with the Company's scheme to illegally obtain IRPJ and CSLL tax credits.

### 3.     Bradesco's 2014 Bribery Schemes

77.     Bradesco's attempts to illegally obtain favorable tax treatment through the payment of millions of Brazilian Reais in bribes continued into 2014 at the same time the Federal Police secretly were conducting Operation Zealots.   The Federal Police have uncovered detailed evidence of three separate bribery schemes that Bradesco put in place in 2014 to reap hundreds of millions of dollars in tax benefits.   Those schemes included (i) seeking tax credits and reimbursements in the amount of R$1,000,000,000 (roughly $600,000,000) based on taxes the Company paid from 2009 to 2014, (ii) requesting PIS and COFINS tax credits totaling R$360,000,000 (roughly $144,000,000), and (iii) manipulating a CARF tax appeal pertaining to R$2,736,809,135.03 (approximately $1,232,800,000) in tax credits and associated fines.   Each scheme is discussed below.

### (a)     Bradesco's Scheme to Influence the Adjudication of a 2014 Tax Compensation Request

78.     In addition to bribing Leite and Pagnozzi to obtain tax credits at the DEINF/SP level, Defendants continued to pay them in a scheme related to a 2014 review of the Company's prior tax filings.   In this facet of the scheme, Bradesco agreed to pay Leite to:  (i) review all of the Company's tax filings from the previous five years to identify prior tax payments that the

Company could characterize as "overpayments"; (ii) counsel Bradesco on how to request tax credits or reimbursements based on those "overpayments"; and (iii) grant the Company's request seeking the award of these credits or reimbursements.

79.     Specifically, in a proposal dated March 24, 2014, sent by Pagnozzi's office to Angelotti and bearing Bradesco's stamp with the date of receipt, Pagnozzi proposed the "verification, review and study, relative to the last five (5) years, of all taxes . . . seeking to make feasible the reduction of [Bradesco's] current tax burden and the recovery of overpaid taxes." The proposal further provided that Bradesco would file a petition with the DEINF/SP, seeking approval of tax credits and reimbursements in the amounts that Leite had identified and proposed – roughly R$1,000,000,000 (approximately $392,157,000).   Leite, as the head of the DEINF/SP's Guidance and Tax Analysis Division, would then grant the Company's petition. The reimbursements and credits awarded by the DEINF/SP would serve to reduce the Company's tax burden and/or increase its assets.   The proposal also contemplated that Bradesco would pay 15% of any tax credits and reimbursements awarded at the DEINF/SP administrative level to Leite and Pagnozzi.   Bradesco accepted the proposal, but sought to negotiate the amount of the bribe to Leite and Pagnozzi.

80.     Pagnozzi and Tamazato met with Angelotti on March 24, 2014 and August 12, 2014 to discuss the proposal and renegotiate the bribe percentage.   On August 14, 2014, Pagnozzi and Tamazato sent Angelotti a revised proposal for his review that cut the bribe amount to a range of 5% to 8% depending on the amount of the credit or reimbursement that Leite was able to secure for the Company.   The revised proposal again confirmed that the DEINF/SP – i.e., Leite – would determine the validity of any credits or reimbursements owed to Bradesco.

81.     Email communications that were seized by the Federal Police and intercepted telephone conversations between members of the Bribe Facilitation Group also suggest that the tax review scheme was discussed during meetings with the Defendants at Bradesco on October 9, 2014 and November 12, 2014.   During a November 12, 2014 telephone call that was intercepted and recorded by the Federal Police, Pagnozzi and Tamazato revisited the bribe amount, noting that it had been negotiated down to R$30,000,000 (approximately $11,765,000) – 3% of the value of the expected tax credits.

82.     While the scheme was never completed due to the announcement of Operation Zealots in the spring of 2015, the evidence shows that Angelotti and Abreu, with Trabuco's knowledge and consent, illegally agreed to pay bribes in exchange for a favorable finding from Leite that would have resulted in a benefit to the Company of roughly R$1,000,000,000 (approximately $392,157,000).

### (b)      Scheme to Manipulate PIS and COFINS Credits

83.     Also in 2014, Defendants agreed to pay additional bribes to Leite and Pagnozzi to obtain more than one hundred million dollars in tax credits related to PIS and COFINS taxes.

84.     PIS and COFINS are federal taxes that are assessed based on a company's gross revenues, irrespective of profits.   In 2014, Pagnozzi and Leite proposed to Bradesco that it seek a massive amount of PIS and COFINS tax credits based on taxes that were paid by Bradesco's holding company.   Based on discussions between Leite and Pagnozzi, the Bribe Facilitation Group identified between R$1,500,000,000 (roughly $600,000,000) and R$360,000,000 (roughly $144,000,000) in potential tax credits.   As with the prior tax credit requests, the validity of the credits would be determined by the DEINF/SP, which was headed by Leite.   In exchange for a guaranteed favorable outcome, the Company agreed to pay a bribe to Pagnozzi and Leite.

85.     Pagnozzi, Tamazato and Leite discussed this scheme with Angelotti, Abreu and Trabuco during an October 9, 2014 in-person meeting at Bradesco's headquarters.  Trabuco attended the meeting, but left shortly after greeting Pagnozzi, Tamazato and Leite.

86.     During a follow-up meeting on November 12, 2014 attended by Pagnozzi, Abreu, Angelotti and Trabuco, Abreu told Pagnozzi that Bradesco was "going to close that deal" with Pagnozzi, Tamazato and Leite.  Likewise, during this same meeting, Trabuco told Pagnozzi to "tell our friend [Leite] we are interested in hiring you to do this."  In other words, Abreu and Trabuco wanted to engage Leite to illegally identify potential tax credits for Bradesco's benefit with the understanding that Leite would then grant the requested credits – all in exchange for bribes to be paid by the Company.

87.     To move forward with the arrangement, Bradesco requested additional data concerning other companies that had made similar applications.  This data was only available through Leite's ability to access confidential information due to his role with the DEINF/SP.  Accordingly, Leite used his DEINF/SP credentials to access the confidential data requested by Bradesco.  Unbeknownst to Leite and the Defendants, it was this unauthorized access that ultimately tipped off the Federal Police to Bradesco's involvement in the scheme.

88.     Using the information improperly obtained through Leite's access to restricted data, including information and documents protected by tax secrecy laws, and certain confidential information that Leite had previously obtained through a private consultation with an FRS attorney in connection with a separate matter, Leite put together a proposal for Bradesco. This proposal purported to explain why the Company was entitled to R$360,000,000 in PIS and COFINS credits.

89.     Leite, Pagnozzi, Tamazato and Angelotti met again on November 28, 2014 to further discuss the arrangement.   The credit request and related bribe payments were never completed due to the announcement of Operation Zealots in the spring of 2015.   However, telephone conversations intercepted by the Federal Police show that Defendants had already agreed to hire Leite, Pagnozzi and Tamazato to illegally secure the PIS and COFINS tax credits in exchange for a bribe from Bradesco.

(c)      <strong>Scheme to Manipulate CARF Proceedings</strong>

90.     Between October 2014 and March 2015, Angelotti and Abreu, with Trabuco's and Teixeira's knowledge, also agreed to pay bribes to public servants with the aim of manipulating the outcome of a CARF proceeding concerning a R$2.7 billion (approximately $1.2 billion) Bradesco tax appeal.

91.     Specifically, in 2014, Bradesco and the Bribe Facilitation Group set their sights on manipulating the outcome of a R$2,736,809,135.03 (approximately $1,232,800,000) CARF appeal.   The amount at stake in this appeal consisted of a R$1,824,539,423.40 (approximately $821,865,000) tax credit that had been disallowed and an associated fine of R$912,269,711.63 (approximately $410,932,000) that Bradesco incurred in connection with the disallowance. Bradesco previously obtained a COFINS credit for the February 2001 to December 2005 time period.   The Company received this credit as a result of a favorable ruling on July 13, 2006 in an action that Bradesco had filed before the 21st Federal Civil Court of São Paulo.   The Brazilian government subsequently appealed this ruling to the Federal Regional Tribunal of São Paulo, which also decided in Bradesco's favor on November 12, 2008.   The Company then initiated a proceeding before the DEINF/SP to obtain official recognition of COFINS credit.   Officials within the DEINF/SP, which did not include Leite, refused to recognize the full COFINS credit and imposed a fine against the Company for "undue compensation."   As a result, Bradesco

appealed the DEINF/SP decision to the DRJ, which appeal was rejected as unfounded. Following the DRJ ruling, Bradesco filed an appeal with CARF. The CARF appeal was docketed as Administrative Tax Proceeding No. 16327.000190/2011-83 and distributed to the members of the CARF panel on April 24, 2014.

92.     After the appeal was distributed, Bradesco and the Bribe Facilitation Group began to discuss how they could influence the members of the CARF panel to manipulate the CARF proceedings in the Company's favor. As he was not a CARF councilor, Leite, Bradesco's usual "ace in the hole," was no longer able to direct the outcome of the proceeding. Therefore, to continue its decade-old bribery scheme, but this time at the CARF level, the Bribe Facilitation Group enlisted the participation of two additional individuals. First, they involved Nascimento, an FRS tax analyst and Head of the Technical and Legal Advisory Service of CARF, who was also the "right hand" of then CARF president, Cartaxo. Nascimento's position authorized him to draft CARF orders and decisions. It also allowed him to view internal, confidential information and access the CARF computer systems, including the internal system for tracking the progression of proceedings. In addition, Nascimento had connections with the sitting CARF councilors and was intimately familiar with the internal workings of CARF. Nascimento's ability to view information on the progress of CARF proceedings and related confidential data – which was inaccessible to Leite – as well as his regular communications and interactions with CARF councilors and his experience with CARF proceedings made him a valuable asset to the Bribe Facilitation Group and Defendants. As the Criminal Complaint noted, Nascimento was the "eyes" of the Bribe Facilitation Group inside CARF.

93.     The Bribe Facilitation Group also enlisted Victor, the retired FRS Auditor and CARF councilor who was described in the Criminal Complaint as specializing in the trade of

"selling facilitations" within the FRS.  In other words, Victor made a business out of assisting taxpayers in bribing public officials in exchange for favorable outcomes.  Indeed, Victor served as the go-between with Bradesco and Nascimento as Victor paid Nascimento and certain of his family members a monthly "advance" of R$5,000 on the total amount of expected bribe payments.  In addition, as Nascimento later admitted to the Federal Police, Victor had relationships with the sitting CARF councilors that enabled him to influence the outcome of the proceedings.

94.     As of July 30, 2014, when the Federal Police began intercepting the telephone calls of Leite, Salazar, Nascimento, Tamazato and Victor, the plan to manipulate the CARF proceedings was in full-swing.  Victor, Salazar and Leite scheduled a meeting in Brasília with Nascimento.  Prior to the meeting, Leite used his DEINF/SP credentials to access restricted, confidential information and view the current status of Bradesco's proceeding.  Victor also reminded Nascimento to bring his computer and his access token to the meeting so that they could run searches in the CARF internal systems to find information relevant to Bradesco's appeal.  In his statement to the Federal Police, Nascimento confirmed that he attended this meeting with Victor, Salazar and Leite to discuss the Bradesco appeal.  Nascimento told the Federal Police that this meeting was set up so that Leite could evaluate Bradesco's chances of succeeding on appeal, and that Victor mentioned to Nascimento that he would receive a percentage of Victor's bribe proceeds if Bradesco prevailed.

95.     As the CARF trial was initially set for August 8, 2014, the Bribe Facilitation Group, along with Salazar, Victor and Nascimento, began to devise a plan to corrupt the CARF commissioners who were assigned to Bradesco's proceeding.  Initially, they performed due diligence on each of the relevant CARF councilors.  For example, they discussed that Walber

José da Silva, who was the president of the panel hearing Bradesco's case, was "not very good with business, tough to deal with."  Likewise, they labeled CARF councilor Maria da Conceição Arnaldo Jacó as "tough to deal with."   By contrast, they characterized Fabíola Cassiano Keramidas as "not dangerous."   As a result of their due diligence, the group recognized that Bradesco was likely to lose in the first instance, before the CARF Lower Chamber.  As such, they hoped for reversal by the CARF Upper Chamber, noting during intercepted telephone conversations that there was "not much to be done" in the Lower Chamber, and that Bradesco would "have to wait for this to go to the Upper Chamber."

96.     The trial was postponed and did not proceed on August 8, 2014 – a fact that Nascimento shared with the group after confidentially obtaining information on the postponement from the internal CARF system used to track the status of proceedings.  This postponement provided the group with additional time to prepare the "papers" that they would present to Bradesco, proposing a plan for manipulating the proceedings.

97.     On September 2, 2014, Victor met with Salazar, Leite, Pagnozzi and Tamazato in São Paulo.  According to the Criminal Complaint, during this meeting, the attendees discussed the need to "stoke the fire" with Bradesco during the delay – i.e., to convince the Company to hire them so that everything could be "stitched up" before the case was placed back on the Lower Chamber's agenda.

98.     Using his CARF credentials, on September 3, 2014, Nascimento improperly obtained confidential information from the Ministry of Finance's restricted database regarding, among other things, the status of Bradesco's proceeding and the composition of the panel that would hear the case.  Leite, Salazar and Victor then set about drafting, editing and finalizing the "papers" for Bradesco.

99.     Shortly thereafter, on or about September 15, 2014, Victor spoke with councilor Keramidas and directed Keramidas to request that the Lower Chamber trial be again postponed. Councilor Keramidas lodged a request to postpone the proceedings the next day and the case was moved to the agenda for the following month.

100.    Armed with the additional time, the confidential CARF information from Nascimento concerning the status of Bradesco's case and the composition of the panel that would hear the appeal, and the "papers" that they had prepared, Leite, Pagnozzi and Tamazato met with Bradesco on Thursday, October 9, 2014 at 11 a.m. at Bradesco's headquarters to finalize the deal and present their proposal for how to influence the proceedings.  Angelotti, Abreu and Trabuco attended the meeting on Bradesco's behalf.   According to the Criminal Complaint, Trabuco left shortly after greeting Leite, Pagnozzi and Tamazato.

101.    At the meeting, Leite, Pagnozzi and Tamazato provided the Company with the "papers" they had prepared and also discussed the three possible outcomes of the Lower Chamber proceedings:  (i) conversion of the trial into a diligence investigation, similar to what occurred with another banking company, Banco Mercantil; (ii) further postponement of the trial, which the group could orchestrate for the Company; or (iii) an unfavorable Lower Chamber decision.   With respect to how Bradesco could respond to an unfavorable decision, Leite, Pagnozzi and Tamazato discussed lodging a motion for clarification, which would be decided by the Lower Chamber, and/or filing a special appeal, the admissibility of which would be decided by Cartaxo in the Upper Chamber.   Each of these options would provide Bradesco with an avenue to challenge an adverse Lower Chamber ruling.

102.    While the "papers" presented to Bradesco by Leite, Pagnozzi and Tamazato were comprehensive, they omitted one advantage that the group could provide – an advantage that

even Leite refused to put in writing.  During the course of the meeting, Leite, Pagnozzi and Tamazato orally offered Bradesco this unwritten advantage, which they referred to as the "Midas Touch."  As explained in an intercepted telephone call between Leite and Victor on the eve of the meeting, the "Midas Touch" was a reference to the group's connections with the councilor who "will make the decision [in Bradesco's] favor" – i.e., their ability to unlawfully influence the outcome of the proceedings.  Specifically, the CARF president, Cartaxo, was the father-in-law of Leonardo Siadi Manzan ("L. Manzan"), a lawyer who was the son of one of Victor's partners, Aegnor Manzan.  The group intended to influence Cartaxo through these relationships. This "Midas Touch" was especially important because, as mentioned in the "papers," if Bradesco lost before the Lower Chamber, one of the options would be to pursue a special appeal to the Upper Chamber, and the determination of this appeal would be decided by Cartaxo.

103.    As soon as the October 9, 2014 meeting concluded, Leite reported to Salazar in an intercepted telephone call that "there had been no decision, obviously, but the conversation had been quite good."  Leite also reported that "the meeting was very good, it was very long and that he believes he was very fortunate in his arguments and he believes that now it's going to pan out."  In further discussing the outcome of the meeting, Leite relayed that Defendants were very interested in the "product" and emphasized his pre-existing relationship with the Company, stating that he "was already someone known to them, with whom they personally interacted." According to this recording, Leite reinforced to Bradesco at the meeting "you know me and know that I am a very transparent and determined person, I will work very hard and right now there are positives 'in our favor.'"

104.    Following the meeting, and in light of the fast approaching trial date, Leite reiterated to Bradesco that the group could attempt to delay the proceedings before the Lower

Chamber. Bradesco, however, opted to "allow things to be defined" – i.e., to allow the proceedings to move forward. As the Criminal Complaint explains, this October 9 meeting and the subsequent efforts undertaken by the group, detailed below, show that the Defendants had given the enterprise the "green light" to proceed.

105. The CARF trial was scheduled for October 14, 2014 and Leite, Salazar, Tamazato and Pagnozzi awaited a report from Victor and Nascimento regarding the outcome. They soon learned that the case had been moved to the agenda for the next morning, as one of the councilors was unable to attend the session, and Leite commented to Tamazato in a telephone call intercepted by the Federal Police that, based on their information, Bradesco "should lose." However, the case was not heard the next morning and was instead postponed to November 12, 2014, once again at the request of councilor Keramidas, who Victor described as "our friend."

106. Pagnozzi, met again with Bradesco on November 12, 2014 – the same day that the Lower Chamber CARF proceeding was to be decided. During this meeting, Abreu questioned Pagnozzi regarding the different options that Bradesco could pursue, and also asked, if Bradesco should lose before the Lower Chamber, whether the Company would prevail on appeal before the Upper Chamber. Trabuco, who only briefly attended the meeting, according to the Criminal Complaint, also asked how Pagnozzi proposed to proceed if the case was remanded for a diligence investigation. As the Criminal Complaint explained, this question was intended to suggest that Leite could "give an advantage" to Bradesco in the event that the case was remanded back to the DEINF/SP for further investigation by the FRS analysts.

107. However, as Pagnozzi later reported to Tamazato, Bradesco lost before the Lower Chamber, eliminating any possibility that the proceeding could be converted into diligence investigation. The vote was unanimous – six votes to zero. After learning of the adverse ruling

on the same day as the November 12 meeting, Abreu and Angelotti accused the group of negatively influencing the trial.  In making these accusations, as the Criminal Complaint explained, it was "*again clear* that Abreu, Angelotti and Trabuco knew that they had sat at the table to engage with criminals."  Abreu threatened to expose Leite and have him imprisoned, but Pagnozzi warned against this course of action, stating that it would only result in the Company making "the greatest enemy on Earth."  Teixeira briefly joined the contentious meeting and reinforced to Abreu and Angelotti the benefit of the "services provided" by the group.

108.    While Trabuco did not attend the full meeting on November 12, 2014, during an intercepted telephone conversation the next day, Pagnozzi confirmed to Leite that Trabuco knew about Abreu's and Angelotti's dealings with the group.  In fact, during the brief period that Trabuco was at the meeting he told Pagnozzi, "I'm glad you're here . . . helping the Bank," which Pagnozzi understood to mean that Angelotti and Abreu were "relaying" to Trabuco "everything we're talking about."  In other words, Trabuco knew all of the details regarding Bradesco's 2014 dealings with Pagnozzi, Leite, Tamazato and Salazar.

109.    In the aftermath of the November 12, 2014 meeting and the Company's unanimous Lower Chamber defeat, Leite and Tamazato worried that Bradesco would be hesitant to continue with the scheme.  This concern did not materialize.  While Defendants had initially delayed formalizing their informal bribery agreement with the group because they believed Bradesco would prevail at the Lower Chamber proceeding, an intercepted telephone conversation between Tamazato and Leite confirmed that Defendants "desperately" sought out Pagnozzi and Leite the very next day – November 13, 2014.

110.    Bradesco and the group soon agreed upon a strategy to challenge the Lower Chamber ruling.  Bradesco executed the first part of this strategy by filing a Petition for

38

Clarification, Rectification and Amendment with the Lower Chamber on December 16, 2014.  In the meantime, Victor and Nascimento began to research possible paradigms[2] to support an appeal of the Lower Chamber finding to the Upper Chamber, with the intention of passing these paradigms on to Bradesco's tax lawyer, Leo Krakowiak, who would officially file the appeal.

111.    While the Brazilian Federal Court overseeing the investigation refused to extend the wiretaps of the group's phones beyond November 14, 2014 (based on a judicial finding that sufficient evidence of Defendants' active corruption had been collected), documents seized by the Federal Police show that the group and Bradesco continued to execute their plan.  For example, Pagnozzi, Tamazato, Leite and Angelotti all met on November 28, 2014.  In addition, on January 28, 2015, Pagnozzi met with Leite in the morning and then with Bradesco in the afternoon.  Pagnozzi met again with Bradesco on the morning on March 19, 2015.  These meetings demonstrate that Defendants were continuing to move forward with the scheme.

112.    Further to the agreed-on plan, Mr. Krakowiak filed an appeal on behalf of the Company on March 18, 2015.  As mentioned above, the admissibility of this appeal would be determined by Cartaxo – the group's "Midas Touch."  The group planned to influence Cartaxo, through his son-in-law, L. Manzan, such that he would accept the appeal.  In addition, Nascimento, as Cartaxo's right-hand man, would be responsible for examining the arguments and drafting the order of admissibility for the appeal.  With Cartaxo and Nascimento on its side, everything seemed to be falling into place for Bradesco.

113.    However, once Operation Zealots was disclosed to the public on March 26, 2015, Bradesco's "Midas Touch" was lost.  As a result, the Company abandoned its CARF appeal.

---

[2]        In this context, "paradigm" refers to a previous CARF decision that an appellee may cite in an effort to strengthen its arguments or prove a specific point.  However, an appellee is limited in terms of which prior decisions it can cite.  In addition, the cited paradigms are examined at the threshold admissibility stage, rather than at the merits stage.

**B.      News of Defendants' Unlawful Conduct Begins to Emerge**

114.     On March 26, 2015, the Federal Police publicly disclosed certain information concerning the ongoing Operation Zealots investigation to the public.   In particular, Federal Police inspector Marlon Cajado stated that seventy industrial, agricultural, civil engineering and financial companies, including banks, were under investigation for bribing CARF members to obtain favorable rulings that reduced or waived the tax amounts these companies owed.   The inspector further stated that the Federal Police had seized documents and R$1.8 million (approximately $494,500) during raids in three different cities earlier that morning and indicated that the participants in this criminal scheme could face charges of influence peddling, corruption, criminal conspiracy and money-laundering, with jail sentences of up to fifty years.   U.S. news articles published after the market closed on March 26, 2015 reported on Operation Zealots.

115.     On March 28, 2015, *O Estado de S. Paulo*, a major Brazilian news outlet, confirmed that Bradesco was one of the large banks being investigated in Operation Zealots.

116.     In early April 2015, additional details regarding Defendants' scheme began to emerge.   Specifically, various Brazilian news outlets, including *O Estado de São Paulo*, reported that Bradesco executives, including Trabuco, were subjects of the investigation and that the MPF had recorded telephone conversations revealing that these Bradesco executives met with the lawyers and FRS officials being investigated and engaged in negotiations with this group in an attempt to avoid an unfavorable CARF decision.   These reports noted, however, that because the Federal Police's telephonic recordings were discontinued while Bradesco's negotiations with Brazilian officials were ongoing, it remained unclear whether evidence existed showing that Bradesco executives followed through with the alleged corruption scheme.

117.     On May 20, 2015, Marlon Oliveira Cajado dos Santos, a representative of the Federal Police, announced that the Operation Zealots investigation would be spun off into

separate, company-specific investigations in order to expedite the proceedings and provide an answer to the Brazilian people.   Mr. Cajado stated that the Federal Police were identifying "priority" cases, of which Bradesco was one, that would be investigated first.   Mr. Cajado also commented that by expediting the proceedings, the Federal Police planned to "close [the] taps" and prevent further diversion of public funds.

118.   After continuing their investigation into the scheme and their review of the evidence collected, on May 31, 2016, the Federal Police indicted Bradesco executives Trabuco, Abreu and Angelotti.

119.   Based on the information in the indictment and the police report compiled by the Federal Police, the MPF filed the Criminal Complaint against Trabuco, Abreu, Angelotti, Teixeira, Leite, Pagnozzi, Tamazato, Victor, Nascimento, and Salazar on July 27, 2016.   The Criminal Complaint alleges that the Individual Defendants committed the crime of active corruption and provides specific facts and details evidencing these crimes.   As set forth in the applicable provision of the Brazilian Criminal Code which defines the crime of active corruption, Article 333, it is illegal "[t]o offer or promise an undue advantage to a public official, for him to conduct, omit or delay an official act."   The Criminal Complaint also contained information and details regarding the aspects of Bradesco's tax bribery scheme that occurred between 2004 and 2015.

120.   Also on July 27, 2016, the Federal District Court in Brazil accepted the Criminal Complaint filed against Trabuco, Abreu, Angelotti, Teixeira, Leite, Pagnozzi, Tamazato, Victor, Nascimento, and Salazar.   The Brazilian court's acceptance of the Criminal Complaint indicates that the court found just cause to prosecute the criminal action.

121.    In the decision accompanying the Brazilian court's acceptance of the Criminal Complaint, Judge Oliveira noted that, while the accused were still entitled to present their defense, "in this initial evaluation, there is no relevant clear piece of evidence capable of invalidating the accusation."

122.    As a result of Operation Zealots, CARF proceedings were suspended for much of 2015 and only resumed in December 2015 after the enactment of sweeping reforms aimed at inhibiting similar illicit conduct in the future.

### C.    A Brazilian Federal Judge Hinders the Progress of Operation Zealots

123.    Despite the magnitude of the scandal, the MPF and Federal Police faced an uphill battle in investigating the crimes committed by the Defendants, among others, and securing the evidence necessary to file indictments and complaints.  Specifically, the Brazilian Federal Judge who was initially overseeing the Operation Zealots proceedings, Judge Ricardo Augusto Soares Leite ("Judge Leite"), consistently hindered the investigation – so much so that the MPF filed a formal complaint with the internal affairs department of the Brazilian Federal Regional Court.

124.    Among the obstructionist actions cited by Federal Prosecutor Frederico Paiva was Judge Leite's refusal to grant any of the twenty-six requests filed by the MPF for temporary imprisonment of CARF councilors and ex-councilors and accounting and law firm employees. Temporary imprisonment of suspects is crucial to an investigation like Operation Zealots because it ensures that the police are able to take statements from the suspects before they can communicate with one another and agree upon common answers and stories.  Judge Leite also refused to lift the secrecy order and unseal the investigation and selectively rejected the MPF's requests to freeze the assets of the individuals under investigation.  In addition, Judge Leite rejected search and seizure requests from the Federal Police and, as mentioned above, similarly rejected the Federal Police's applications in late 2014 to extend the email monitoring and phone

wiretaps of the suspected criminals.  Significantly, Judge Leite's decision denying the Federal

Police's request to extend the wiretaps came just days after Leite's conversation with Pagnozzi,

wherein Pagnozzi relayed Trabuco's comment that "I'm glad you're here . . . helping the Bank."

This decision severely impeded the efforts of the Federal Police in gathering further evidence of

Defendants' illegal bribery schemes.

125.    As a result of the MFP's internal affairs complaint filed against Judge Leite, he

was removed from the case in August 2015 and was eventually replaced with Judge Oliveira.

### D.    The CARF CPI Succumbs to Improper Influence

126.    In the wake of the disclosure of the Operation Zealots investigation, a

Parliamentary Commission of Inquiry, known by its Portuguese-language acronym "CPI," was

formed by Brazil's House of Representatives to investigate the alleged manipulation of CARF

proceedings through the payment of bribes.  Notably, despite the evidence uncovered by the

Federal Police regarding Bradesco's participation in the scheme to bribe CARF officials,

Trabuco was never summoned to testify before the CPI.  One congressman explained that when

requests calling for the testimony of high-level bank executives, such as Trabuco, were made, the

CARF CPI session was emptied such that the requests could not be approved for lack of a

quorum.

127.    Further indicating illicit manipulation of the commission, two congressmen

participating in the investigation, including the vice president of the CARF CPI, have stated that

some members of the commission accepted bribes in exchange for agreeing not to seek

testimony from certain executives implicated in the scheme.  As additional evidence of improper

relationships between the CARF CPI members and the corrupt executives, one congressman who

lodged an "Independent Vote" pointed to the large sums donated by the companies implicated in

Operation Zealots, including Bradesco, to these CPI members' political campaigns.   This

congressman further stated that Trabuco was "systematically shield[ed]" from being called to testify.  The vice president of the CARF CPI similarly denounced the "calls to give testimony of Mr. Carlos Luis Trabuco . . . that have been systematically avoided."  A third congressman resigned from the CARF CPI, stating that he was "ashamed" that he was supposed to be a "representative of the people" in the proceeding and yet this CPI did not result in "absolutely anything."  In his formal resignation, the congressman also noted that not one "of those who actually practiced the crimes" was heard before the CPI and declared the commission "an embarrassment to [the] country."

128.    Unsurprisingly, the CARF CPI came to a close in August 2016 without reaching any conclusions or issuing a final report.  While the interim president, Waldir Maranhão, had approved an extension of the committee's term, Rodrigo Maia ("Maia") overruled this extension when he assumed the presidency three days later.  Notably, Maia's denial of the extension occurred on the same day that he had lunch with André Gerdau of the Gerdau Group, Defendant Trabuco and the interim President of Brazil, Michel Temer, at an event organized by the Instituto Talento Brasil.  Maia further determined that the last twenty-six days of the CPI would be dedicated only to voting on a final report, meaning that no additional testimony would be heard.  Following Maia's decision, Committee members delayed submitting the final report for voting in hopes of spurring an extension of the CPI term, but were not successful in their efforts.  This delay instead resulted in the CPI having insufficient time to vote on the final report, which recommended the indictment of certain Gerdau executives but said nothing about Bradesco.

### E.    Bradesco's CARF Connections

129.    On November 27, 2014, in the midst of Bradesco's CARF bribery scheme, Joaquim Levy ("Levy") was named by President Dilma Rousseff as Brazil's Minister of Finance – after Trabuco apparently turned down the appointment.  Levy subsequently took office

44

on January 1, 2015.   Prior to his appointment as Minister of Finance, Levy served as the managing director of Bradesco's subsidiary, Bradesco Asset Management, from 2010 to 2014. He remained on Bradesco's payroll through the end of 2014.  The Ministry of Finance, which is responsible for overseeing CARF, was involved in the Operation Zealots investigation.

130.     In early 2015, just before the announcement of Operation Zealots, Levy appointed Maria Teresa Martinez Lopes ("Martinez"), a Bradesco lawyer, as Vice President of CARF. Following her appointment, Martinez, a Bradesco employee for thirty-one years and a sitting CARF councilor for fifteen years, stated that she would continue her employment with the Company while also serving as Vice President of CARF.   The public immediately raised concerns that Martinez's dual roles – working for Bradesco while simultaneously adjudicating disputes lodged by taxpayers, such as Bradesco – created a conflict of interest.   CARF and Bradesco attempted to quell these concerns by citing to CARF procedures that would prohibit Martinez from voting in any proceeding in which Bradesco had an interest and Bradesco also noted that the Company's internal compliance policies similarly prohibited such a conflict. Notably, the internal CARF information contained in the "papers" that the Bribe Facilitation Group presented to Bradesco reflected that Martinez was originally part of the CARF Upper Chamber panel that would have heard Bradesco's appeal of the Lower Chamber decision.   The group assumed that she would recuse herself, but the CARF proceeding was terminated before she made such a recusal.

131.     Despite the reassurances from CARF and Bradesco about avoiding potential conflicts of interest, and in light of the allegations leveled against Bradesco in connection with Operation Zealots, Levy and Martinez's ties to the Company aroused public suspicion.   One commentator called for Levy's termination "before Brazil was handed over to Bradesco," even

going so far as to imply that Levy's connections to Bradesco amounted to treason. Levy resigned from his position as Minister of Finance on December 18, 2015. Martinez, however, continues to serve as Vice President of CARF and work at Bradesco.

### F. Defendants Deny Any Wrongdoing After Operation Zealots is Publicly Announced

132. Shortly after Operation Zealots was announced and Bradesco was implicated in the scheme, the Company began vehemently denying any wrongdoing on the part of its executives.

133. For example, Bradesco issued a press release on March 31, 2015, which it later filed with the SEC on a Form 6-K signed by Angelotti on April 10, 2015, responding to the March 28, 2015 *O Estado de São Paulo* article, which confirmed that Bradesco was one of the companies implicated in the CARF bribery scheme. In its response, the Company stated that "Bradesco informs that it does not know details concerning the investigative process related to the subject" and further "clarifie[d] that it adopts strict internal controls to ensure the compliance of its Anticorruption Corporate Policy and of its Code of Ethical Conduct, besides complying with the rules issued by Regulatory Bodies."

134. On June 1, 2016, in response to the May 31, 2016 announcement of the indictment of Trabuco, Angelotti and Abreu, Bradesco filed a Form 6-K with the SEC, stating that "[n]o proposal, hiring or payment have been implemented from these contacts [with the group], even because the tax pending issue was under the responsibility of renowned tax specialists." The Company also emphasized that "the lawsuit at CARF, object of the investigation, was tried in disfavor of Bradesco unanimously - 6 x 0, and is now submitted to the Judiciary." Finally, Bradesco stated:

The Company informs that it has never promised, offered or gave undue advantage to any person, including public employees, for submission of tax affairs or of any other nature.

The indictment takes by surprise the Bradesco's Management, considering that the two Officers were heard only as witnesses [during the Operation Zealots investigation] and the Company's CEO [never] [sic] has been heard or participated in any meeting with representatives of the tax advisory office.

Bradesco reiterates its high standards of ethical conduct and reaffirms its confidence in the full operation of Justice.

## VI.   DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS

135.   During the Class Period, Defendants made a series of false or misleading statements and omissions of material fact regarding:  (i) the Company's internal controls and disclosure controls and procedures; (ii) its Anti-Corruption Policy and procedures; (iii) its code of ethics; and (iv) the accuracy of its SEC and CVM filings.  In addition, Defendant Trabuco executed CEO Certifications and certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX") that were rendered materially false or misleading by the undisclosed bribery scheme.  Finally, Bradesco issued materially false or misleading statements denying any wrongdoing in response to disclosures concerning Operation Zealots.[3]

### A.   Internal Controls Statements

136.   Bradesco's 2011 Form 20-F stated as follows with respect to the Company's internal control over financial reporting:

(b) Management's annual report on internal control over financial reporting

Our Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Articles 13a-15(f) and 15d-15(f) under the Securities and Exchange Act of 1934 of the SEC.  ***Our internal control was designed to provide reasonable assurance regarding the reliability***

---

[3]   Unless otherwise noted herein, all quotes from Defendants in this Section are reproduced verbatim.

*of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.*

All internal control systems, no matter how well designed, have inherent limitations.  Therefore, even those systems determined to be effective may not prevent or detect misstatements.  Also, projections of any evaluation of efficacy for future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may decline.

Our Management made an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2011 based on criteria established by the Committee of Sponsoring Organizations of the Treadway Commission's (COSO) "Enterprise Risk Management - Integrated Framework."  Based on its evaluation and those criteria, *our management has concluded that our internal control over financial reporting was effective as of December 31, 2011.*

* * *

(d) Changes in internal control over financial reporting

There have been no changes in our internal control over financial reporting (as such term is defined in Articles 13a-15(f) and 15d-15(f) under the "Exchange Act of 1934" of the SEC) that occurred during the fiscal year ended December 31, 2011 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

137.    Bradesco's May 2012 Reference Form states with respect to the "level of efficiency of [internal controls used to ensure that reliable financial statements are prepared], indicating eventual deficiencies and actions taken to correct them" that "*[t]here were no such faults* and therefore no such measures taken on preparing the issuer's consolidated financial statements for the years ended on December 31, 2011, 2010 and 2009."

138.    Bradesco's 2012 Form 20-F states as follows with respect to the Company's internal control over financial reporting:

(b) Management's annual report on internal control over financial reporting

Our Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Articles 13a-15(f) and 15d-15(f) under the Securities and Exchange Act of 1934 of the SEC.  *Our internal control was designed to provide reasonable assurance regarding the reliability*

48

*of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.*

Our Management made an assessment of the effectiveness of our internal control over consolidated financial reporting as of December 31, 2012 based up on [sic] the framework "Enterprise Risk Management – Integrated Framework" established by the COSO and has **concluded that our internal control over financial reporting was effective.**

* * *

(d) Changes in internal control over financial reporting

There have been no changes in our internal control over financial reporting (as such term is defined in Articles 13a-15(f) and 15d-15(f) under the "Exchange Act of 1934" of the SEC) that occurred during the fiscal year ended December 31, 2012 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

139.    Bradesco's May 2013 Reference Form states that:

The Management evaluated the effectiveness of internal controls related to consolidated financial statements dated of December 31, 2012, and **concluded with a reasonable level of assurance that internal controls are efficient and effective to ensure the information integrity**, and that no significant deficiencies or material weaknesses have been identified.

140.    Bradesco's 2013 Form 20-F states as follows with respect to the Company's

internal control over financial reporting:

(b) Management's annual report on internal control over financial reporting

Our Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Articles 13a-15(f) and 15d-15(f) under the Securities and Exchange Act of 1934 of the SEC. **Our internal control was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.**

Our Management made an assessment of the effectiveness of our internal control over consolidated financial reporting as of December 31, 2013 based upon the framework "Enterprise Risk Management – Integrated Framework" established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and has **concluded that our internal control over financial reporting was effective.**

* * *

(d) Changes in internal control over financial reporting

There have been no changes in our internal control over financial reporting (as such term is defined in Articles 13a-15(f) and 15d-15(f) under the "Exchange Act of 1934" of the SEC) that occurred during the fiscal year ended December 31, 2013 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

141.    Bradesco's May 2014 Reference Form states:

[T]he Management evaluated the effectiveness of internal controls related to consolidated financial statements dated of December 31, 2013, and ***concluded with a reasonable level of assurance that internal controls are efficient and effective to ensure the information integrity***, and that no significant deficiencies or material weaknesses have been identified.

142.    Bradesco's 2014 Form 20-F states as follows with respect to the Company's

internal control over financial reporting:

(b) Management's annual report on internal control over financial reporting

Our Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Articles 13a-15(f) and 15d-15(f) under the Securities and Exchange Act of 1934 of the SEC. ***Our internal control was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.***

Our Management made an assessment of the effectiveness of our internal control over consolidated financial reporting as of December 31, 2014 based upon the 2013 framework "Enterprise Risk Management – Integrated Framework" established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and ***has concluded that our internal control over financial reporting was effective.***

* * *

(d) Changes in internal control over financial reporting

There have been no changes in our internal control over financial reporting (as such term is defined in Articles 13a-15(f) and 15d-15(f) under the "Exchange Act of 1934" of the SEC) that occurred during the fiscal year ended December 31, 2014 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

143.    Bradesco's May 2015 Reference Form states:

[T]he Administration has assessed the effectiveness of internal controls related to the consolidated financial statements closed in December 31, 2014, and **concluded, with reasonable certainty, that the internal controls are effective and efficient in order to ensure the completeness of the information**, whereas no significant deficiencies or material weaknesses have been identified.

144.    Bradesco's 2015 Form 20-F states as follows with respect to the Company's

internal control over financial reporting:

(b) Management's annual report on internal control over financial reporting

Our Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Articles 13a-15(f) and 15d-15(f) under the Securities and Exchange Act of 1934 of the SEC. **Our internal control was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.**

Our Management made an assessment of the effectiveness of our internal control over consolidated financial reporting as of December 31, 2015 based upon the 2013 framework "Integrated Internal Control Structure" established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and **has concluded that our internal control over financial reporting was effective.**

* * *

(d) Changes in internal control over financial reporting

There have been no changes in our internal control over financial reporting (as such term is defined in Articles 13a-15(f) and 15d-15(f) under the "Exchange Act of 1934" of the SEC) that occurred during the fiscal year ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

145.    Bradesco's May 2016 Reference Form states that:

[T]he Management has evaluated the effectiveness of internal controls related to the consolidated financial statements ended on December 31, 2015, and **concluded, with a reasonable degree of certainty, that the internal controls are effective and efficient to guarantee the integrity of information**, whereby no significant deficiencies or material weaknesses were identified.

146.    For the reasons set forth above in Section V, and as further detailed herein,

Bradesco's statements in ¶¶ 136-145 representing, among other things, that the Company's

internal controls over financial reporting were "designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements" and that these controls were "effective" during the Class Period were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because: (i) in violation of the Company's internal controls, Defendants were engaged in an eleven-year-long practice of paying illegal bribes in exchange for illegally obtained tax credits, which were then reflected in Bradesco's financial statements; and (ii) Bradesco's internal controls over financial reporting were ineffective and inadequately designed as evidenced by the fact that these controls, which remained unchanged from 2004 to 2016, had failed to prevent or detect the long-running bribery scheme committed by Defendants – let alone Bradesco's mischaracterization of the bribes as payments for "tax advice" – nor had they prevented the Company from reflecting in its financial statements tax credits that Defendants had unlawfully obtained as a result of this scheme.

147.    The ineffectiveness of the Company's internal controls in 2014 and 2015, and therefore the falsity of Defendants' statements in the 2014 and 2015 Forms 20-F and the May 2015 and May 2016 Reference Forms, is further evidenced by the fact that, from mid-2014 to early 2015, members of Bradesco's senior management were actively engaging in illegal conduct by negotiating the payment of bribes in exchange for favorable determinations in connection with:  (i) Administrative Tax Proceeding No. 16327.000190/2011-83; (ii) the Company's contemplated tax compensation request; and (iii) Bradesco's application for COFINS and PIS tax credits.

### B.    Anti-Corruption Statements

148.    On August 8, 2014, Bradesco filed a press release with the SEC on a Form 6-K signed by Angelotti.  In the Management Report section of this press release, the Board and the

Executive Board represent as follows with respect to "Preventing and Combating Corruption and

Money Laundering and the Financing of Terrorism":

> Bradesco adopts a ***formal and effective process for preventing and combating corruption and bribery***, supported by the Code of Ethical Conduct and by the Corporate Anti-Corruption Policy.  Cultural adaptation is accomplished through institutional communication and training programs, providing an effective monitoring of risks and controls.  Bradesco also has a complaint channel, whose actions configured as violations are subject to applicable disciplinary measures, regardless of hierarchical level, and without prejudice to appropriate legal penalties.

149.    Bradesco's 2014 Form 20-F states as follows with respect to "Prevention and

Fight again Corruption":

> ***We carry out procedures to prevent and fight any corruption acts on an ongoing and permanent basis***.  In 2014, we reinforced processes, procedures and training focused on the prevention and fight against corruption.
>
> Our Board of Directors approved ***the Corporate Anti-Corruption Policy, which establishes guidelines for the prevention and fight against corruption, applicable to management and employees of the Group***, comprising Bradesco and its controlled entities in Brazil and abroad.
>
> The Board of Directors also established the Corporate Anti-Corruption Rule, with ***rules and procedures aimed at preventing and fighting corruption and bribes***, in conformity with the legislation and regulations currently in force in Brazil and in the countries in which we have business units.
>
> The Anti-Corruption Program is supported by the Code of Ethics and by the Corporate Anti-Corruption Policy, and the actions developed also comprise managing business partners, contracting products and services and raising awareness in employees and partners through remote and in-person training as well as internal and external communications, thus, providing an effective monitoring of risks and controls.
>
> We also make available reporting channels in which any actions being construed as violations are subject to proper disciplinary measures, regardless of the hierarchy level involved, and without prejudice to any applicable legal penalties.

150.    Bradesco's 2015 Form 20-F states as follows with respect to "Prevention and

Fight against Corruption":

We continuously seek to *enforce measures with a view to preventing and fighting corruption and bribery*, thus *demonstrating our commitment towards operating our business and building and maintaining relationships in an ethical manner*.   The Program of Prevention and Fight against Corruption is supported by the Code of Ethical Conduct, by the Corporate Anti-corruption Policy and by the Ethical Conduct Committee, all approved by the Board of Directors.   The Anti-Corruption Corporate Standard, *with rules and procedures are aimed at the concession of gifts, sponsorships, donations, procurement and management of business partners, which aim to prevent and combat corruption and bribery*, in compliance with the laws and regulations in force in Brazil and in the countries in which we have business units.   We apply self-assessment (corporate, operational and administrative), which is one of the tools to ascertain the level of knowledge, understanding and implementation of the program, as well as subsidizing the actions for its dissemination.   In 2016, we will continue to implement measures aimed at improvement of the integrity program provided for by Law No. 12,846/13.   The main initiatives of such measures will be the review for the mapping of the risks of corruption and automated monitoring of concessions to third parties including, when applicable, public agents.

151.    For the reasons set forth above in Section V, and as further detailed herein, the statements in ¶¶ 148-150 regarding the Company's policies for "Preventing and Combating Corruption" and its "Prevention and Fight against Corruption" were materially false or misleading or omitted material facts necessary to make such statements not misleading because, at the time these representations were made to investors, Bradesco and its executives were attempting to pay illegal bribes in order to:  (i) secure a favorable result in Administrative Tax Proceeding No. 16327.000190/2011-83 and, in fact, had already engaged in illegal conduct by discussing and negotiating this bribe payment in mid-2014 and early 2015; (ii) obtain a favorable determination with respect to the Company's tax compensation request and, in fact, had already engaged in illegal conduct by discussing and negotiating this bribe payment in mid-2014 and early 2015; and (iii) obtain a favorable DEINF/SP determination with respect to Bradesco's application for COFINS and PIS tax credits and, in fact, had already engaged in illegal conduct by discussing and negotiating this bribe payment in late-2014 and early 2015.

### C.      Code of Ethics Statements

152.      In each of Bradesco's Class Period Forms 20-F, filed with the SEC, the Company

stated:

> *We have adopted a Code of Ethics* and Sectorial Codes of Ethics under the Securities Exchange Act of 1934, as amended. *Our Codes of Ethics apply to our Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and persons performing similar functions, to our directors, other officers,* employees, business partners, suppliers and service providers. Our Codes of Ethics Conduct are available on our website at www.bradesco.com.br/ir.

153.      The "Code of Ethical Conduct of the Bradesco Organization" applicable from the

start of the Class Period through January 26, 2014 states as follows:

> Integrity signifies the quality of righteousness, of correct and impartial conduct, adherence to which reflects honesty on our part. *It also signifies full respect for the laws of the Country and rules that govern the activities of our sector and of our Organization.*
>
> * * *
>
> *We must prohibit any granting of advantage or privilege to public servants.*
>
> *We must ensure compliance with our policies, rules and rigid controls for the prevention* and combating of money laundering, the financing of terrorism, *corruption and unlawful acts of any nature*, in strict compliance with applicable laws and in accordance with that best national or international practices, wherever applicable.
>
> * * *
>
> Any concern or complaint regarding any accounting matters or *fraud committed by the management and employees of the Bank* and its subsidiaries, or even by third parties, *must be brought to the attention of the Audit Committee*, which shall maintain the identity of the communicating individual and the information confidential.  In the event that accusations of this nature are made by a means of contact other than the Audit Committee, the matter shall be obligatorily communicated to it.

154.      For the reasons stated above in Section V, and as further detailed herein, the

foregoing statements in ¶¶ 152-153 that were contained in the Company's 2011, 2012 and 2013

Forms 20-F and Bradesco's operative code of ethics were materially false or misleading when

made or omitted material facts necessary to make such statements not misleading because, far from "prohibit[ing] any granting of advantage or privilege to public servants":  (i) the Company was engaged in an eleven-year-long scheme, executed by its officers, of paying illegal bribes to public servants in exchange for illegally-obtained tax credits, which were then reflected in Bradesco's financial statements; (ii) Defendants routinely violated the Company's code of ethics by engaging in this illegal conduct; and (iii) Defendants continuously violated the Company's code of ethics by concealing this illegal conduct.

155.   The "Code of Ethical Conduct of the Bradesco Organization" applicable from January 27, 2014 through June 28, 2015 states as follows:

Integrity means the quality of righteousness, of upright and impartial conduct, whose nature of action gives us an image of honesty.  *It also means total respect for the laws and rules that govern the activities of the sector and of our Organization.*

In this context, *is unacceptable any conduct that configure in attempt or practice of bribery or corruption, including concealment or dissimulation of the occurrence of such acts* or difficult the investigation or supervision of those facts.

Therefore, *it is forbidden to accept, obtain, finance, fund, grant, pay, promise, sponsor or authorize, directly or indirectly, any benefit, monetary or otherwise, in any way whatsoever, in favor or whoever that may represent improper relationship*.

* * *

*It is prohibited to promise, offer or give, directly or indirectly, benefit to the public servant or to a third-party related to him,* as well as to receive, whether on behalf of the Organization or whoever.

*We must ensure compliance with our policies, rules and controls for the prevention and combating of* money laundering, the financing of terrorism, *corruption and unlawful acts of any nature*, in strict compliance with applicable laws to the subject and according to the national and/or international best practices, where they are applicable.

* * *

> ***Facts related to any accounting aspects or frauds committed by managers and employees of the Bank*** and its subsidiaries, or by third parties, ***must be brought to the attention of the Audit Committee***, which will maintain the identity of the provider and the confidentiality of the information.  In the event that accusations of this nature are made by means other than the Audit Committee, the issue shall be mandatorily communicated to it.

156.    The "Code of Ethical Conduct of the Bradesco Organization" applicable from

June 29, 2015 through the end of the Class Period states as follows:

> Integrity means the quality of righteousness, of upright and impartial conduct, whose nature of action gives us an image of honesty.  ***It also means total respect for the laws and rules that govern the activities of the sector and of our Organization.***

> In this context, ***it is considered unacceptable any conduct that configure in attempt or practice of bribery or corruption, including concealment or dissimulation of occurrence of such acts*** or, also, to difficult the investigation or supervision of those facts.

> Therefore, ***it is forbidden to accept, obtain, finance, fund, grant, pay, promise, sponsor or authorize, directly or indirectly, any benefit, monetary or otherwise, in any way whatsoever, in favor or whoever that may represent improper relationship.***

> * * *

> ***It is prohibited to promise, offer or give, directly or indirectly, benefit to the public servant or to a third-party related to him***, as well as to receive, whether on behalf of the Organization or whoever.

> ***We must ensure compliance with our policies, rules and controls for the prevention and combating of*** money laundering, the financing of terrorism, ***corruption and unlawful acts of any nature***, in strict compliance with applicable laws to the subject and according to the national and/or international best practices, where they are applicable.

> * * *

> ***Facts related to any accounting aspects or frauds committed by managers and employees of the Bank*** and its subsidiaries, or by third parties, ***must be brought to the attention of the Audit Committee***, which will maintain the identity of the provider and the confidentiality of the information.  In the event that accusations of this nature are made by means other than the Audit Committee, the issue shall be mandatorily communicated to it.

157.    For the reasons stated above in Section V, and as further detailed herein, the foregoing statements in ¶¶ 152 and 155-156 that were contained in the Company's 2014 and 2015 Forms 20-F and Bradesco's operative code of ethics were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because, at the time these representations, including the Company's claimed prohibition on paying "any benefit, monetary or otherwise" to public servants, were made to investors:  (i) the Company was engaged in an eleven-year-long scheme, executed by its officers, of paying illegal bribes to public servants in exchange for illegally-obtained tax credits, which were then reflected in Bradesco's financial statements; (ii) Defendants routinely violated the Company's code of ethics by engaging in this long-running bribery scheme; and (iii) Defendants continuously violated the Company's code of ethics by concealing this bribery scheme from investors.

158.    In addition, these statements were also materially false or misleading because, at the time such statements were made, Bradesco and its executives were violating the Company's code of ethics by attempting to pay illegal bribes in order to:  (i) secure a favorable result in Administrative Tax Proceeding No. 16327.000190/2011-83 and, in fact, had already engaged in illegal conduct by discussing and negotiating this bribe payment in mid-2014 and early 2015; (ii) obtain a favorable determination with respect to the Company's tax compensation request and, in fact, had already engaged in illegal conduct by discussing and negotiating this bribe payment in mid-2014 and early 2015; and (iii) obtain a favorable DEINF/SP determination with respect to Bradesco's application for COFINS and PIS tax credits and, in fact, had already engaged in illegal conduct by discussing and negotiating this bribe payment in late-2014 and early 2015.

### D.    Disclosure Controls Statements

159.    Each of Bradesco's Class Period Forms 20-F contained the following representation regarding the Company's disclosure controls and procedures:

(a) Disclosure controls and procedures

As of December 31, [xxxx], evaluations of the effectiveness of our disclosure controls and procedures (as defined in Articles 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 of the SEC) were carried out under the supervision of our Management, including our Chief Executive Officer and Chief Financial Officer.   There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, and it may not prevent or identify deficiencies.   Accordingly, even effective disclosure controls and procedures can only provide reasonable assurance of achieving their control objectives.

Based upon the evaluation referred to above, our Chief Executive Officer and Chief Financial Officer concluded, subject to the limitations noted above, that for the period covered by this annual report, *our disclosure controls and procedures were adequate and effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act of the SEC is recorded, processed, summarized and disclosed* within the time periods specified in the applicable rules and forms, and that it is accumulated and communicated to our Management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

160.   For the reasons stated above in Section V, and as further detailed herein, Bradesco's statements in ¶ 159 representing that the Company's "disclosure controls and procedures were adequate and effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act of the SEC is recorded, processed, summarized and disclosed" were materially false or misleading when made or omitted material facts necessary to make such statements not misleading.   In truth, Bradesco's disclosure controls and procedures were inadequate and ineffective as evidenced by: (i) the fact that the Company's Class Period representations, regarding, for example, its internal controls and compliance with SEC regulations, omitted and concealed Bradesco's eleven-year-long practice of paying illegal bribes in exchange for tax credits – credits which were then reflected in the Company's financial statements; and (ii) the fact that Bradesco's Class Period Forms 20-F did not contain the information required by Item 3 (*see* ¶¶ 166-167).

161.    The ineffectiveness of the Company's disclosure controls and procedures in 2014, 2015 and 2016 is further evidenced by:  (i) Defendants' representations in Bradesco's 2014 and 2015 Forms 20-F regarding the Company's internal controls and compliance with SEC regulations; and (ii) the Company's statements in its 2015 and 2016 Forms 6-K concerning Defendants' involvement in the illegal conduct targeted by Operation Zealots, each of which was materially false or misleading in light of Bradesco's negotiation of the payment of illegal bribes in exchange for favorable determinations in connection with:  (a) Administrative Tax Proceeding No. 16327.000190/2011-83; (b) the Company's contemplated tax compensation request; and (c) Bradesco's application for COFINS and PIS tax credits.

### E.    Statements in SOX Certifications

162.    Bradesco's Class Period Forms 20-Fs each contain the following signed and sworn "CEO Certification" pursuant to SOX:

I, Luiz Carlos Trabuco Cappi, certify that:

1.    I have reviewed this annual report on Form 20-F of Banco Bradesco S.A.;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.    Based on my knowledge, the financial statements and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.    The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a)    ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its***

*consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.      *The company's other certifying officer and I have disclosed*, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)     *Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting*.

163.    Bradesco's Class Period Forms 20-F also contain the following additional

certification pursuant to SOX, signed by Trabuco:

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), the undersigned officer of Banco Bradesco S.A. (the "Company"), *does hereby certify, to such officer's knowledge, that the annual report on Form 20-F for the year ended December 31, 2014 of the Company (the "Form 20-F") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 20-F fairly presents, in all material respects, the financial condition and results of operations of the Company*.

164.    For the reasons stated above in Section V, and as further detailed herein, the foregoing statements in ¶¶ 162-163 made by Trabuco were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because:  (i) the Company was engaged in an undisclosed eleven-year-long practice of paying illegal bribes in exchange for illegally obtained tax credits, which were then reflected in Bradesco's financial statements; (ii) Bradesco's internal controls over financial reporting and disclosure controls were ineffective and inadequately designed as evidenced by the fact that these controls, which remained unchanged from 2004 to 2016, did not prevent or detect the long-running bribery scheme committed by Bradesco's management or the resulting impact of this scheme on Bradesco's financial statements; and (iii) Bradesco's Class Period Forms 20-F did not contain the information required by Item 3 (*see* ¶¶ 166-167).

165.    The statements in ¶¶ 162-163 that were contained in the Company's 2014 and 2015 Forms 20-F were also materially false or misleading or omitted material facts necessary to make such statements not misleading in light of:  (i) the Company's intention to pay a bribe in order to secure a favorable result in Administrative Tax Proceeding No. 16327.000190/2011-83 and the illegal conduct committed by Defendants in discussing and negotiating this bribe payment in mid-2014 and early 2015; (ii) Bradesco's intention to pay a bribe to obtain a favorable determination with respect to the Company's tax compensation request and the illegal conduct committed by Defendants in discussing and negotiating this bribe payment in mid-2014 and early 2015; and (iii) the Company's intention to pay a bribe in order to obtain a favorable DEINF/SP determination with respect to Bradesco's application for COFINS and PIS tax credits and the illegal conduct committed by Defendants in discussing and negotiating this bribe payment in late-2014 and early 2015.

**F.      Failure to Make Disclosures Required by Item 3 of Form 20-F**

166.    Item 3.D of Form 20-F requires filers to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk, in a section headed 'Risk Factors.'"  The instructions to Item 3.D state:  "Risk factors should be concise and explain clearly how the risk affects the issuer or the securities."

167.    Notwithstanding the disclosure requirement set forth in Item 3.D, in each of its Class Period Forms 20-F, Bradesco's Item 3.D disclosures were incomplete and therefore materially misleading because Defendants failed to disclose the following risks, each of which stemmed from Defendants' eleven-year-long practice of paying illegal bribes in exchange for tax credits:  (i) the risk that public disclosure of the bribery scheme would result in Bradesco's executives facing criminal charges in Brazil; (ii) the risk that public disclosure of the bribery scheme would result in the Company and/or its executives incurring fines and penalties related to the tax credits that Bradesco illegally obtained; (iii) the risk that public disclosure of the bribery scheme would result in the Company's liability pursuant to the Foreign Corrupt Practices Act of 1977 and/or other criminal or civil penalties in the United States; and (iv) the risk that public disclosure of the bribery scheme would result in a loss of investor confidence and a corresponding decline in the price of Bradesco PADS.

**G.      Statements Regarding Accuracy of Reference Form Information**

168.    Bradesco's Class Period Reference Forms each contain a statement by Trabuco and Angelotti declaring that "the set of information contained therein is a true, accurate, and complete description of the issuer's economic financial outcomes and of the risks inherent to its activities and securities issued."

169.    For the reasons stated above in Section V, and as further detailed herein, the foregoing statements in ¶ 168 from Bradesco's Class Period Reference Forms were materially

false or misleading when made or omitted material facts necessary to make such statements not misleading because the Company was engaged in an eleven-year-long practice of paying illegal bribes in exchange for illegally-obtained tax credits, which were then reflected in Bradesco's financial statements.   In addition, these statements were materially misleading in light of Bradesco's failure to disclose the following risks, each of which stemmed from Defendants' eleven-year-long practice of paying illegal bribes in exchange for tax credits:  (i) the risk that public disclosure of the bribery scheme would result in its executives facing criminal charges in Brazil; (ii) the risk that public disclosure of the bribery scheme would result in the Company and/or its executives incurring fines and penalties related to the tax credits that Bradesco illegally obtained; (iii) the risk that public disclosure of the bribery scheme would result in the Company's liability pursuant to the Foreign Corrupt Practices Act of 1977 and/or other criminal or civil penalties in the United States; and (iv) the risk that public disclosure of the bribery scheme would result in a loss of investor confidence and a corresponding decline in the price of Bradesco PADS.

170.    The statements in ¶ 168 contained in the Company's 2015 and 2016 Reference Forms were also materially false or misleading or omitted material facts necessary to make such statements not misleading because, from mid-2014 to early 2015, members of Bradesco's senior management were actively engaging in illegal conduct by negotiating the payment of bribes in exchange for favorable rulings in connection with:  (i) Administrative Tax Proceeding No. 16327.000190/2011-83; (ii) the Company's contemplated tax compensation request; and (iii) Bradesco's application for COFINS and PIS tax credits.

### H.    Defendants' False Denials Related to Operation Zealots

171.    In a press release issued on March 31, 2015, later filed with the SEC on a Form 6-K signed by Angelotti on April 10, 2015, Bradesco responded to the March 28, 2015 *O Estado*

*de São Paulo* article confirming that Bradesco was one of the large banks involved in the wrongdoing uncovered during Operation Zealots, by stating that "Bradesco informs that it does not know details concerning the investigative process related to the subject" and further "clarifie[d] that it **adopts strict internal controls to ensure the compliance of its Anticorruption Corporate Policy and of its Code of Ethical Conduct**, besides complying with the rules issued by Regulatory Bodies."

172.    On December 4, 2015, *O Estado de São Paulo* published an article concerning Operation Zealots and requested comment from Bradesco on whether the Company committed any of the alleged misconduct. In response to *O Estado de São Paulo*'s request for comment, Bradesco stated that it maintained its own legal structure, which was the only one authorized to represent the bank in legal proceedings, and that it did not contract any additional legal services provider. The Company went on to state that it "never conceded to, negotiated or had practiced acts in violation of the internal rules of compliance as well as the applicable laws of the Country."

173.    On May 31, 2016, in response to the indictment of Trabuco, Angelotti and Abreu, Bradesco issued a "Notice to the Market," stating that "**No proposal, hiring or payment have been implemented from these contacts [with the group]**, even because the tax pending issue was under the responsibility of renowned tax specialists." The Company also emphasized that "the lawsuit at CARF, object of the investigation, was tried in disfavor of Bradesco unanimously - 6 x 0, and is now submitted to the Judiciary." Finally, Bradesco stated:

> The Company informs that **it has never promised, offered or gave undue advantage to any person, including public employees, for submission of tax affairs or of any other nature**.
>
> The indictment takes by surprise the Bradesco's Management, considering that the two Officers were heard only as witnesses [during the Operation Zealots

investigation] and the Company's CEO [n]eve[r] has been heard or participated in any meeting with representatives of the tax advisory office.

***Bradesco reiterates its high standards of ethical conduct*** and reaffirms its confidence in the full operation of Justice.

174.   The Company subsequently filed this "Notice to the Market" with the SEC on a Form 6-K on June 1, 2016.  Bradesco's denial of wrongdoing was picked up and repeated by several news outlets, including *Reuters*, *The Wall Street Journal*, *Bloomberg* and *Financial Times*.

175.   In a Form 6-K filed with the SEC on June 9, 2016 and signed by Angelotti, Bradesco stated:  "we would like to take this opportunity to reiterate the clarifications provided in the Notice to the Market of May 31, 2016 [set forth in ¶ 174 above]."

176.   For the reasons stated above in Section V, and as further detailed herein, the foregoing statements in ¶¶ 171-175 denying illegal conduct by Bradesco and its executives in connection with tax proceedings, as well as the Company's reaffirmation of, among other things, its "Anticorruption Corporate Policy and of its Code of Ethical Conduct" and "high standards of ethical conduct," were materially false or misleading when made or omitted material facts necessary to make such statements not misleading because these statements are directly contradicted by evidence establishing that:  (i) Bradesco made numerous bribe payments between 2004 and 2007 in exchange for favorable determinations regarding the Company's applications for tax credits; and (ii) the Company continued to make bribe payments to Leite and also made bribe payments to Victor between 2007 and 2014.  In addition, when Operation Zealots was announced, Bradesco was in the midst of negotiating bribe payments in order to:  (i) secure a favorable result in Administrative Tax Proceeding No. 16327.000190/2011-83; (ii) obtain a favorable determination with respect to the Company's tax compensation request; and (iii) obtain a favorable DEINF/SP determination with respect to Bradesco's application for

COFINS and PIS tax credits.   Defendants violated Brazilian law by negotiating and paying bribes between 2004 and 2014, and by discussing and negotiating bribe payments between mid-2014 and early 2015.   The Company's reaffirmation of, among other things, its "Anticorruption Corporate Policy and of its Code of Ethical Conduct" and "high standards of ethical conduct," were materially false or misleading when made or omitted material facts necessary to make such statements not misleading for these same reasons.   Finally, the Company's representation that it did not contract with any additional legal services providers, like Pagnozzi and Tamazato, was materially false and misleading in light of, *inter alia*, their decade-long relationship with Pagnozzi and Tamazato whereby the Company illegally obtained tax advantages in exchange for bribes.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

177.   Bradesco and the Individual Defendants knowingly and/or recklessly made the materially false or misleading statements and omissions of material fact alleged herein.   Trabuco, Abreu and Angelotti were active, culpable, and primary participants in the fraudulent scheme. As alleged in more detail above in Section V, Defendants' scienter is evidenced by the following facts, among others:

i.   Bradesco paid at least R$2,717,000 (approximately $1,206,700) to Pagnozzi between 2004 and 2007 for supposed "tax advice," notwithstanding that the Company already had retained experienced tax counsel (*see* ¶¶ 63-72);

ii.   In exchange for the more than R$2,717,000 in bribes Bradesco paid to Pagnozzi (which flowed through to Leite) between 2004 and 2007, the Company received R$260,250,000 (approximately $103,673,000) in tax credits (*see* ¶¶ 63-72);

iii.   Following each of the bribe payments to Pagnozzi and Leite between 2004 and 2007, Bradesco received a favorable determination from Leite regarding the Company's request for tax credits (*see* ¶¶ 63-72);

iv.   At all relevant times, Leite was the Head of the Tax Guidance and Analysis Division at the DEINF/SP (*see* ¶ 33);

v.    Recorded telephone conversations confirm that in 2014, Leite stated that he was "was already someone known to [Defendants], with whom they personally interacted" and that Defendants "kn[e]w" him and knew that he was "a very transparent and determined person" who would "work very hard" (*see* ¶ 103);

vi.    According to records obtained by the Federal Police, Bradesco made 450 payments to Pagnozzi, totaling R$12,981,421.83 (approximately $5,200,000), from 2007 to 2015 and also made 148 payments to Victor, who specialized in the facilitation of bribes between CARF and taxpayers like Bradesco, between 2005 and 2013, totaling R$2,073,978.41 (approximately $830,000) (*see* ¶¶ 73-76);

vii.    In 2014, Defendants agreed to pay a bribe, and negotiated the bribe amount, in connection with tax credits and reimbursements in the amount of roughly R$1,000,000,000 (approximately $392,157,000) that – consistent with Defendants' prior dealings with Leite and Pagnozzi – Leite had identified, proposed and would approve once Bradesco applied for such credits (*see* ¶¶ 78-82);

viii.    Angelotti met with Tamazato and Pagnozzi on March 24, 2014 and August 12, 2014 to discuss the proposal provided by Leite and Pagnozzi regarding potential tax credits and reimbursements and to renegotiate the bribe percentage proposed by Leite and Pagnozzi (*see* ¶ 80);

ix.    In 2014, Defendants agreed to pay a bribe in connection with R$360,000,000 (roughly $144,000,000) in PIS and COFINS tax credits that – consistent with Defendants' prior dealings with Leite and Pagnozzi – Leite had identified, proposed and would approve once Bradesco applied for such credits (*see* ¶¶ 83-89);

x.    Pagnozzi, Tamazato and Leite discussed Bradesco's tax bribery schemes with Angelotti, Abreu and Trabuco during an October 9, 2014 in-person meeting at Bradesco's headquarters (*see* ¶¶ 881, 85, 100);

xi.    In discussing the scheme to obtain the R$360,000,000 in PIS and COFINS credits during the October 9, 2014 meeting at Bradesco's headquarters, Trabuco told Pagnozzi to "tell our friend [Leite] we are interested in hiring you to do this" (*see* ¶ 86);

xii.    During the October 9, 2014 meeting to discuss the CARF scheme, Defendants were offered something that Leite and Pagnozzi referred to as the "Midas Touch" – i.e., connections to and influence over the CARF councilor who "will make the decision [in Bradesco's] favor" (*see* ¶ 102);

xiii.    Abreu, Angelotti and Trabuco attended a meeting with Pagnozzi on November 12, 2014 to discuss Bradesco's tax bribery schemes (*see* ¶¶ 81, 86, 106-108);

xiv.    Leite, Pagnozzi, Tamazato and Angelotti met again on November 28, 2014 to discuss Bradesco's tax bribery schemes (*see* ¶¶ 89, 111);

xv.   Defendants agreed to pay a bribe in order to secure a favorable result in Administrative Tax Proceeding No. 16327.000190/2011-83 before CARF (*see* ¶¶ 90-113);

xvi.  During the November 12, 2014 meeting to discuss the CARF scheme, Trabuco told Pagnozzi, "I'm glad you're here . . . helping the Bank" (*see* ¶ 108);

xvii. Defendants again met with Pagnozzi on January 28, 2015 and on March 19, 2015 (*see* ¶ 111);

xviii. Following the announcement of Operation Zealots, Defendants did not consummate any of their ongoing negotiations with Leite and Pagnozzi, and promptly abandoned Bradesco's CARF appeal (*see* ¶¶ 82, 89, 113); and

xix.  In accepting the Criminal Complaint, Judge Oliveira concluded that "there is no relevant clear piece of evidence capable of invalidating the [charges] against [the Defendants]" (*see* ¶ 121).

178.   The scienter of Abreu and Angelotti is further evidenced by their statements to the Federal Police on April 1, 2015.   In his sworn statement, Angelotti admitted to attending meetings at Bradesco with Leite, Pagnozzi and Tamazato, including a meeting in October 2014 and a meeting following the November 12, 2014 Lower Chamber decision on Bradesco's CARF appeal.  Abreu, in his sworn statement, also admitted that he attended an October 2014 meeting at Bradesco with Pagnozzi, Tamazato and a man matching the physical description of Leite, which Angelotti provided.  Abreu further stated that, prior to this meeting, he met with Pagnozzi and possibly Tamazato towards the end of September 2014.   However, Abreu denied that Bradesco contracted with Pagnozzi and Tamazato for tax advisory services, stating that Bradesco has its own team of competent legal professionals to handle tax matters and that, as a general rule, the Company does not contract with outside advisors for tax services.

179.   The Individual Defendants were responsible for issuing the materially false or misleading statements and omissions of material fact alleged herein based upon:  (i) their actual issuance of and/or control over Bradesco's materially false or misleading statements; and (ii) their knowledge or reckless disregard of the fraudulent and criminal conduct described herein.

These senior executives made or had control over the statements alleged in Section VI herein, and each of them knew or recklessly disregarded that each of these statements was materially false or misleading and/or omitted material facts at the time it was made.

180.    Trabuco, as the Company's CEO, and Angelotti, as the Company's Head of Investor Relations, were in positions to control the contents of Bradesco's SEC and CVM filings, and in fact attested to the accuracy of these statements, as detailed above in ¶¶ 162-163, 168.

181.    As members of certain internal Bradesco committees, Abreu and Angelotti were involved in the preparation of the materially false or misleading statements set forth in Section VI.  Specifically, Abreu was a member of the Internal Controls and Compliance Committee, which was responsible for:  (i) evaluating the effectiveness and compliance of the Company's internal controls system; (ii) ensuring that the Company's internal control procedures complied with applicable rules, regulations and legislation; and (iii) submitting a semi-annual report to the Board regarding the Company's internal controls compliance.  Abreu and Angelotti both were members of the Executive Disclosure Committee, which was charged with:  (i) supporting Bradesco's senior management in appraising the disclosure of significant transactions and information relating to the Company; and (ii) examining reports in order to ensure that they are prepared in accordance with controls and procedures defined for their preparation.  In addition, Abreu was a member of the Statutory Committee for Ethical Conduct, also referred to as the Ethics Committee, which was charged with, among other things, "propos[ing] actions to ensure the enforcement of [Bradesco's] Corporate and Sector Codes of Ethics, and of the corporate policies, especially the Corporate Anticorruption Policy."

182.    By virtue of his membership on these three committees, Abreu not only was involved in the preparation of the materially false or misleading statements set forth in Section

VI regarding the Company's internal controls, code of ethics and Anti-Corruption Policy and the accuracy of its SEC and CVM filings, but he also knew or recklessly disregarded that these statements were materially false or misleading at the time they were made.  Similarly, due to his membership on the Disclosure Committee, Angelotti was involved in ensuring the accuracy of the Company's statements and therefore knew or recklessly disregarded that these statements were materially false or misleading at the time they were made.

183.    The scienter of the Individual Defendants is further established by their motive to conceal the tax bribery scheme from the public in order to avoid potential criminal liability, prosecution and imprisonment for their illegal conduct in negotiating and/or paying bribes to Pagnozzi, Leite and Victor.  Similarly, even after the illegal bribery scheme was revealed, the Individual Defendants had a motive to deny all of the allegations leveled in connection with the Brazilian criminal proceedings in an attempt to avoid criminal charges, convictions and imprisonment.

## VIII.   LOSS CAUSATION

184.    As alleged herein, Defendants engaged in a scheme to deceive investors by misrepresenting and omitting material facts concerning:  (i) the adequacy of Bradesco's internal controls and disclosure controls and procedures; (ii) risks faced by the Company; (iii) the Company's Anti-Corruption Policy and procedures and its code of ethics; (iv) the accuracy of Bradesco's SEC and CVM filings; and (v) Defendants' involvement in Bradesco's tax bribery scheme.  Defendants' materially false or misleading statements and omissions of material fact, alleged above in Section VI, caused the price of Bradesco PADS to be artificially inflated and operated as a fraud or deceit upon Class Period purchasers of Bradesco PADS.

185.    Lead Plaintiff and other Class members suffered actual economic loss and were damaged when the foreseeable risks of criminal investigation and prosecution created and

concealed by Defendants' misstatements and omissions materialized through the disclosure of new information concerning Bradesco on March 26, 2015, May 20, 2015, May 31, 2016, and July 27, 2016.   As alleged in this Section, these partial corrective disclosures and/or materializations of the foreseeable risks concealed by Defendants' fraud caused foreseeable declines in the price of Bradesco PADS by removing portions of the artificial inflation in the price of Bradesco PADS that resulted from Defendants' fraud.

186.   Specifically, before the market opened on March 26, 2015, the MPF announced the ongoing Operation Zealots investigation.   This announcement disclosed for the first time that the MPF was conducting an investigation into allegations of bribery related to certain CARF proceedings, and that the MPF's investigation had uncovered facts demonstrating that numerous companies, including Brazilian banks, had sought to bribe and/or bribed public officials, including CARF members, in exchange for favorable tax rulings.   Shortly after the MPF announcement, Brazilian news outlets, including *O Estado de São Paulo*, *Globo* and *Agência Brasil*, began to report on the disclosure of the Operation Zealots investigation.   These outlets noted that the companies targeted by the MPF included "large banks."   After the market closed on March 26, 2015, *Reuters* reported in the U.S. on the disclosure of the Operation Zealots investigation and published an article titled "Brazil uncovers multibillion-dollar tax fraud at Finance Ministry."   Among other things, the MPF's announcement and related news articles, revealed that:  (i) the MPF and Federal Police were investigating potential bribes offered and/or paid to Brazilian public officials related to tax liabilities that amounted to approximately R$19 billion (roughly $6 billion); (ii) Brazil's large banks were among the entities that the Federal Police and MPF were investigating for offering and/or paying the illegal bribes to Brazilian public officials, including CARF members; and (iii) the individuals at the corporations, including

Brazil's large banks, that were under investigation for offering and/or paying the illicit bribes to Brazilian public officials, could face criminal charges for their improper conduct, including charges for influence peddling, conspiracy, and other crimes of corruption.

187. The criminal investigation and potential forthcoming criminal charges against the scheme participants at large Brazilian banks like Bradesco revealed on March 26, 2015 were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misstatements and omissions. On this news, the price of Bradesco PADS declined from a close of $11.38 per share on the prior trading day, March 25, 2015 to a close of $8.86 per share on March 27, 2015. On an adjusted basis, after accounting for the impact of a stock bonus (whereby, holders of Bradesco PADS received two additional shares for every ten shares they held as of March 26, 2015) on the PADS' share price, the price of Bradesco PADS fell from a close of $8.62 on March 25, 2015 to a close of $8.05 on March 27, 2015.

188. As alleged above in Section VI, Bradesco issued a press release on March 31, 2015, which was later filed with the SEC on April 10, 2015 on a Form 6-K. In this press release, the Company denied knowledge of any details concerning the Operation Zealots investigation or the tax debts that the MPF and Federal Police were investigating. Bradesco also reiterated that it maintained strict internal controls to ensure compliance with anticorruption measures.

189. On May 20, 2015, Marlon Oliveira Cajado dos Santos, a representative of the Federal Police, appeared at a public hearing before a subcommittee of the Brazilian House of Representatives and announced that the Operation Zealots investigation would be spun off into separate, company-specific investigations in order to expedite the proceedings and provide an answer to the Brazilian people. According to Mr. Cajado, the Federal Police were identifying "priority" cases out of the 70 companies that would be investigated first. Mr. Cajado also

commented that by expediting the proceedings, the Federal Police hoped to "close [the] taps" and prevent further diversion of billions in public funds.  Mr. Cajado's statements were repeated by various news outlets on May 20, 2015, including *Brasil 24/7*, *EBC Agência Brasil* and *R7.com*.  A report by one news outlet, *Diálogos Políticos*, included a graphic adjacent to its headline specifically identifying Bradesco as one of the companies implicated by Mr. Cajado's comments.

190.    The new information regarding the division of the Operation Zealots investigation and the sequencing of "priority cases" revealed on May 20, 2015 was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' misstatements and omissions.  As a direct result of this partial corrective disclosure and/or materialization of the risks concealed by Defendants' fraud, the price of Bradesco PADS declined by $0.33 per share, or 3.6%, from a close of $10.08 per share on May 20, 2015, to a close at $9.71 per share on May 21, 2015.

191.    On May 31, 2016, the MPF announced that it had filed criminal charges against Defendants Trabuco, Angelotti, Abreu and others for their role in attempting to bribe and/or bribing Brazilian tax officials, including CARF members, in connection with a R$2.7 billion (approximately $1.2 billion) Bradesco CARF proceeding.

192.    More specifically, the MPF's May 31, 2016 announcement revealed new information concerning Defendants' tax bribery scheme, including:  (i) the identity of the Bradesco officials involved in the wrongdoing; (ii) confirmation of the amounts at issue in the subject Bradesco CARF proceeding; and (iii) the charges of influence peddling, corruption, racketeering, and money laundering with which Trabuco, Angelotti, and Abreu were charged, each of which was a foreseeable consequence of, and within the zone of risk concealed by Defendants' misstatements and omissions.  As a direct result of this partial corrective disclosure

and/or materialization of the risks concealed by Defendants' fraud, the price of Bradesco PADS declined by an additional 5.58%, from a closing price of $6.63 per share on May 27, 2016, to a closing price of $6.26 per share on the next trading day, May 31, 2016.

193.    Based upon these revelations, analysts issued reports attributing the decline in the prices of Bradesco securities, including the PADS, to the announcement of the criminal charges. For example, Scotiabank issued a May 31, 2016 report on Bradesco entitled "BBD's Stock Hit on News of CEO Indictment" that stated, among other things, that "the indictments are a negative for the stock."  Similarly, Deutsche Bank issued a May 31, 2016 report on the Company entitled "CEO and Two Other Executives Indicted by Federal Police," noting that the price decline in Bradesco's PADS in response to the new information issued that day raised questions concerning "the credibility of management."  Each of the foregoing analysts also noted that the Company issued a statement on May 31, 2016 in which Bradesco denied the alleged wrongdoing and claimed that Trabuco did not participate in any meetings with Brazilian officials to discuss manipulating the outcome of the Company's CARF proceeding.  News outlets also attributed the May 31, 2016 PADS price decline to the announcement of the indictment of Bradesco executives.  For example, a *Reuters* article published on May 31, 2016 titled "Bradesco stock slumps as CEO Trabuco accused in Brazil tax probe" noted that "[s]hares in Banco Bradesco SA, Brazil's No. 2 private-sector bank, posted their biggest intraday drop in almost seven months on Tuesday after the federal police accused Chief Executive Officer Luiz Carlos Trabuco and two senior executives of wrongdoing in a sweeping tax probe."

194.    Finally, on July 27, 2016, Judge Oliveira, Federal Judge of the Tenth Federal Court of the Judiciary Section of the Federal District of the Federative Republic of Brazil issued a decision in which the court accepted as sufficient the Criminal Complaint filed the same day

against Trabuco, Angelotti, Abreu and others.  As alleged above in Section V, in accepting the Criminal Complaint, Judge Oliveira determined that just cause existed to prosecute Trabuco, Angelotti, Abreu and others for the crimes of active and passive corruption.

195.    As a direct result of this partial corrective disclosure and/or materialization of the risks concealed by Defendants' fraud, the price of Bradesco PADS declined by an additional 4.81%, from a closing price of $8.73 per share on July 27, 2016, to a closing price of $8.31 per share on July 28, 2016.

196.    The material misrepresentations and omissions detailed above had the effect of causing the prices for Bradesco PADS to be artificially inflated throughout the Class Period. Lead Plaintiff and other Class members purchased or otherwise acquired Bradesco PADS at prices that were artificially inflated as a result of Defendants' misrepresentations and omissions of material fact alleged herein.

197.    Defendants' wrongful conduct directly and proximately caused the damages suffered by Lead Plaintiff and other Class members.  Throughout the Class Period, the prices at which Lead Plaintiff and other Class members purchased Bradesco's PADS were artificially inflated as a result of Defendants' materially false or misleading statements and omissions of material fact concerning:  (i) the adequacy of Bradesco's internal controls and disclosure controls and procedures; (ii) risks faced by the Company; (iii) the Company's Anti-Corruption Policy and procedures and its code of ethics; (iv) the accuracy of Bradesco's SEC and CVM filings; and (v) Defendants' involvement in Bradesco's tax bribery scheme.  Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Bradesco PADS at the artificially inflated prices that they paid.  It was entirely foreseeable to

Defendants that misrepresenting and concealing these material facts and risks from the public would cause the prices of Bradesco PADS to be artificially inflated.  It was also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Bradesco PADS to decline, as the inflation resulting from Defendants' earlier materially false or misleading statements and omissions of material fact was removed from the stock price.

198.    Accordingly, Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Lead Plaintiff and to the other members of the Class who purchased or otherwise acquired Bradesco PADS during the Class Period.

199.    The economic losses, i.e., damages, suffered by Lead Plaintiff and other Class members are direct and foreseeable results of:  (i) Defendants' materially false or misleading statements and omissions of material fact, which caused the price of Bradesco PADS to be artificially inflated; and (ii) the subsequent significant decline in the price of Bradesco PADS when the truth was gradually revealed and/or the risks previously concealed by Defendants' fraud gradually materialized on March 26, 2015, May 20, 2015, May 31, 2016, and July 27, 2016, removing portions of the artificial inflation from the price of Bradesco PADS.

## IX.    THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

200.    At all relevant times, the market for Bradesco's PADS was efficient for the following reasons, among others:

    i.    Bradesco's PADS met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient electronic stock market, under the symbol "BBD";

    ii.    As a registered and regulated issuer of securities, Bradesco filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

iii.   Bradesco regularly communicated with public investors via established market communication mechanisms, including conference calls, regular disseminations of press releases on the national circuits of major newswire services, the Company's website, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

iv.   Bradesco was followed by securities analysts employed by major brokerage firms, including Scotiabank, Deutsche Bank and UBS, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

201.   As a result of the foregoing, the market for Bradesco's PADS promptly digested current information with respect to Bradesco from all publicly-available sources and reflected such information in the price of these securities.  Under these circumstances, all purchasers of the Company's publicly-traded PADS during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies.

202.   Further, at all relevant times, Lead Plaintiff and other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Bradesco PADS at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

203.   The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged in this Complaint.

204.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

205.    To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.  As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and/or misleading statements.

206.    To the extent that the statutory safe harbor may apply to any materially false and/or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false and/or misleading forward-looking statement because at the time such statement was made, the speaker actually knew the statement was false, or the statement was authorized and/or approved by an executive officer of Bradesco who actually knew that the statement was false.

207.    Moreover, to the extent that Bradesco and/or the Individual Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading because they did not disclose that the risks that were the subject of such warnings had materialized and/or Bradesco and the Individual Defendants had actual knowledge of undisclosed material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

## XI.    CLASS ACTION ALLEGATIONS

208.    Lead Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all

persons and entities who purchased or otherwise acquired Bradesco PADS between April 30, 2012 and July 27, 2016, inclusive, and who were damaged thereby.  Excluded from the Class are (i) Defendants (as set forth herein), (ii) present or former executive officers of Bradesco, members of Bradesco's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii))), (iii) any of the foregoing individual's and entity's legal representatives, heirs, successors or assigns, and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of Bradesco.

209.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Bradesco PADS were actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members in the proposed Class.  As of June 30, 2016, Bradesco had approximately 720 million PADS outstanding and available for trading on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Bradesco and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

210.    Lead Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class purchased or otherwise acquired Bradesco PADS during the Class Period at artificially inflated prices and were similarly affected by Defendants' wrongful conduct that violated the federal securities laws, as complained of herein.

211.    Lead Plaintiff will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in class action and securities

litigation.  Lead Plaintiff has no interests that are adverse or antagonistic to the interests of other Class members.

212.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.  Lead Plaintiff knows of no difficulty that will be encountered in managing this litigation that would preclude maintaining it as a class action.

213.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

i.    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

ii.    Whether Defendants' statements to the investing public during the Class Period misrepresented and/or omitted material facts;

iii.    Whether and to what extent the market prices of Bradesco PADS, were artificially inflated and/or distorted during the Class Period due to the misrepresentations and/or omissions of material fact complained of herein;

iv.    Whether the Defendants named under Section 10(b) of the Exchange Act acted with scienter;

v.    Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the *Affiliated Ute* presumption; and

vi.    Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

214.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect

81

to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

215.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## XII.    CAUSES OF ACTION

<u>COUNT I</u>
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
<u>Thereunder Against Bradesco and the Individual Defendants</u>**

216.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is brought against Bradesco and the Individual Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class.

217.    During the Class Period, Bradesco and the Individual Defendants, while in possession of material adverse, non-public information, disseminated or approved the false or misleading statements and/or omissions alleged herein, which each defendant knew or recklessly disregarded were misleading in that they misrepresented material facts and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants carried out a plan, scheme and course of conduct that:  (i) deceived the investing public, including Lead Plaintiff and other Class members, as alleged herein, regarding the intrinsic value of Bradesco PADS; (ii) caused the price of Bradesco PADS to be artificially inflated; and (iii) caused Lead Plaintiff and other members of the Class to purchase Bradesco PADS at artificially inflated prices that did not reflect their

true value.  In furtherance of this unlawful scheme, plan and course of conduct, Bradesco and the

Individual Defendants took the actions set forth herein while using the means and

instrumentalities of interstate commerce and the facilities of a national securities exchange.

218.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that

they, individually and in concert, directly and indirectly, knowingly and/or recklessly:

(i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material

fact and/or omitted to state material facts necessary to make the statements made not misleading;

and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit

upon Lead Plaintiff and other members of the Class in connection with their purchases of

Bradesco PADS in an effort to maintain artificially high market prices during the Class Period

for Bradesco PADS in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   As

alleged herein, the material misrepresentations contained in, or the material facts omitted from,

Defendants' public statements included, but were not limited to, materially false and/or

misleading representations and omissions during the Class Period regarding, among other things:

(i) the adequacy of Bradesco's internal controls and disclosure controls and procedures; (ii) risks

faced by the Company; (iii) the Company's Anti-Corruption Policy and procedures and its code

of ethics; (iv) the accuracy of Bradesco's SEC and CVM filings; and (v) Defendants'

involvement in Bradesco's tax bribery scheme.

219.     Defendants are liable for all materially false or misleading statements and

omissions of material fact alleged above in Section VI.  By virtue of their high-level positions at

the Company during the Class Period, the Individual Defendants were authorized to make public

statements, and made public statements during the Class Period on Bradesco's behalf.  The

Individual Defendants were privy to and participated in the creation, development, and issuance

of the materially false or misleading statements alleged herein, and they and the Company disseminated information to the investing public that they either knew, or were reckless in not knowing, was materially false or misleading.

220.    In addition to the duties of full disclosure imposed on Defendants as a result of making affirmative statements and reports to the investing public, Defendants also had a duty to disclose information required to update and/or correct their prior statements, misstatements, and/or omissions, and to update any statements or omissions that had become false or misleading as a result of intervening events.   Further, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's PADS would be based on truthful, complete, and accurate information.

221.    Defendants' material misrepresentations and/or omissions were made knowingly, recklessly, and without a reasonable basis, for the purpose and effect of concealing from the investing public the relevant truth, and misstating the intrinsic value of Bradesco PADS.   By concealing material facts from investors, Defendants maintained artificially inflated prices for Bradesco PADS throughout the Class Period.

222.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Bradesco PADS was artificially inflated throughout the Class Period.   In ignorance of the fact that market prices of Bradesco PADS were artificially inflated, and relying directly or indirectly on the false or misleading statements made by Bradesco and the Individual Defendants or upon the integrity of the market in which the securities traded, and/or in the absence of material

adverse information that was known to or recklessly disregarded by Bradesco and the Individual Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Bradesco PADS during the Class Period at artificially inflated prices and were damaged thereby.

223. At the time of the material misrepresentations and/or omissions, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class known the truth regarding Bradesco's bribery schemes and the intrinsic value of Bradesco PADS, Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Bradesco PADS at the artificially inflated prices that they paid.

224. By virtue of the foregoing, Bradesco and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their purchases and/or acquisitions of Bradesco PADS during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

225. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of Lead Plaintiff and all other members of the Class.

226. During the Class Period, each of the Individual Defendants was a controlling person of Bradesco within the meaning of Section 20(a) of the Exchange Act. By reason of their high-level positions at Bradesco and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the materially false or misleading statements and

omissions of material fact in statements filed by the Company with the SEC and/or disseminated to the investing public, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including the content and dissemination of the various statements that Lead Plaintiff contends were materially false or misleading.   The Individual Defendants exercised day-to-day control over the Company and had the power and authority to cause Bradesco to engage in the wrongful conduct complained of herein.   In this regard, the Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be materially misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

227.    Each of the Individual Defendants was a direct participant in making, and/or made aware of the circumstances surrounding, the materially false and/or misleading representations and omissions during the Class Period regarding, among other things:   (i) the adequacy of Bradesco's internal controls and disclosure controls and procedures; (ii) risks faced by the Company; (iii) the Company's Anti-Corruption Policy and procedures and its code of ethics; (iv) the accuracy of Bradesco's SEC and CVM filings; and (v) Defendants' involvement in Bradesco's tax bribery scheme.   Accordingly, each Individual Defendant was a culpable participant in the underlying violations of Section 10(b) alleged herein.

228.    As set forth above, Bradesco violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.   By virtue of their positions as controlling persons of Bradesco and, as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with,

and to the same extent as Bradesco is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and other members of the Class who purchased or otherwise acquired Bradesco PADS during the Class Period at artificially inflated prices.

229.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of Bradesco PADS during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

### <u>JURY TRIAL DEMANDED</u>

Lead Plaintiff hereby demands a trial by jury.

Dated:  October 21, 2016                          Respectfully submitted,

                                                  /s/ *Andrew L. Zivitz*
                                                  Andrew L. Zivitz (admitted *pro hac vice*)
                                                  Johnston de F. Whitman, Jr.
                                                  Richard A. Russo, Jr. (admitted *pro hac vice*)
                                                  Margaret E. Onasch (admitted *pro hac vice*)
                                                  **KESSLER TOPAZ MELTZER**
                                                  **  & CHECK LLP**
                                                  280 King of Prussia Road
                                                  Radnor, PA  19087
                                                  Telephone:  (610) 667-7706

Facsimile:  (610) 667-7056

*Lead Counsel for Public Employees'
Retirement System of Mississippi and the
Class*

**LABATON SUCHAROW LLP**
Michael W. Stocker
Francis P. McConville
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 21, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

/s/ *Andrew L. Zivitz*
Andrew L. Zivitz