USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/29/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                     :

In re BANCO BRADESCO S.A. SECURITIES     :              1:16-cv-4155-GHW
LITIGATION.                                        :

                                                     :            OPINION AND ORDER

------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

      In 2013, an anonymous letter was delivered to the headquarters of the Brazilian Federal

Police detailing a widespread practice of corporate bribery of Brazilian tax officials. That letter

prompted the Brazilian authorities to open a multi-year investigation into more than seventy

Brazilian industrial, agricultural, civil engineering, and financial institutions known as "Operation

Zealots." On May 31, 2016, Defendants Luiz Carlos Trabuco Cappi, Domingos Figueiriedo de

Abreu, and Luiz Carlos Angelotti, each senior executives of Defendant Banco Bradesco S.A., were

indicted by the Brazilian Federal Police on charges of violating Brazilian anti-corruption laws

through an alleged scheme to unlawfully influence the outcome of proceedings pending before a

Brazilian tax tribunal.

      Lead Plaintiff Public Employees' Retirement System of Mississippi alleges that Defendants

made a number of statements that, in light of the alleged misconduct underlying those criminal

charges as well as earlier uncharged bribery schemes, were false or misleading in violation of the

Securities Exchange Act of 1934. Defendants have moved to dismiss the operative complaint on

several grounds. In addition, Defendant Abreu has moved to dismiss the claims against him for lack

of personal jurisdiction. For the reasons that follow, Defendants' motion to dismiss is GRANTED

IN PART and DENIED IN PART.

## I.    BACKGROUND[1]

This putative class action arises indirectly out of Operação Zelotes ("Operation Zealots"), a multi-year investigation by Brazilian authorities into allegedly widespread corporate bribery of Brazilian tax officials.  As a result of Operation Zealots, Defendants Luiz Carlos Trabuco Cappi ("Trabuco"), Domingos Figueiredo de Abreu ("Abreu"), and Luiz Carlos Angelotti ("Angelotti") (collectively, the "Individual Defendants"), each senior executives of Defendant Banco Bradesco S.A. ("Bradesco" or the "Company"), were indicted by the Brazilian Federal Police on May 31, 2016 on charges of violating Brazilian anti-corruption laws through an alleged scheme to unlawfully obtain favorable tax treatment and tax rulings for Bradesco.

Lead Plaintiff, the Public Employees' Retirement System of Mississippi ("Plaintiff") brings this lawsuit under Section 10(b) of the Securities Exchange Act ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder, as well as under Section 20(a) of the Exchange Act, on behalf of itself and a putative class of purchasers or acquirers of preferred American Depositary Shares ("PADS") of Bradesco between April 30, 2012 and July 27, 2016 (the "Class Period").[2]  Plaintiff filed an amended complaint on October 21, 2016, naming Bradesco, Trabuco, Abreu, and Angelotti as defendants.  ECF No. 45.  Defendants filed a motion to dismiss the amended complaint on

---

[1] Unless otherwise noted, the facts are taken from the amended class action complaint, and are accepted as true for the purposes of this motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In the amended complaint, Plaintiff represents that, where allegations are not made on personal knowledge, they are made on information and belief based upon, "among other things, the ongoing investigation that court-appointed Lead Counsel is conducting under Lead Plaintiff's supervision," which includes review and analysis of (i) documents filed by Bradesco with the SEC and the Brazilian Comissão de Valores Mobiliários ("CVM"); (ii) securities analysts' reports about Bradesco; (iii) transcripts of Bradesco conference calls; (iv) Bradesco press releases; (v) media reports, including those published in the U.S. and in Brazil, concerning Bradesco and "Operation Zealots"; and (vi) documents, criminal complaints, and other evidence submitted by Brazilian prosecutors and other governmental authorities in Brazilian court proceedings. Am. Compl. at 1.

[2] This action was initially filed by purported Bradesco ADS purchaser William Bryan on June 3, 2016.  ECF No. 1.  In accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(3), the Court received motions by members of the putative class for appointment as lead counsel.  Following full briefing, the Court, by order dated August 15, 2016, appointed the Public Employees' Retirement System of Mississippi as lead plaintiff and approved its choice of lead counsel and liaison counsel.  ECF No. 24.  The operative amended class action complaint was then filed on October 21, 2016.  ECF No. 45.

December 23, 2016, ECF No. 63, Plaintiff filed an opposition on February 3, 2017, ECF No. 69, and Defendants filed a reply on March 3, 2017, ECF No. 73.

A summary of the factual allegations pleaded in the amended complaint follows.

## A.  The Parties

Defendant Banco Bradesco S.A. is one of the largest banks in Brazil.  Am. Class Action Compl. (ECF No. 45) ("amended complaint" or "AC") ¶ 23.  It provides a variety of commercial banking services, including loans and deposit-taking, credit card issuance, insurance, leasing, payment collection and processing, asset management, and brokerage services.  *Id.*  Bradesco has a number of subsidiaries that operate in the insurance and asset management industries, including Grupo Bradesco Seguros, Bradesco Seguros S.A., Bradesco Asset Management, and Bradesco BBI.  *Id.*  Bradesco's common and preferred shares are listed and traded on the Bolsa de Valores de São Paulo ("BOVESPA"), and its common and preferred American Depositary Shares ("CADS" and "PADS," respectively) are listed and traded on the NYSE.  AC ¶¶ 24-25.  Bradesco is subject to reporting requirements of both the SEC and its Brazilian equivalent, the Comissão de Valores Mobiliários ("CVM").  AC ¶ 26.

Defendant Luiz Carlos Trabuco Cappi is Bradesco's Chief Executive Officer and Vice President of its Board of Directors.  AC ¶ 29.  Prior to his appointment as CEO on March 10, 2009, Trabuco had served as Bradesco's Vice President since March 1999.  *Id.*

Defendant Luiz Carlos Angelotti is Bradesco's Managing Officer and Investment Relations Officer and is a member of its Executive Board.  AC ¶ 30.  Angelotti was elected to the position of Managing Officer in January 2012 and served on Bradesco's Executive Committees for Disclosure and Corporate Governance from 2012 to 2016.  AC ¶ 30.  According to the amended complaint, he was also responsible for the Company's "Tax Audit, General Accounting, Social and Environmental Responsibility, as well as its Planning, Budgeting and Control areas during the Class Period."  *Id.*

Prior to his appointment as Managing Officer, Angelotti served as Department Officer from 2002 to 2010, and then as Deputy Officer from 2010 to 2012. *Id.*

Defendant Domingos Figueiredo de Abreu is Bradesco's Executive Vice President and is also a member of the Company's Executive Board. AC ¶ 31. Abreu served on the Company's Statutory Committees for Ethical Conduct and Internal Controls and Compliance, and its Executive Committees for Disclosure and Corporate Governance from 2012 to 2016. *Id.*

According to the amended complaint, each of the Individual Defendants was "named as a defendant in the Criminal Complaint for his role in Bradesco's tax bribery scheme." AC ¶¶ 29-31. Plaintiff alleges that Trabuco and Angelotti made a series of false or misleading statements in SEC and CVM filings during the Class Period, while Abreu made one false or misleading statement in an SEC filing and, "by virtue of" his committee membership, "was involved in the preparation and review of the false or misleading statements in Bradesco's SEC and CVM filings." *Id.*

### B. Bradesco's Alleged Unlawful Scheme

According to the amended complaint, Operations Zealots revealed "that Bradesco had been engaged in an eleven-year scheme, beginning in 2004, to improperly influence the outcome of tax adjudications with billions of Brazilian Reais at stake." AC ¶ 60. The relevant cast of characters in the alleged scheme includes Eduardo Cerqueira Leite ("Leite"), Mario Pagnozzi Junior ("Pagnozzi"), and José Teruji Tamazato ("Tamazato") (collectively, the "Bribe Facilitation Group"), as well as a number of other non-parties. Leite served as an auditor at the Federal Revenue Service of Brazil ("FRS"). *Id.* ¶¶ 4, 33. Specifically, he was the Head of the Tax Guidance and Analysis Division at the Delegacia Especial de Receita Federal de Instituições Financeiras em São Paulo ("Specialized Office for Financial Institutions in São Paulo" or "DEINF/SP"), an administrative body within the FRS with responsibility for taxation, collection and recovery, as well as verification with respect to financial institution taxpayers. AC ¶ 33. Leite, who was also named in the Brazilian criminal complaint, is alleged in the amended complaint to have "facilitated Bradesco's efforts to influence

the outcome of" proceedings before CARF, the appellate body responsible for adjudicating tax disputes in Brazil, and to have been "instrumental in Bradesco's tax bribery scheme, including his role in making determinations favorable to Bradesco in various actions before the DEINF/SP, in exchange for bribes." *Id.*

Pagnozzi is a Brazilian businessman and lawyer affiliated with Pagnozzi, Calazans & Associados Consultoria Empresarial Ltda., which "purportedly provided 'tax advice' to Bradesco." AC ¶ 34. Plaintiff alleges that Pagnozzi, who was also named in the Brazilian criminal complaint, "served as an intermediary for Bradesco's illicit actions, facilitating bribe payments from the Company and the improper provision of confidential information to the Company at both the DEINF/SP and CARF levels." *Id.*

Tamazato, who was also named in the criminal complaint, is a business partner of Pagnozzi's at Pagnozzi, Calazans & Associados, where he serves as an accountant and "client winner." AC ¶ 35. Tamazato "worked with Pagnozzi to facilitate Bradesco's payment of bribes in exchange for the improper provision of confidential information as well as favorable determinations in various tax proceedings." *Id.*

Mário da Silveira Teixeira Júnior ("Teixeira") was a member of Bradesco's Board of Directors from 2002 to 2015. AC ¶ 41. He served on the Company's Statutory Committee for Internal Controls and Compliance and acted as it Coordinator from 2012 to 2015. *Id.* Also named in the criminal complaint, Teixeira allegedly attended at least one meeting between the Individual Defendants, Leite, and Pagnozzi, where he "encouraged the Bradesco attendees to pay for the 'services' that Leite and Pagnozzi were offering." *Id.*

Jorge Victor Rodrigues ("Victor") is a former FRS auditor and CARF councilor. In addition to being named in the criminal complaint, Victor "has also been implicated in CARF bribery schemes involving Banco Safra, Santander[, and] other Brazilian companies." AC ¶ 37.

Otacilio Cartaxo ("Cartaxo") was the President of CARF from the middle of 2011 until January 2015, prior to which he was Secretary of the FRS from 2009 to 2011. AC ¶¶ 11, 38.

Lutero Fernandes do Nascimento ("Nascimento") is a former FRS tax analyst and former Head of the Technical and Legal Advisory Service of CARF. He served as a legal adviser to Cartaxo as President of CARF in 2013 and 2014, and is also named in the criminal complaint. AC ¶¶ 11, 39.

Jeferson Ribeiro Salazar ("Salazar") is a former FRS auditor with experience presenting tax cases before CARF, and who, according to the amended complaint, "offered to help facilitate Bradesco's CARF proceeding." AC ¶¶ 11, 40. Salazar is also named in the criminal complaint. *Id.*

## 1. 2004 and 2007 Tax Credits

Plaintiff alleges that, on several occasions beginning in the early 2000s, Leite accessed confidential tax information related to Bradesco's prior tax filings, as well as information related to other financial institutions and relevant administrative tax proceedings in order to identify tax credits for which Bradesco could apply. AC ¶ 64. After acquiring that information, Leite provided it to Pagnozzi and worked with Pagnozzi to formulate a written proposal advising the Company to seek "lucrative tax credits." *Id.* Pagnozzi would present the proposals, which were allegedly referred to by Leite and Pagnozzi as "papers," to the Company, which, according to the amended complaint, agreed to pay Pagnozzi a percentage of the requested tax credit in return for a favorable determination in the ensuing tax proceedings. *Id.* The payments, which were "disguised as remuneration for 'tax advice,'" were passed on to Leite, who then made determinations in Bradesco's favor, "effectively approving his own recommendations." *Id.*

For example, on November 24, 2004, Pagnozzi and Leite proposed to Bradesco that the Company apply for corporate income tax ("IRPJ") and social contribution over net profits ("CSLL") credits for calendar years 2000 and 2001 based on a purported overpayment by the Company and related adjustments to its prior tax filings. AC ¶ 65. Utilizing confidential information that he accessed with his DEINF/SP credentials, the amended complaint alleges, Leite put together the

"papers" for Bradesco, "proposing how the Company could illegally obtain the tax credits in exchange for a bribe." AC ¶ 66. Leite reviewed Bradesco's 1995 and 1999 tax returns to "manufacture an overpayment for the 2000 and 2001 fiscal years, such that Bradesco would be able to claim IRPJ and CSLL credits in the amount of R$200,000,000 (approximately $73,260,000)."[3] *Id.* Pagnozzi then delivered the "papers"—"under the guise of providing 'tax advice'"—to Angelotti, who was responsible for the Company's "tax area." *Id.* Bradesco then paid Pagnozzi and Leite more than R$1,250,000 (approximately $458,000). *Id.* As alleged in the amended complaint, Bradesco "did exactly as Pagnozzi and Leite instructed" and instituted a tax proceeding (Administrative Tax Proceeding No. 16327.000683/2003-11) to seek approval of the IRPJ and CSLL credits described in the "papers." AC ¶ 67. Leite was responsible for approving Bradesco's request, which he did. *Id.*

Plaintiff describes a number of similar tax credit schemes in 2007, and alleges that "[b]etween 2004 and 2007, Bradesco and its subsidiary Banco Boavista paid Pagnozzi and Leite no less than R$2,717,000 (approximately $1,206,700) in bribes in exchange for more than R$260,250,000 (approximately $103,673,000) in illegally obtained tax credits." AC ¶¶ 68-72.

### 2. Bradesco's "Continued Payments" from 2007 to 2015

An expert report compiled by the Brazilian Federal Police "establishes that Bradesco made 450 payments to Pagnozzi, totaling R$12,981,421.83 (approximately $5,200,000), from 2007 to 2015." AC ¶ 73. In addition, Plaintiff alleges that evidence collected by the Federal Police shows that the Company "made more than 100 payments to" Victor, totaling R$2,073,978.41 (approximately $830,000). AC ¶ 74. According to the amended complaint, this evidence of "Bradesco's transfers to Victor and Pagnozzi" between 2007 and 2015 demonstrates that

---

[3] References to "R$" are to amounts in Brazilian Reais. AC at 1 n.1.

"Bradesco's bribe payments continued long after the 2007 payments made in connection with the Company's scheme to illegally obtain IRPJ and CSLL tax credits." AC ¶ 76.

### 3. Bradesco's 2014 Bribery Scheme

Plaintiff alleges that, in the course of Operation Zealots, the Federal Police uncovered "three separate bribery schemes that Bradesco put in place in 2014 to reap hundreds of millions of dollars in tax benefits," including (i) seeking tax credits and reimbursements of R$1,000,000,000 (approximately $600,000,000) based on taxes the Company paid from 2009 to 2014; (ii) requesting PIS and COFINS tax credits totaling R$360,000,000 (approximately $144,000,000); and (iii) manipulating a CARF tax appeal pertaining to R$2,736,809,135.03 (approximately $1,232,800,000) in tax credits and associated fines. AC ¶ 77.

### a. Alleged Scheme to Influence the Adjudication of a 2014 Tax Compensation Request

In addition to the above-described scheme to obtain tax credits at the DEINF/SP level, Defendants allegedly continued to pay Pagnozzi and Leite in a scheme related to a 2014 review of Bradesco's prior tax filings. AC ¶ 78. In a proposal dated March 24, 2014, sent to Angelotti by Pagnozzi's office and bearing Bradesco's stamp with the date of receipt, Pagnozzi proposed the "verification, review and study, relative to the last five (5) years, of all taxes . . . seeking to make feasible the reduction of [Bradesco's] current tax burden and the recovery of overpaid taxes." AC ¶ 79. According to the amended complaint, the proposal further provided that Bradesco would file a petition with the DEINF/SP seeking approval of tax credits and reimbursements "in the amounts that Leite had identified and proposed" (roughly R$1,000,000,000, or approximately $392,157,000), and that Leite, as head of the DEINF/SP's Guidance and Tax Analysis Division, would grant the petition. *Id.* The proposal also contemplated that Bradesco would pay 15% of any awarded credits or reimbursements at the DEINF/SP level to Leite and Pagnozzi. *Id.*

Plaintiff alleges that "Bradesco accepted the proposal, but sought to negotiate the amount of the bribe to Leite and Pagnozzi." *Id.* Pagnozzi and Tamazato met with Angelotti on March 24, 2014 and August 12, 2014 to discuss the proposal and renegotiate the "bribe percentage." AC ¶ 80. On August 14, 2014, Pagnozzi and Tamazato sent Angelotti a revised proposal for his review that reduced the percentage to 5-8% depending on the amount of the credit or reimbursement that Leite was able to secure for the Company. *Id.* During a November 12, 2014 telephone call that was intercepted and recorded by the Federal Police, Pagnozzi and Tamazato "revisited the bribe amount," noting that it had been negotiated down to 3% of the value of the expected credits. AC ¶ 81.

This scheme "was never completed due to the announcement of Operation Zealots in the spring of 2015." AC ¶ 82.

### b. Alleged Scheme to Manipulate PIS and COFINS Credits

According to the amended complaint, Defendants also agreed to pay bribes to Leite and Pagnozzi to obtain more than $100,000,000 in credits related to PIS and COFINS taxes, which are assessed on the basis of a company's gross revenues, irrespective of profits. AC ¶¶ 83-84. Pagnozzi and Leite proposed to Bradesco that it seek between R$1,500,000,000 (approximately $600,000,000) and R$360,000,000 (approximately $144,000,000) in potential tax credits. AC ¶ 84. As with the prior tax credit requests, "the Company" agreed to pay a bribe to Pagnozzi and Leite in exchange for a guaranteed favorable outcome. *Id.*

Pagnozzi, Tamazato, and Leite discussed this scheme with Angelotti, Abreu, and Trabuco during an October 9, 2014 in-person meeting at Bradesco's headquarters. AC ¶ 85. While Trabuco attended the meeting, he left shortly after greeting Pagnozzi, Tamazato, and Leite. *Id.* During a follow-up meeting on November 12, 2014 attended by Pagnozzi, Abreu, Angelotti, and Trabuco, Abreu told Pagnozzi that Bradesco was "going to close that deal" with Pagnozzi, Tamazato, and

Leite.  AC ¶ 86.  During the same meeting, Trabuco allegedly told Pagnozzi to "tell our friend [Leite] we are interested in hiring you to do this."  *Id.* (alteration in original).

Plaintiff alleges that Bradesco requested additional data concerning other companies that had made similar tax credit applications.  AC ¶ 87.  Leite used his DEINF/SP credentials to access confidential data, including information and documents protected by tax secrecy laws, as well as information Leite had obtained through a private consultation with an FRS attorney in connection with a separate matter.  AC ¶¶ 87-88.  He then used that information to put together a proposal for Bradesco purporting to explain why the Company was entitled to R$360,000,000 in PIS and COFINS credits.  AC ¶ 88.  Leite, Pagnozzi, Tamazato, and Angelotti met again on November 28, 2014 to further discuss the arrangement.  AC ¶ 89.

This scheme was also "never completed due to the announcement of Operation Zealots in the spring of 2015."  *Id.*

### c.  Alleged Scheme to Manipulate CARF Proceedings

Between October 2014 and March 2015, Angelotti and Abreu, "with Trabuco's and Teixeira's knowledge," also agreed to pay bribes to public servants in order to manipulate the outcome of a CARF proceeding concerning a R$2.7 billion (approximately $1.2 billion) Bradesco tax appeal.  AC ¶ 90.  The amount at stake in the appeal consisted of a R$1,824,539,423.40 (approximately $821,865,000) tax credit that had been disallowed and an associated fine of R$912,269,711.63 (approximately $410,932,000) that Bradesco had incurred in connection with the disallowance.  AC ¶ 91.

After the appeal was docketed as Administrative Tax Proceeding No. 16327.000190/2011-83 and distributed to the CARF, Bradesco and the Bribe Facilitation Group allegedly discussed how they could influence the members of the CARF panel to manipulate the outcome of the proceedings in the Company's favor.  AC ¶ 92.  According to the amended complaint, Bradesco could not rely on Leite for this endeavor, since he was not a CARF councilor.  *Id.*  Accordingly, the Company

enlisted the participation of two additional individuals: Nascimento and Victor. *Id.* Plaintiff alleges that Nascimento, an FRS tax analyst, Head of the Technical and Legal Advisory Service of CARF, and CARF President Cartaxo's "right hand," had the authority to draft CARF orders and decisions. *Id.* He also had access to internal confidential information and to the CARF computer systems, including the internal system for tracking the progression of proceedings. *Id.* In addition, Nascimento "had connections with the sitting CARF councilors and was intimately familiar with the internal workings of CARF." *Id.* Victor, the retired FRS auditor and CARF councilor "specializ[ed] in the trade of 'selling facilitations' within the FRS." AC ¶ 93. As relevant here, he "served as the go-between with Bradesco and Nascimento as [he] paid Nascimento and certain of his family members a monthly 'advance' of R$5,000 on the total amount of expected bribe payments." *Id.* Victor also had relationships with sitting CARF councilors. *Id.*

By July 30, 2014, Victor, Salazar, and Leite had scheduled a meeting in Brasilia with Nascimento. AC ¶ 94. Before the meeting, Leite again used his DEINF/SP credentials to access restricted, confidential information and view the current status of Bradesco's proceeding. *Id.* As alleged, Victor "also reminded Nascimento to bring his computer and his access token to the meeting so that they could run searches in the CARF internal systems to find information relevant to Bradesco's appeal." *Id.* Plaintiff alleges that Nascimento confirmed his attendance at this meeting to the Brazilian Federal Police, and that he told the Federal Police that the meeting "was set up so that Leite could evaluate Bradesco's chances of succeeding on appeal," and that "Victor mentioned to Nascimento that he would receive a percentage of Victor's bribe proceeds if Bradesco prevailed." *Id.*

With the CARF proceeding initially set for August 8, 2014, the Bribe Facilitation Group worked with Salazar, Victor, and Nascimento to "devise a plan to corrupt the CARF commissioners who were assigned to Bradesco's proceeding." AC ¶ 95. According to the amended complaint, they performed "due diligence" on each of the relevant CARF councilors and determined that Bradesco

11

was likely to lose in the first instance, before the CARF Lower Chamber. *Id.* An intercepted telephone conversation revealed that they had chosen to focus their efforts on achieving a reversal in the CARF Upper Chamber. *Id.*

Based on confidential information obtained from the internal CARF system, Nascimento informed "the group" that Bradesco's proceeding had been postponed from its original August 8, 2014 date. AC ¶ 96. On September 2, 2014, Victor met with Salazar, Leite, Pagnozzi, and Tamazato in São Paulo. AC ¶ 97. According to the criminal complaint, Plaintiff alleges, the attendees "discussed the need to 'stoke the fire' with Bradesco during the delay—i.e., to convince the Company to hire them so that everything could be 'stitched up' before the case was placed back on the Lower Chamber's agenda." *Id.*

The next day, Nascimento used his CARF credentials to obtain confidential information from the Ministry of Finance's restricted database regarding the status of Bradesco's proceeding and the composition of the panel that would hear its case. AC ¶ 98. Leite, Salazar, and Victor then set out to create the "papers" that they would present to Bradesco and which would allegedly "propos[e] a plan for manipulating the proceedings." AC ¶¶ 96, 98.

Shortly thereafter, on approximately September 14, 2014, Victor spoke with CARF councilor Fabíola Cassiano Keramidas ("Keramidas"). AC ¶ 99. During the earlier "due diligence" that had been conducted in August, the Bribe Facilitation Group, along with Salazar, Victor, and Nascimento had assessed that, although two of the relevant councilors were "tough to deal with," Keramidas was "not dangerous." AC ¶ 95. During the September conversation, Victor "directed Keramidas to request that the Lower Chamber trial be again postponed." AC ¶ 99. Plaintiff alleges that Keramidas lodged such a request and that the proceeding was moved to the agenda for the following month. *Id.*

Armed with the additional time, the confidential CARF information from Nascimento concerning the status of Bradesco's case and the composition of the panel, as well as the "papers"

they had prepared, the Bribe Facilitation Group met with Bradesco on October 9, 2014 at Bradesco's headquarters to "finalize the deal and present their proposal for how to influence the proceedings." AC ¶ 100. Angelotti, Abreu, and Trabuco attended the meeting on Bradesco's behalf, though "Trabuco left shortly after greeting" the members of the Bribe Facilitation Group. *Id.* At the meeting, the Bribe Facilitation Group provided the "papers" they had prepared and also discussed "the three possible outcomes of the Lower Chamber proceedings: (i) conversion of the trial into a diligence investigation," similar to what had occurred with another banking company; "(ii) further postponement of the trial, which the group could orchestrate for the Company; or (iii) an unfavorable Lower Chamber decision." AC ¶ 101.

During the October 9 meeting, the Bribe Facilitation Group also explained that they could offer Bradesco the ability to influence the outcome of the CARF proceedings, an advantage they described as the "Midas Touch." AC ¶ 102. Specifically, Cartaxo was the father-in-law of one of Victor's business partners, and the group planned to use that relationship to influence Cartaxo. *Id.* According to the amended complaint, the "Midas Touch" strategy was "especially important because, as mentioned in the 'papers,' if Bradesco lost before the Lower Chamber, one of the options would be to pursue a special appeal to the Upper Chamber, and the determination of this appeal would be decided by Cartaxo." *Id.*

Immediately after the October 9 meeting concluded, Leite reported to Salazar in an intercepted telephone call that "the meeting was very good" and that he believed that "it's going to pan out." AC ¶ 103. He also relayed that the Bradesco attendees were very interested in the "product" and stated that he "was already someone known to them, with whom they personally interacted." *Id.* According to this intercept, Leite told the attendees at the Bradesco meeting: "[Y]ou know me and know that I am a very transparent and determined person, I will work very hard and right now there are positives 'in our favor.'" *Id.*

As described in the amended complaint, Leite reiterated to Bradesco after the October 9 meeting that they could attempt to further delay the Lower Chamber proceedings, which were scheduled for October 14, 2014, but Bradesco opted to allow the proceedings to move forward.  AC ¶ 104-105.  As it turns out, however, the case was not heard on October 14, and was instead postponed until November 12, 2014, "once again at the request of councilor Keramidas, who Victor described as 'our friend.'"  AC ¶ 105.  On November 12, Pagnozzi met again with representatives of Bradesco.  AC ¶ 106.  During the meeting, Abreu questioned Pagnozzi regarding the different options Bradesco could pursue.  *Id.*  He also asked whether the Company would prevail on appeal to the CARF Upper Chamber in the event it lost in the Lower Chamber.  *Id.*  Trabuco, who attended the meeting only briefly, also asked for Pagnozzi's proposal on how to proceed if the case were remanded for a diligence investigation.  *Id.*

Bradesco lost its case before the CARF Lower Chamber by a unanimous 6-0 vote.  AC ¶ 107.  After learning of the adverse ruling, Plaintiff alleges, Abreu and Angelotti "accused the group of negatively influencing the trial."  *Id.*  Abreu "threatened to expose Leite and have him imprisoned, but Pagnozzi warned against this course of action, stating that it would only result in the Company making 'the greatest enemy on Earth.'"  *Id.*  Teixeira also joined the meeting briefly and "reinforced to Abreu and Angelotti the benefit of the 'services provided' by the group."  *Id.*

According to the amended complaint, while Trabuco did not attend the entire November 12, 2014 meeting, Pagnozzi confirmed to Leite in an intercepted telephone call the next day that Trabuco knew about Abreu's and Angelotti's dealings with the group.  AC ¶ 108.  During the brief period that Trabuco was at the meeting, he told Pagnozzi, "I'm glad you're here . . . helping the Bank," which Pagnozzi "understood to mean that Angelotti and Abreu were 'relaying' to Trabuco 'everything we're talking about.'"  *Id.*

Plaintiff alleges that "Bradesco and the group" quickly agreed on a strategy to challenge the adverse Lower Chamber ruling, and that Bradesco executed the first part of the strategy by filing a

Petition for Clarification, Rectification and Amendment with the Lower Chamber on December 16, 2014. AC ¶ 110. In the meantime, Victor and Nascimento began to research possible "paradigms"[4] to support an appeal of the Lower Chamber finding to the Upper Chamber. The amended complaint describes a series of additional meetings in the following months that allegedly "demonstrate that Defendants were continuing to move forward with the scheme": (i) a meeting between the Bribe Facilitation Group and Angelotti on November 28, 2014; (ii) a meeting between Pagnozzi and Leite, and then another meeting between Pagnozzi and "Bradesco" on January 28, 2015; and (iii) a meeting between Pagnozzi and "Bradesco" on March 19, 2015. AC ¶ 111.

Bradesco's tax lawyer, Leo Krakowiak, filed an appeal on behalf of the Company on March 18, 2015, and Bradesco intended to rely on the "Midas Touch" provided by the relationship with Cartaxo's son-in-law to ensure that the appeal would be deemed "admissible." AC ¶ 112. "In addition, Nascimento, as Cartaxo's right-hand man, would be responsible for examining the arguments and drafting the order of admissibility for the appeal." *Id.* However, once Operation Zealots was disclosed to the public on March 26, 2015, Bradesco abandoned its CARF appeal. AC ¶ 113.

### C. Operation Zealots Becomes Public

On March 26, 2015, the Brazilian Federal Police publicly disclosed certain information about the ongoing Operation Zealots investigation, including that seventy companies, including banks, were under investigation for bribing CARF members to obtain favorable rulings. AC ¶ 114. U.S. news outlets published articles on Operation Zealots after the market closed on that day. *Id.* On March 28, 2015, major Brazilian news outlet *O Estado de S. Paulo* ("*O Estado*") "confirmed that Bradesco was one of the large banks being investigated in Operation Zealots." AC ¶ 115.

---

[4] According to the amended complaint, a "'paradigm' refers to a previous CARF decision that an appellee may cite in an effort to strengthen its arguments or prove a specific point. However, an appellee is limited in terms of which prior decisions it can cite. In addition, the cited paradigms are examined at the threshold admissibility stage, rather than at the merits stage." AC ¶ 110 n.2.

In early April 2015, various Brazilian news outlets, including *O Estado*, reported that Bradesco executives, including Trabuco, were subjects of the investigation, and that the Brazilian Federal Prosecutor ("MPF") had recorded telephone conversations revealing that the executives had met with the lawyers and FRS officials being investigated and had engaged in negotiations with that group in an attempt to avoid an unfavorable CARF decision. AC ¶ 116. The reports noted, however, that because the Federal Police's telephone intercepts were discontinued while Bradesco's negotiations with Brazilian officials were still ongoing, it "remained unclear whether evidence existed showing that Bradesco executives followed through with the alleged corruption scheme." *Id.*

### D. The Indictment of Trabuco, Abreu, and Angelotti

On May 31, 2016, the Federal Police indicted Trabuco, Abreu, and Angelotti. AC ¶ 118. Based on the information in the indictment and the police report compiled by the Federal Police, the MPF filed a criminal complaint against Trabuco, Abreu, Angelotti, Teixeira, Leite, Pagnozzi, Tamazato, Victor, Nascimento, and Salazar on July 27, 2016. AC ¶ 119. The criminal complaint alleges that the Individual Defendants committed the crime of "active corruption" and provides specific facts and details evidencing these crimes. *Id.* In particular, the criminal complaint alleges violations of Article 333 of the Brazilian Criminal Code, under which it is illegal "[t]o offer or promise an undue advantage to a public official, for him to conduct, omit or delay an official act." *Id.* The criminal complaint also contained information and details regarding the other tax bribery schemes that Bradesco is alleged to have undertaken between 2004 and 2015. *Id.*

On July 27, 2016, the Brazilian Federal District Court "accepted" the criminal complaint, which Plaintiff alleges "indicates that the court found just cause to prosecute the criminal action." AC ¶ 120. In the decision accompanying the court's acceptance of the complaint, the judge noted that, while the accused were still entitled to present their defense, "in this initial evaluation, there is no relevant clear piece of evidence capable of invalidating the accusation." AC ¶ 121.

### E. The Temporary Suspension of CARF Proceedings and the Alleged Improper Influence over the Parliamentary Commission of Inquiry

As a result of Operation Zealots, all CARF proceedings were suspended for much of 2015. AC ¶ 122. They resumed in December 2015 after the enactment of "sweeping reforms aimed at inhibiting similar illicit conduct in the future." *Id.* In the wake of the Operation Zealots revelations, Brazil's House of Representatives also formed a Parliamentary Commission of Inquiry ("CPI") to investigate the alleged manipulation of CARF proceedings through the payment of bribes. AC ¶ 126. However, Trabuco was never summoned to testify. *Id.*

Plaintiff alleges that the CPI itself succumbed to improper influence. For example, the amended complaint alleges that one congressman explained that when requests calling for the testimony of high-level bank executives were made, the CPI session was emptied so the requests could not be approved for lack of a quorum. *Id.* In addition, two congressmen participating in the investigation, including the CPI Vice President, "stated that some members of the commission accepted bribes in exchange for agreeing not to seek testimony from certain executives implicated in the scheme." AC ¶ 127.

The amended complaint cites as "additional evidence of improper relationships between the CARF CPI members and the corrupt executives" that one congressman lodged an "Independent Vote" pointing to the large sums donated by Bradesco and other companies implicated in Operation Zealots to CPI members' political campaigns. *Id.* The same congressman further stated that Trabuco had been "systematically shield[ed]" from being called to testify, and the CPI Vice President similarly stated that calls for Trabuco to give testimony had been "systematically avoided." *Id.* A third congressman resigned from the CPI, noting that not one "of those who actually practiced the crimes" had been heard before the CPI and declared the commission "an embarrassment to [the] country." *Id.*

In August 2016, the CARF CPI came to a close without having reached any conclusions or having issued a final report. AC ¶ 128. While the interim president, Waldir Maranhão, had approved an extension of the commission's term, Rodrigo Maia overruled the extension when he assumed the presidency three days later. *Id.* According to Plaintiff, Maia's decision to overrule the extension came on the same day he had lunch with André Gerdau of the Gerdau Group, Trabuco, and the interim President of Brazil, Michel Temer. *Id.*

### F. Additional Allegations Concerning Bradesco's CARF Connections

On November 27, 2014, "in the midst of Bradesco's CARF bribery scheme," Brazilian President Dilma Rousseff named Joaquim Levy ("Levy") as Brazil's Minister of Finance after Trabuco "apparently turned down the appointment." AC ¶ 129. Levy took office on January 1, 2015. *Id.* Prior to his appointment as Minister of Finance, Levy had served as managing director of Bradesco subsidiary Bradesco Asset Management from 2010 to 2014, where he remained on the payroll until the end of 2014. *Id.* According to the amended complaint, the Ministry of Finance, which is responsible for overseeing CARF, was involved in the Operation Zealots investigation. *Id.*

In early 2015, shortly before the public announcement of Operation Zealots, Levy appointed Bradesco lawyer Maria Teresa Martinez Lopes ("Martinez") as Vice President of CARF. AC ¶ 130. Martinez, who had worked for Bradesco for thirty-one years and had served as a sitting CARF councilor for fifteen years, announced that she would continue working for Bradesco while also serving as Vice President of CARF. *Id.* When the public raised concerns that this dual role created a conflict of interest, "CARF and Bradesco attempted to quell these concerns by citing to CARF procedures that would prohibit Martinez from voting in any proceeding in which Bradesco had an interest," and "Bradesco also noted that the Company's internal compliance policies similarly prohibited such a conflict." *Id.* Plaintiff alleges, however, that the internal CARF information contained in the "papers" that the Bribe Facilitation Group had presented to Bradesco indicated that Martinez was originally part of the CARF Upper Chamber panel that would have heard Bradesco's

appeal of the Lower Chamber ruling. *Id.* Although "the group assumed that she would recuse herself," the CARF proceeding was terminated before she did. *Id.*

Levy resigned as Minister of Finance on December 18, 2015. Martinez, however, continues both to serve as Vice President of CARF and to work at Bradesco. AC ¶ 131.

### G. Operation Car Wash

Before Operation Zealots became public in 2015, the public learned in 2014 of another investigation being conducted by Brazilian authorities called Operação Lava Jato ("Operation Car Wash"). AC ¶ 45. Operation Car Wash involves "allegations of bid-rigging and bribery at Brazil's state-owned oil company, Petróleo Brasileiro S.A.—Petrobras ('Petrobras')." *Id.* According to the amended complaint, "[t]he evidence unearthed by this investigation to date establishes a decades-long corruption scheme in which third-party contractors were awarded Petrobras contracts based on inflated bids and then kicked-back a certain percentage of the contract value as a bribe payment that was funneled to Petrobras executives and politicians." *Id.* Operation Car Wash has resulted in numerous arrests and convictions. *Id.*

Plaintiff alleges that the "scandal at Petrobras intensified investors' focus on the policies in place at Brazilian companies to prevent similar misconduct." AC ¶ 46. Bradesco recognized the adverse impact that Operation Car Wash and its revelations could have on Bradesco's own business. The Company cautioned investors in its 2014 Form 20-F, filed with the SEC on April 30, 2015, that "the perception of risks and uncertainties surrounding Brazil may also adversely affect our business," and further stated: "The high-profile nature of these [Operation Car Wash] investigations may have momentarily harmed the reputation of Brazil, which could reduce investor confidence . . . . If uncertainty continues or a reduction in investor confidence as a result of these investigations is material, it may adversely affect the results of our operations." *Id.*

According to Plaintiff, "[a]s Bradesco publicly recognized that a bribery scandal involving another Brazilian company could reduce investor confidence and adversely affect Bradesco's

financial results, a bribery scandal involving Bradesco would be even more damaging to the Company and its investors." AC ¶ 47.

## H. The Challenged Statements and Omissions

Plaintiff alleges that Defendants made a series of false or misleading statements and omissions of material fact during the Class Period. The challenged statements and omissions can be broken into eight categories: (i) statements about the Company's internal controls over financial reporting; (ii) statements about the Company's Anti-Corruption Policy and measures it takes to prevent and combat corruption; (iii) statements about the Company's Code of Ethical Conduct, as well as the Code of Ethical Conduct itself; (iv) statements regarding the Company's disclosure controls and procedures; (v) statements in Sarbanes-Oxley ("SOX") certifications; (vi) the failure to make disclosures required by Item 3 of Form 20-F; (vii) statements regarding the accuracy of Reference Forms filed with the Brazilian CVM and then with SEC on Forms 6-K; and (viii) allegedly false denials related to Operation Zealots. A summary of each category of alleged misstatements or omissions follows.

### 1. Statements Regarding Bradesco's Internal Controls over Financial Reporting ("ICFR")

In its 2011 Form 20-F, Bradesco stated that "[o]ur internal control was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles," and that "our management has concluded that our internal control over financial reporting was effective as of December 31, 2011." AC ¶ 136. Bradesco's May 2012 Reference Form filed with the CVM stated with respect to the "level of efficiency of [internal controls used to ensure that reliable financial statements are prepared], indicating eventual deficiencies and actions taken to correct them" that "[t]here were no such faults and therefore no such measures taken on preparing the

issuer's consolidated financial statements for the years ended on December 31, 2011, 2010 and 2009." AC ¶ 137.[5]

Bradesco's 2012, 2013, 2014, and 2015 Forms 20-F contain nearly identical statements regarding the Company's ICFR as were made in the 2011 Form 20-F. AC ¶¶ 138, 140, 142, 144. Each of the Company's Forms 20-F between 2011 and 2015 reported that there had been no material changes in the Company's ICFR over the prior fiscal year. AC ¶¶ 136, 138, 140, 142, 144. Bradesco's May 2013, May 2014, and May 2015 Reference Forms each state, with only immaterial variations in wording, that management had "concluded with a reasonable level of assurance that internal controls are efficient and effective to ensure the integrity of information." AC ¶¶ 139, 141, 145.

Plaintiff alleges that the statements that Bradesco's ICFR were "designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements" and that the controls were "effective" during the Class Period were materially false or misleading because: "(i) in violation of the Company's internal controls, Defendants were engaged in an eleven-year-long practice of paying illegal bribes in exchange for illegally obtained tax credits, which were then reflected in Bradesco's financial statements; and (ii) Bradesco's [ICFR] were ineffective and inadequately designed as evidenced by the fact that these controls, which remained unchanged from 2004 to 2016, had failed to prevent or detect the long-running bribery scheme committed by Defendants—let alone Bradesco's mischaracterization of the bribes as payments for 'tax advice'—nor had they prevented the Company from reflecting in its financial statements tax credits that Defendants had ultimately obtained as a result of this scheme." AC ¶ 146. According to the amended complaint, the ineffectiveness of Bradesco's ICFR in 2014 and 2015, and therefore the falsity of Defendants' statements in the 2014 and 2015 Forms 20-F and the May 2015 and May 2016

---

[5] After being filed with the CVM, this and all other Reference Forms were filed with the SEC on Form 6-K. AC ¶ 28.

Reference Forms, "is further evidenced by the fact that, from mid-2014 to early 2015, members of Bradesco's senior management were actively engaging in illegal conduct by negotiating the payment of bribes in exchange for favorable determinations in connection with Administrative Tax Proceeding No. 16327.000190/2011-83; (ii) the Company's contemplated tax compensation request; and (iii) Bradesco's application for COFINS and PIS tax credits." AC ¶ 147.

### 2. Anti-Corruption Statements

On August 8, 2014, Bradesco filed a press release with the SEC on a Form 6-K signed by Angelotti. AC ¶ 148. In the "Management Report" section of the press release, under the heading "Preventing and Combating Corruption and Money Laundering and the Financing of Terrorism," the Company's Board of Directors and Board of Executive Officers stated:

> Bradesco adopts a formal and effective process for preventing and combating corruption and bribery, supported by the Code of Ethical Conduct and by the Corporate Anti-Corruption Policy. Cultural adaptation is accomplished through institutional communication and training programs, providing an effective monitoring of risks and controls. Bradesco also has a complaint channel, whose actions configured as violations are subject to applicable disciplinary measures, regardless of hierarchical level, and without prejudice to appropriate legal penalties.

*Id.* The Company's 2014 Form 20-F stated, with respect to "Prevention and Fight Against Corruption," that "[w]e carry out procedures to prevent and fight any corruption acts on an ongoing and permanent basis," that in 2014 Bradesco's Board "approved the Corporate Anti-Corruption Policy, which establishes guidelines for the prevention and fight against corruption, applicable to management and employees of the Group, comprising Bradesco and its controlled entities," and that the Board "also established the Corporate Anti-Corruption Rule, with rules and procedures aimed at preventing and fighting corruption and bribes." AC ¶ 149.

Bradesco's 2015 Form 20-F states that "[w]e continuously seek to enforce measures with a view to preventing and fighting corruption and bribery, thus demonstrating our commitment towards operating our business and building and maintaining relationships in an ethical manner."

AC ¶ 150. Similar to the 2014 Form 20-F, the 2015 Form 20-F also described "[t]he Anti-Corruption Corporate Standard, with rules and procedures are [sic] aimed at the concession of gifts, sponsorships, donations, procurement and management of business partners, which aim to prevent and combat corruption and bribery, in compliance with the laws and regulations in force in Brazil and in the countries in which we have business units." *Id.*

Plaintiff alleges that the above statements were materially false or misleading because, at the time they were made to investors, "Bradesco and its executives were attempting to pay illegal bribes in order to: (i) secure a favorable result in Administrative Tax Proceeding No. 16327.000190/2011-83 and, in fact, had already engaged in illegal conduct by discussing and negotiating this bribe payment in mid-2014 and early 2015; (ii) obtain a favorable determination with respect to the Company's tax compensation request and, in fact, had already engaged in illegal conduct by discussing and negotiating this bribe payment in mid-2014 and early 2015; and (iii) obtain a favorable DEINF/SP determination with respect to Bradesco's application for COFINS and PIS tax credits and, in fact, had already engaged in illegal conduct by discussing and negotiating this bribe payment in late-2014 and early 2015." AC ¶ 151.

### 3. Code of Ethics Statements

Each of the Bradesco's Class Period Forms 20-F stated the following:

> We have adopted a Code of Ethics and Sectorial Codes of Ethics under the Securities Exchange Act of 1934, as amended. Our Codes of Ethics apply to our Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and persons performing similar functions, to our directors, other officers, employees, business partners, suppliers, and service providers.

AC ¶ 152. According to the amended complaint, Bradesco's "Code of Ethical Conduct" underwent certain revisions during the Class Period. The version applicable from the beginning of the Class Period through January 26, 2014 stated that "integrity" "signifies full respect for the laws of the Country and rules that govern the activities of our sector and of our Organization," that "[w]e must prohibit any granting of advantage or privilege to public servants," and that "[w]e must ensure

compliance with our policies, rules and rigid controls for the prevention and combating of . . . corruption and unlawful acts of any nature, in strict compliance with applicable laws." AC ¶ 153. It also provided that "[a]ny concern or complaint regarding . . . fraud committed by the management and employees of the Bank and its subsidiaries, or even by third parties, must be brought to the attention of the Audit Committee." *Id.*

Plaintiff alleges that the Code of Ethics statement in Bradesco's 2011, 2012, and 2013 Forms 20-F and the Code of Ethical Conduct in operation during that time were materially false or misleading because, "far from 'prohibit[ing] any granting of advantage or privilege to public servants': (i) the Company was engaged in an eleven-year-long scheme, executed by its officers, of paying illegal bribes to public servants in exchange for illegally-obtained tax credits, which were then reflected in Bradesco's financial statements; (ii) Defendants routinely violated the Company's code of ethics by engaging in this illegal conduct; and (iii) Defendants continuously violated the Company's code of ethics by concealing this illegal conduct." AC ¶ 154.

The version of Bradesco's Code of Ethical Conduct applicable from January 27, 2014 through June 28, 2015 stated that "integrity" "means total respect for the laws and rules that govern the activities of the sector and of our Organization," that "[i]n this context, is [sic] unacceptable any conduct that configure in attempt or practice of bribery or corruption, including concealment or dissimulation of the occurrence of such acts," that "it is forbidden to accept, obtain, finance, fund, grant, pay, promise, sponsor or authorize, directly or indirectly, any benefit, monetary or otherwise, in any way whatsoever, in favor or [sic] whoever that may represent improper relationship," and that "[i]t is prohibited to promise, offer or give, directly or indirectly, benefit to the public servant or to a third-party related to him." AC ¶ 155. The January 27, 2014-June 28, 2015 Code also stated that "[w]e must ensure compliance with our policies, rules and controls for the prevention and combating of . . . corruption and unlawful acts of any nature, in strict compliance with applicable laws to the subject," and provided that "[f]acts related to any accounting aspects or frauds

committed by managers and employees of the Bank and its subsidiaries, or by third parties, must be brought to the attention of the Audit Committee." *Id.* The Code of Ethical Conduct in effect from June 29, 2015 through the end of the Class Period contained substantially the same statements, with only immaterial variations in wording. *See* AC ¶ 156.

Plaintiff alleges that the statements in Bradesco's 2014 and 2015 Forms 20-F and the operative Codes of Ethical Conduct were materially false or misleading because, at the time they were made, "(i) the Company was engaged in an eleven-year-long scheme, executed by its officers, of paying illegal bribes to public servants in exchange for illegally-obtained tax credits, which were then reflected in Bradesco's financial statements; (ii) Defendants routinely violated the Company's code of ethics by engaging in this long-running bribery scheme; and (iii) Defendants continuously violated the Company's code of ethics by concealing this bribery scheme from investors." AC ¶ 157. Plaintiff alleges that the statements were also materially false or misleading because, at the time they were made, "Bradesco and its executives were violating the Company's code of ethics by attempting to pay illegal bribes in order to: (i) secure a favorable result in Administrative Tax Proceeding No. 16327.000190/2011-83 and, in fact, had already engaged in illegal conduct by discussing and negotiating this bribe payment in mid-2014 and early 2015; (ii) obtain a favorable determination with respect to the Company's tax compensation request and, in fact, had already engaged in illegal conduct by discussing and negotiating this bribe payment in mid-2014 and early 2015; and (iii) obtain a favorable DEINF/SP determination with respect to Bradesco's application for COFINS and PIS tax credits and, in fact, had already engaged in illegal conduct by discussing and negotiating this bribe payment in late-2014 and early 2015." AC ¶ 158.

#### 4. Disclosure Controls Statements

Each of Bradesco's Class Period Forms 20-F contained the following statement regarding the Company's disclosure controls and procedures:

> Based upon the evaluation referred to above, our Chief Executive Officer and
> Chief Financial Officer concluded, subject to the limitations noted above, that for
> the period covered by this annual report, our disclosure controls and procedures
> were adequate and effective to provide reasonable assurance that information
> required to be disclosed by us in the reports that we file or submit under the
> Exchange Act of the SEC is recorded, processed, summarized and disclosed
> within the time period specified in the applicable rules and forms, and that it is
> accumulated and communicated to our Management, including our Chief
> Executive Officer and Chief Financial Officer, as appropriate to allow timely
> decisions regarding required disclosure.

AC ¶ 159. Plaintiff alleges that Bradesco's statements that its "disclosure controls and procedures were adequate and effective to provide reasonable assurance that information required to be disclosed by us . . . is recorded, processed, summarized and disclosed" were materially false and misleading because "[i]n truth, Bradesco's disclosure controls and procedures were inadequate and ineffective as evidenced by: (i) the fact that the Company's Class Period representations, regarding, for example, its internal controls and compliance with SEC regulations, omitted and concealed Bradesco's eleven-year-long practice of paying illegal bribes in exchange for tax credits—credits which were then reflected in the Company's financial statements; and (ii) the fact that Bradesco's Class Period Forms 20-F did not contain the information required by Item 3." AC ¶ 160. According to the amended complaint, the ineffectiveness of Bradesco's disclosure controls and procedures in 2014-2016 is "further evidenced by: (i) Defendants' representations in Bradesco's 2014 and 2015 Forms 20-F regarding the Company's internal controls and compliance with SEC regulations; and (ii) the Company's statements in 2015 and 2016 Forms 6-K concerning Defendants' involvement in the illegal conduct targeted by Operation Zealots, each of which was materially false or misleading in light of Bradesco's negotiation of the payment of illegal bribes in exchange for favorable determinations in connection with" the CARF appeal, the tax compensation request, and the application for COFINS and PIS tax credits. AC ¶ 161.

### 5. Trabuco's Statements in SOX Certifications

Each of Bradesco's Class Period Forms 20-F contained a signed and sworn CEO

Certification pursuant to SOX.  AC ¶ 162.  In each of those certifications, Trabuco "certif[ied] that

. . . [b]ased on my knowledge, this report does not contain any untrue statement of a material fact or

omit to state a material fact necessary to make the statements made, in light of the circumstances

under which such statements were made, not misleading with respect to the period covered by this

report."  *Id.*  Trabuco also certified that "[t]he company's other certifying officer and I are

responsible for establishing and maintaining disclosure controls and procedures . . . and [ICFR] . . .

for the company and have . . . [d]esigned such disclosure controls and procedures, or caused such

disclosure controls and procedures to be designed under our supervision, to ensure that material

information relating to the company, including its consolidated subsidiaries, is made known to us by

others within those entities, particularly during the period in which this report is being prepared."

*Id.*  Finally, Trabuco certified that "[t]he company's other certifying officer and I have disclosed . . .

to the company's auditors and the audit committee of the company's board of directors . . . [a]ny

fraud, whether or not material, that involves management or other employees who have a significant

role in the company's [ICFR]."  *Id.*

Bradesco's Class Period Forms 20-F also contained an additional certification pursuant to

SOX Section 906, and signed by Trabuco, stating that "the undersigned officer of Banco Bradesco

S.A. . . . does hereby certify, to such officer's knowledge, that the annual report on Form 20-F . . .

fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of

1934 and information contained in the Form 20-F fairly presents, in all material respects, the

financial condition and results of operations of the Company."  AC ¶ 163.

Plaintiff alleges that the foregoing SOX certifications were false or misleading because:  "(i)

the Company was engaged in an undisclosed eleven-year-long practice of paying illegal bribes in

exchange for illegally obtained tax credits, which were then reflected in Bradesco's financial

statements; (ii) Bradesco's [ICFR] and disclosure controls were ineffective and inadequately designed as evidenced by the fact that these controls, which remained unchanged from 2004 to 2016, did not prevent or detect the long-running bribery scheme committed by Bradesco's management or the resulting impact of this scheme on Bradesco's financial statements; and (iii) Bradesco's Class Period Forms 20-F did not contain the information required by Item 3." AC ¶ 164. Plaintiff further alleges that those statements were false or misleading "in light of: (i) the Company's intention to pay a bribe in order to secure a favorable result in" the CARF appeal "and the illegal conduct committed by Defendants in discussing and negotiating this bribe payment in mid-2014 and early 2015; (ii) Bradesco's intention to pay a bribe to obtain a favorable determination with respect to the Company's tax compensation request and the illegal conduct committed by Defendants in discussing and negotiating this bribe payment in mid-2014 and early 2015; and (iii) the Company's intention to pay a bribe in order to obtain a favorable DEINF/SP determination with respect to Bradesco's application for COFINS and PIS tax credits and the illegal conduct committed by Defendants in discussing and negotiating this bribe payment in late-2014 and early 2015." AC ¶ 165.

### 6. Failure to Make Disclosures Required by Item 3 of Form 20-F

Item 3.D of Form 20-F requires filers to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk, in a section headed 'Risk Factors.'" AC ¶ 166. The instructions for Item 3.D state that "[r]isk factors should be concise and explain clearly how the risk affects the issuer or the securities." *Id.*

As alleged in the amended complaint, Bradesco's Item 3.D disclosures were incomplete and, therefore, misleading because Defendants failed to disclose the following risks stemming from the alleged eleven-year-long practice of paying bribes in exchange for tax credits: "(i) the risk that public disclosure of the bribery scheme would result in Bradesco's executives facing criminal charges in Brazil; (ii) the risk that public disclosure of the bribery scheme would result in the Company and/or its executives incurring fines and penalties related to the tax credits that Bradesco illegally obtained;

(iii) the risk that public disclosure of the bribery scheme would result in the Company's liability pursuant to the Foreign Corrupt Practices Act of 1977 and/or other criminal or civil penalties in the United States; and (iv) the risk that public disclosure of the bribery scheme would result in a loss of investor confidence and a corresponding decline in the price of Bradesco PADS." AC ¶ 167.

### 7. Statements Concerning the Accuracy of Reference Form Information

Bradesco's Class Period Reference Forms, filed with the CVM and subsequently with the SEC, each contain a statement by Trabuco and Angelotti declaring that "the set of information contained therein is a true, accurate, and complete description of the issuer's economic financial outcomes and of the risks inherent to its activities and securities issued." AC ¶ 168.

Plaintiff alleges that those statements were materially false or misleading because "the Company was engaged in an eleven-year-long practice of paying illegal bribes in exchange for illegally-obtained tax credits, which were then reflected in Bradesco's financial statements." AC ¶ 169. Plaintiff also alleges that they were materially misleading in light of the failure to disclose the same set of risks described above with respect to Item 3 of Form 20-F. *Id.* Plaintiff further alleges that the statements, as contained in Bradesco's 2015 and 2016 Reference Forms, were materially false or misleading because, "from mid-2014 to early 2015, members of Bradesco's senior management were actively engaging in illegal conduct by negotiating the payment of bribes in exchange for favorable rulings in connection with" the CARF appeal, the tax compensation request, and the application for COFINS and PIS tax credits. AC ¶ 170.

### 8. Allegedly False Denials Related to Operation Zealots

In a press release issued on March 31, 2015 and later filed with the SEC on a Form 6-K signed by Angelotti on April 10, 2015, Bradesco responded to the March 28, 2015 *O Estado* article, which had stated that Bradesco was involved in the wrongdoing uncovered by Operation Zealots. AC ¶ 171. The press release stated that "Bradesco informs that it does not know details concerning

the investigative process related to the subject" and further "clarifie[d] that it adopts strict internal controls to ensure the compliance of its Anticorruption Corporate Policy and of its Code of Ethical Conduct, besides complying with the rules issued by Regulatory Bodies." *Id.*

On December 4, 2015, *O Estado* published another article about Operation Zealots and requested comment from Bradesco on whether the Company had committed any of the alleged misconduct. AC ¶ 172. Bradesco provided a comment, stating that it maintained its own legal structure, which was the only one authorized to represent the bank in legal proceedings, and that it did not contract any additional legal services provider. *Id.* The Company also stated that it "never conceded to, negotiated or had practiced acts in violation of the internal rules of compliance as well as the applicable laws of the Country." *Id.*

On May 31, 2016, in response to the indictment of Trabuco, Angelotti, and Abreu, Bradesco issued a "Notice to the Market." AC ¶ 173. The Notice stated that "[n]o proposal, hiring or payment have been implemented from these contacts [with the group], even because the tax pending issue was under the responsibility of renowned tax specialists" and also noted that "the lawsuit at CARF, object of the investigation, was tried in disfavor of Bradesco unanimously – 6 x 0, and is now submitted to the Judiciary." *Id.* Finally, the Notice stated:

> The Company informs that it has never promised, offered or gave undue advantage to any person, including public employees, for submission of tax affairs or of any other nature.
>
> The indictment takes by surprise the Bradesco's Management, considering that the two Officers were heard only as witnesses [during the Operation Zealots investigation] and the Company's CEO [n]eve[r] has been heard or participated in any meeting with representatives of the tax advisory officer.
>
> Bradesco reiterates its high standards of ethical conduct and reaffirms its confidence in the full operation of Justice.

*Id.* (alterations in original).

Bradesco subsequently filed the Notice with the SEC on a Form 6-K on June 1, 2016, and Bradesco's denial of wrongdoing was picked up and repeated by several news outlets, including

*Reuters*, *The Wall Street Journal*, *Bloomberg*, and *Financial Times*. AC ¶ 174. In a Form 6-K filed on June 9, 2016 and signed by Angelotti, Bradesco stated: "[W]e would like to take this opportunity to reiterate the clarifications provided in the Notice to the Market of May 31, 2016." AC ¶ 175.

Plaintiff alleges that the statements denying illegal conduct and reaffirming the Company's Anti-Corruption Policy and Code of Ethical Conduct and its "high standards of ethical conduct" were materially false or misleading because they are "directly contradicted by evidence establishing that: (i) Bradesco made numerous bribe payments between 2004 and 2007 in exchange for favorable determinations regarding the Company's applications for tax credits; and (ii) the Company continued to make bribe payments to Leite and also made bribe payments to Victor between 2007 and 2014. In addition, when Operation Zealots was announced, Bradesco was in the midst of negotiating bribe payments in order to" secure a favorable result in the CARF appeal, obtain a favorable determination with respect to the tax compensation request, and obtain a favorable determination with respect to the application for COFINS and PIS tax credits. AC ¶ 176.

Plaintiff further alleges that the Company's statement that it did not contract with any additional legal services providers was materially false or misleading "in light of, *inter alia*, their decade-long relationship with Pagnozzi and Tamazato whereby the Company illegally obtained tax advantages in exchange for bribes." *Id.*

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678) (alterations omitted). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Because claims under Section 10(b) of the Securities Exchange Act ("Exchange Act") and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Novak v. Kasaks*, 216 F.3d 300, 306-07 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA imposes similar requirements on claims brought under the Exchange Act: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

32

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken," *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted), including documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law," *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991).

## B. Rule 12(b)(2)

On a motion to dismiss pursuant to Rule 12(b)(2), the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) ("When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." (citations omitted)). To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). At the pleading stage—and prior to discovery—a plaintiff need only make a *prima facie* showing that jurisdiction exists, and that showing may be established solely by allegations. *Id.* at 84-85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015) ("'In order to survive a motion to dismiss for lack of personal

jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.'" (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013))).

If the court considers only pleadings and affidavits, the plaintiff's *prima facie* showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)). Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). "'The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits.'" *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)). If the parties present conflicting affidavits, however, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking*, 702 F.3d at 727 (citation omitted).

## III. DISCUSSION

Plaintiff asserts claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as well as claims for control person liability against the Individual Defendants under Section 20(a) of the Exchange Act.

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). Promulgated under authority granted to the SEC by Section 10, Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to

omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Investors, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014)).

Under Rule 10b-5, "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235 (1980). A corporation does not have a duty to disclose information simply because it is material. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *see In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."). Similarly, a corporation does not have a duty to disclose information simply because it suggests the corporation or its employees engaged in uncharged illegal conduct. *See, e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing."). However, "[d]isclosure is required . . . when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44. Thus, "[w]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006); *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."). A duty to disclose may also arise "expressly pursuant to an independent statute or

regulation—i.e., an affirmative legal disclosure obligation." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011) (citation omitted).

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pacific Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010). "To state a claim of control person liability under § 20(a), 'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108).

### A. Preliminary Questions

The parties' briefs raise three predicate questions that are most efficiently addressed at the outset: (1) whether Plaintiff has adequately alleged the bribery schemes that purportedly rendered the challenged statements false or misleading; (2) what impact, if any, a decision issued by a Brazilian appellate court dismissing the criminal charges against Trabuco subsequent to the amended complaint has on this action at the motion-to-dismiss stage; and (3) what impact the Supreme Court's 2011 decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), had on the so-called group-pleading doctrine. As explained more fully below, the Court concludes that Plaintiff has adequately alleged some, but not all, of the asserted bribery schemes, that the Brazilian court decision has no effect on the Court's review of Defendants' motion to dismiss, and that the group-pleading doctrine does not survive *Janus*.

### 1. The Adequacy of the Bribery Allegations

Because the gravamen of the amended complaint is that a series of unlawful bribery schemes over the course of eleven years rendered the challenged statements false or misleading, the Court must determine at the outset whether Plaintiff has adequately alleged any or all of those schemes. *See, e.g., In re Axis Capital Holdings, Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) ("In the present case, each of plaintiffs' nondisclosure claims are entirely dependent upon the predicate allegation that AXIS participated in an anticompetitive scheme to drive other insurance companies out of the market. If the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed."). As part of the "circumstances constituting fraud," *see* Fed. R. Civ. P. 9(b), such schemes must be pleaded with particularity. *See, e.g., In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 354 (S.D.N.Y. 2008) ("[I]n order to state a claim that defendants violated the securities laws because they failed to disclose the insider trading scheme, plaintiffs must plead the alleged trading scheme with particularity."); *In re Yukos Oil Co. Sec. Litig.*, No. 04-cv-5243 (WHP), 2006 WL 3026024, at *14 (S.D.N.Y. Oct. 25, 2006) (dismissing claim premised on failure to disclose illegal tax evasion scheme where complaint failed "to plead with particularity sufficient facts demonstrating that [defendant's] tax strategy violated . . . the Russian Federation Tax Code."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632 (S.D.N.Y. 2005) ("Plaintiffs contend that JPM Chase made material omissions in failing to disclose its violations of 18 U.S.C. Sections 215 and 1005. Plaintiffs have failed to allege with particularity that JPM Chase or its agents violated these statutes."); *see also Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578-79, 582 (S.D.N.Y. 2016) (dismissing claim premised on foreign bribery where complaint failed adequately to plead "how, when, and whether" defendant offered anything of value to government officials).

### a. The amended complaint does not adequately allege pre-2014 bribery schemes

Plaintiff has failed adequately to allege that anyone at Bradesco was aware that they were involved in any unlawful dealings with government officials at least until March 24, 2014. According to the detailed allegations in the amended complaint, no one in the Company, including the Individual Defendants, had any contact or communication with Leite during that period. Although the portion of the amended complaint describing the alleged pre-2014 schemes contains some blanket allegations that payments were made by the Company "to Leite and Pagnozzi," *e.g.*, AC ¶ 70, the particularized examples of such transactions provided by Plaintiff consistently describe payments made to Pagnozzi, and then passed on by Pagnozzi to Leite, *see, e.g., id.* Blanket allegations that payments were made "to Leite and Pagnozzi," standing alone, do not satisfy Rule 9(b)'s requirement to plead the "who, what, when, where, and how" of the alleged transactions. *See Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 520 (S.D.N.Y. 2014) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

Moreover, the Brazilian criminal complaint, upon which Plaintiff expressly and pervasively relies for its bribery allegations and which the Court may consider without converting Defendants' motion to one for summary judgment,[6] exclusively describes payments made during this period to either Pagnozzi or Tamazato, and not directly to Leite or any other Brazilian government official. *See* Decl. of Tina Gonzalez Barton (ECF No. 65) ("Barton Decl."), Ex. D, at 3-19. Thus, even if Plaintiff's allegations could be read to suggest with sufficient particularity that Bradesco made some payments directly to Leite during the pre-2014 period, those allegations would not be entitled to the assumption of truth because they are contradicted by the document upon which the amended

---

[6] At least one ground for the Court to consider the criminal complaint is that it is incorporated by reference repeatedly throughout the amended complaint. *See, e.g.*, AC ¶¶ 33-41, 64, 92; *ATSI Comm'ns*, 493 F.3d at 98 (explaining that courts may consider "statements or documents incorporated into the complaint by reference" in ruling on a motion to dismiss). Additionally, because Plaintiff expressly relied on the criminal complaint in framing the amended complaint, *see* AC at p. 1, the Court may consider it as "integral to" the amended complaint. *See Goel.*, 820 F.3d at 559 (explaining that a document is "integral to the complaint" if the complaint "relies heavily upon its terms and effect").

complaint relies. *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 206 (S.D.N.Y. 2008) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies." (citation omitted)); *Rappaport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ("If these documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint." (citation omitted)).

Finally, Plaintiff appears to concede that it has only cognizably alleged that payments were made directly to Pagnozzi, arguing in its opposition brief that it "has alleged with particularity . . . the specific amount of the bribe payments Bradesco made to Leite (via Pagnozzi)" and that, "in pleading that Defendants paid bribes to Leite, through Pagnozzi, in exchange for Leite's issuance of favorable tax adjudications, Plaintiff has stated a plausible claim that the underlying illegal and unethical conduct occurred." Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss (ECF No. 69) ("Pl.'s Mem.") at 40, 42.

In addition to the absence of cognizable allegations of contact directly between Bradesco personnel and Leite, there is no allegation in the amended complaint that Pagnozzi, or anyone, communicated Leite's involvement, or his indirect receipt of payments, to any Bradesco director, officer, or employee during the period prior to 2014. Similarly, Plaintiff alleges that the "papers" were consistently delivered to the Company by Pagnozzi, who was not a government official. Without knowledge that the favorable tax rulings allegedly obtained during the pre-2014 period were the result of illicit payments to, or other unlawful attempts to influence, government officials, neither Defendants nor any other Bradesco personnel could have possessed the scienter necessary to support a securities fraud claim premised on those activities. *See In re PetroChina Co. Ltd. Sec. Litig*, 120 F. Supp. 3d 340, 357-58 (S.D.N.Y. 2015) (concluding that complaint "fails to demonstrate that PetroChina officials were aware of any bribery that Jiang—who had departed a month earlier— might have been involved in when the Company filed its 2012 annual report" and stating that

"Plaintiffs *are* required . . . to establish—at a bare minimum—that the underlying fraud took place during the time period covered by the purportedly false public statements and that someone at PetroChina knew or had reason to know about it.").

Plaintiff attempts to remedy that deficiency through weak circumstantial allegations that Leite said to Salazar in October 2014 that he was "known to" Bradesco and that the Company had "interacted with him personally" at some point during that period, that the Company made a large number of payments to Pagnozzi and Victor during that period, that the Company had no need to engage Pagnozzi for tax advice because it already had several renowned tax experts at its side, and that every tax ruling during that period was favorable to the Company.  But even assuming those allegations are sufficient to meet the plausibility threshold established by *Twombly* and *Iqbal*, they fall on the wrong side of the PSLRA's requirement that securities fraud complaints "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

Plaintiff does not allege, for example, the circumstances under which Leite was "known to" or had "interacted . . . personally" with Leite prior to 2014, aside from the unavailing attempt to do so described above.  Nor does Plaintiff allege that Bradesco's purported familiarity and interactions with Leite during that period did not consist of routine and entirely lawful interactions with him in his capacity as an FRS tax auditor.  Such an allegation may well have strengthened the inference that Plaintiff seeks to create, but such an allegation is not present here.  Additionally, Leite's statement that he was "known to" the Company was made in late 2014 and does not itself indicate when the Company's familiarity with him arose.  Similarly, Plaintiff does not allege the circumstances underlying, or the reason for, the 450 payments to Pagnozzi and the 148 payments to Victor allegedly made during that period.  Indeed, the amended complaint does not even allege that any agent of Bradesco had ever met Victor or knew who he was.

Similarly, the allegation that Bradesco already had ample tax assistance without Pagnozzi falls flat when considered in the context of Plaintiff's own allegation that Pagnozzi's work had resulted in a series of positive tax results for the Company. Viewed through that lens, the decision to engage and continue to work with Pagnozzi is entirely consistent with a rational and lawful business decision, particularly in the absence of any allegation that Bradesco personnel were aware of Leite's involvement. And it certainly is not sufficient to give rise to the inference that Bradesco personnel must have known something illicit was taking place.

Finally, Plaintiff's allegation that Bradesco had a 100% success rate in its tax rulings during the pre-2014 period does not create a plausible inference, much less a strong one, that individuals within the Company knew or should have suspected that unlawful dealings were afoot. Had Plaintiff alleged that such a record of favorable results was atypical, or that other tax advisers had failed to achieve such results for the Company in the past, or that individuals within Bradesco knew the Company was not entitled to the tax treatment it received during that period, the inference would be stronger, but those allegations are not found in the amended complaint. Thus, while that allegation and the others described above may give rise to a *conceivable* or *possible* or even *plausible* inference that Bradesco personnel were aware of the allegedly unlawful dealings with Leite, that it not enough. As noted earlier, even assuming that Plaintiff's pre-2014 allegations are sufficient to satisfy the general plausibility standard of Rule 8, they do not satisfy the particularity requirements of Rule 9(b) and the PSLRA with respect both to falsity and scienter. *See Tellabs*, 551 U.S. at 314 (holding that, "[t]o qualify as 'strong' within the intendment of [the PSLRA], . . . an inference of scienter must be *more than merely plausible or reasonable—it must be cogent* and at least as compelling as any opposing inference of nonfraudulent intent" (emphasis added)); *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009) ("To meet the 'strong inference' standard, it is not sufficient to set out 'facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent,' for that gauge 'does not capture the stricter demand Congress sought

to convey in § 21D(b)(2)." (quoting *Tellabs* 551 U.S. at 314)); *see also In re JP Morgan Chase*, 363 F. Supp. 2d at 624 (holding that plaintiff failed to allege scienter on theory of conscious misbehavior where plaintiff "failed to plead with requisite particularity that any of the defendants engaged in illegal behavior.").

In sum, the Court concludes that, while the amended complaint may adequately allege that Pagnozzi worked with, and made payments to, Leite in order to further his work for Bradesco prior to 2014, the amended complaint does not adequately allege that any agent of Bradesco participated in or was aware of that conduit of information, proposals, and money between Pagnozzi and Leite prior to 2014. In other words, the allegations in the amended complaint relating to that period, when viewed through the applicable pleading standards, show only that Bradesco received tax advice from a lawyer (Pagnozzi), and that Bradesco paid Pagnozzi's firm for those services. As alleged, any unlawful dealings were conducted on the side between Pagnozzi and Leite. As a result, all claims relating to challenged statements or omissions made prior to 2014 are dismissed. *See, e.g.*, *In re FBR*, 544 F. Supp. 2d at 355 ("Plaintiffs' failure to properly plead the wrongdoing that they allege defendants were obligated to disclose is fatal to both their Section 10 and Section 20 claims."). Because the deficiencies that the Court has identified may be curable by amendment, the Court will grant Plaintiff leave to amend.

### b. The amended complaint adequately alleges bribery schemes beginning on March 24, 2014

By contrast, the Court concludes that Plaintiff has adequately alleged that Bradesco personnel were aware of Leite's involvement beginning on March 24, 2014 and extending through the end of the alleged class period. According to the amended complaint, Pagnozzi sent a proposal to Angelotti on March 24, 2014 providing that "Leite, as the head of the DEINF/SP's Guidance and Tax Analysis Division, would . . . grant the Company's [tax credit and reimbursement] petition." AC ¶ 79. Pagnozzi and Tamazato met with Angelotti on March 24, 2014 and August 12, 2014 "to

discuss the proposal and renegotiate the bribe percentage." AC ¶ 80. On August 14, 2014, Plaintiff alleges, Pagnozzi and Tamazato sent Angelotti a revised proposal "that cut the bribe amount to a range of 5% to 8% depending on the amount of the credit or reimbursement that Leite was able to secure for the Company." *Id.* The amended complaint further alleges that Pagnozzi, Tamazato, and Leite met with Angelotti, Abreu, and Trabuco in person at Bradesco headquarters on October 9, 2014 to discuss the scheme to manipulate PIS and COFINS credits. AC ¶ 85. And during a November 12, 2014 meeting attended by Pagnozzi, Abreu, Angelotti, and Trabuco, Abreu is alleged to have told Pagnozzi that Bradesco was "going to close that deal," and Trabuco is alleged to have told Pagnozzi to "tell our friend [Leite] we are interested in hiring you to do this." AC ¶ 86. Bradesco then "requested additional data concerning other companies that had made similar applications," data that "was only available through Leite's ability to access confidential information due to his role with the DEINF/SP." AC ¶ 87.

These particularized allegations are sufficient at the pleading stage to show the commencement of Bradesco's knowing involvement in schemes to unlawfully influence the outcome of tax proceedings through Pagnozzi's connection with Leite. Accordingly, the Court will proceed to analyze any challenged statements or omissions alleged to have been made after March 24, 2014.

### 2. The Impact of the Brazilian Federal Circuit Court of Appeals' June 13, 2017 Ruling

On June 16, 2017, well after the filing of the amended complaint and after Defendants' motion to dismiss was fully briefed, Defendants informed the Court that Brazil's Federal Circuit Court of Appeals for the First Region had granted a writ of habeas corpus three days earlier, dismissing the criminal charges against Trabuco. *See* ECF No. 77. On June 19, 2017, the Court issued an order inviting the parties to submit supplemental letter briefs describing their views of the impact of that decision on the pending motion to dismiss. ECF No. 78. Defendants submitted a

supplemental brief on the issue on June 30, 2017, ECF No. 79, and Plaintiff submitted a responsive letter brief on July 21, 2017, ECF No. 82.

Not surprisingly, Defendants contend that the dismissal of the criminal charges against Trabuco "makes clear that Plaintiffs have not adequately alleged a claim against Trabuco and provides further support for dismissing the claims against the other Defendants." ECF No. 79, at 2. For its part, Plaintiff contends that "the Brazilian Court's decision does not support dismissal of any of Plaintiff's claims against any Defendant." ECF No. 82, at 7. Although the Brazilian court's dismissal of the criminal charges against Trabuco may be relevant at the evidentiary stage of this proceeding, the Court concludes that it has no impact at the pleading stage.

To begin with, the Court notes that, although it may take judicial notice of a foreign judgment on a motion to dismiss, it is not clear that the Court properly may take account of the reasoning and factual recitations contained within a foreign judgment for their truth. *See Jordan (Berm.) Inv. Co. v. Hunter Green Invs. Ltd.*, 154 F. Supp. 2d 682, 689 (S.D.N.Y. 2001) (taking judicial notice of judgment but explaining that "courts routinely take judicial notice of documents filed in [other actions], . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings"). Moreover, the Court is mindful that, in determining an issue of foreign law, courts "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. That is an inquiry that the Court has not yet had an opportunity to conduct. Accordingly, the Court is hesitant to reach any conclusion regarding the impact of the June 13, 2017 decision on this action at this early stage.

Nevertheless, the Court observes that the Brazilian court's decision appears to have turned, at least in large part, on the sufficiency of the allegations in the charging instrument, as well as on the applicable standard of proof. As Plaintiff points out, the decision evaluated the Brazilian prosecutor's complaint against Trabuco based on the standard of proof for criminal cases in Brazil.

44

*See* ECF No. 79, Ex. 1 ("Decision") at 8 (noting that "it falls to the Public Prosecutor's Office to prove, *unequivocally, beyond reasonable doubt*, the guilt of the accused" (emphasis added)); *id.* at 10 (noting that it "must give *maximum consideration* to that which the defense . . . also presented" (emphasis added)); *id.* at 17 ("[A]fter reading the complaint, it is not even *certain* whether the alleged shady business supposedly offered by the public officials . . . was in fact accepted by the Bank, much less that it had consent of the detained person." (emphasis added)). In holding that the charging instrument contained insufficient facts to sustain the charges against Trabuco under Brazilian legal standards, the Brazilian Federal Circuit Court of Appeals for the First Region did not hold that the alleged misconduct did not occur, nor is there any indication that the court's decision is not capable of being reversed by a higher Brazilian court, or that the ruling is with prejudice to Brazilian authorities bringing charges against Trabuco anew.

Perhaps most importantly, the standard of proof in this action—a civil action in a U.S. court—is only a preponderance of the evidence, and the Court is required in evaluating the sufficiency of a civil complaint in U.S. federal court to "accept all allegations in the complaint as true and draw all inferences in the nonmoving party's favor." *LaFaro v. New York Cadiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). The Brazilian court, by contrast, notes its mandate to "always give maximum consideration to that which the defense has . . . also presented." Decision at 10. For that reason, and the other reasons described above, while the decision may be relevant on summary judgment or at trial, the Court cannot conclude that it has any impact on this action at this preliminary stage. *Cf. In re 650 Fifth Ave. and Related Props.*, No. 08-cv-10934 (KBF), 2017 WL 2214869, at *19 (S.D.N.Y. May 18, 2017) (excluding evidence, from trial, of lack of criminal charges due to danger of misleading jury into the "patently incorrect" belief "that a lack of criminal charges means that there can be no civil liability").

45

### 3. The Impact of *Janus* on the Group-Pleading Doctrine

The final preliminary question for the Court is whether the group-pleading doctrine (also known as the group-published documents doctrine) survives the Supreme Court's 2011 decision in *Janus*. The group-pleading/group-published documents doctrine permits securities fraud plaintiffs to rely on "a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 530 (S.D.N.Y. 2010) (citation omitted). That doctrine was recognized by the Second Circuit at least as early as 1987. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) ("[N]o specific connection between fraudulent representations in [an] Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of securities in question.").

In *Janus*, the Supreme Court held that, in order to be liable for a violation of Rule 10b-5—which makes it unlawful for "any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact" in connection with the purchase or sale of securities, 17 C.F.R. § 240.10b-5(b)—a defendant must have "made" the allegedly material misstatements. 564 U.S. at 141. "Make," the Court explained, means "to state," not "to create." *Id.* at 142, 144-45. The Court then set out the following rule for determining whether a defendant is the "maker of a statement": "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142; *see also id.* at 144 ("Without [ultimate] authority, it is not necessary or inevitable that any falsehood will be contained in the statement"). The Court further explained:

> Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This

rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* at 142-43. In applying the rule it had enunciated, the *Janus* Court held that Janus Capital Management ("JCM"), a mutual fund investment adviser, could not be held liable under Rule 10b-5 for false statements included in prospectuses issued by its client mutual funds, Janus Investment Fund. *Id.* at 137. Even though JCM had been "significantly involved in preparing prospectuses," and even though "all of the officers of Janus Investment Fund were also officers of JCM," the Court held that JCM did not "make" any statements in the prospectuses: "Although JCM, like a speechwriter, may have assisted Janus Investment Fund in crafting what Janus Investment Fund said in the prospectuses, JCM itself did not 'make' those statements for purposes of Rule 10b-5." *Id.* at 138, 147-48. In explaining its reasoning, the Court stated:

> Under this rule, JCM did not "make" any of the statements in the Janus Investment Fund prospectuses; Janus Investment Fund did. Only Janus Investment Fund—not JCM—bears the statutory obligation to file the prospectuses with the SEC. The SEC has recorded that Janus Investment Fund filed the prospectuses. There is no allegation that JCM in fact filed the prospectuses and falsely attributed them to Janus Investment Fund. Nor did anything on the face of the prospectuses indicate that any statements therein came from JCM rather than Janus Investment Fund—a legally independent entity with its own board of trustees.

*Id.* at 146-47 (internal citations omitted).

Since *Janus*, courts in this district have reached opposing conclusions regarding its impact on the group-pleading/group-published documents doctrine that has long been applied to claims against corporate insiders.[7] On one end of the spectrum, Judge Sullivan held in *In re UBS AG*

---

[7] In addition to the cases discussed in this section, several courts in this district have recognized, but have not needed to answer, this question. *See, e.g.*, *In re Braskem S.A. Sec. Litig.*, -- F. Supp. 3d --, 2017 WL 1216592, at *20 (S.D.N.Y. Mar. 30, 2017) (stating that *Janus* "cast further doubt on the viability of" the group-pleading doctrine); *In re ShengdaTech, Inc. Sec. Litig.*, No. 11-cv-1918 (LGS), 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) ("[T]here is some question whether the group pleading doctrine has been abrogated by *Janus* . . . ."); *Rollin v. Spartan Mullen Et Cie, S.A.*, No. 10-cv-1586 (CM), 2011 WL 5920931, at *5 (S.D.N.Y. Nov. 23, 2011) ("Whether the Supreme Court's decision in *Janus Capital* abrogated [the group pleading doctrine . . . ] is an open question.").

*Securities Litigation* that "a theory of liability premised on treating corporate insiders as a group cannot survive a plain reading of the *Janus* decision." No. 07-cv-11225 (RJS), 2012 WL 4471265, at *10 (S.D.N.Y. Sept. 28, 2012). Judge Sullivan rejected the lead plaintiff's contention that the rule set forth in *Janus* applies only to third parties and not to "corporate insiders responsible for the day-to-day affairs of a company," a distinction that "does not appear in the opinion." *Id.* "Although *Janus* might not necessarily imply that there can be only one 'maker' of a statement in the case of express or implicit attribution," he explained, "the individual defendants must have actually 'made' the statements under the new *Janus* standard to be held liable under Section 10(b)." *Id.* Similarly, Judge Pauley held in *In re Smith Barney Transfer Agent Litigation* that, because "nothing in the Court's decision in *Janus* limits the key holding . . . to legally separate entities," "only those officers whose signatures appear on misleading statements may be liable as the 'makers' of those statements." 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012) (internal citation omitted).

The other end of the spectrum can be found in Judge Rakoff's decision in *City of Pontiac General Employees' Retirement System v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359 (S.D.N.Y. 2012). There, Judge Rakoff rejected the defendant's argument that *Janus* abrogated the group-pleading doctrine, explaining that *Janus*

> addressed only whether *third parties* can be held liable for statements made by their clients. Its logic rested on the distinction between secondary liability and primary liability, and has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability. It is not inconsistent with *Janus Capital* to presume that multiple people in a single corporation have the joint authority to "make" an SEC filing, such that a misstatement has more than one "maker."

*Id.* at 374 (citations omitted). In *In re Barrick Gold Securities Litigation*, Judge Scheindlin also concluded that the group-pleading doctrine remains viable after *Janus*, explaining:

> *Janus* held that the maker of a statement was the person or entity with the ultimate authority over that statement. Because the defendant there was a separate corporate entity, the Court held that it categorically could not be the "maker" of the statement, as it could not, as a matter of law, have the ultimate authority over that statement. However, it is still possible, even likely, that *within an organization*,

> more than one person will have ultimate authority over a statement, especially when those statements appear in "group-published" documents.

No. 13-cv-385 (SAS), 2015 WL 3486045, at *2 (S.D.N.Y. June 2, 2015).  Because the plaintiffs had pleaded that the individual defendants were "corporate insiders involved in the everyday business of the company, and that the statements were made in group-published documents, such as press releases and annual reports," Judge Scheindlin held that the plaintiffs had adequately alleged that the individual defendants were the "makers" of the challenged statements.  *Id.*  Nevertheless, Judge Scheindlin recognized that the group-pleading doctrine merely creates a presumption at the pleading stage, and that "[c]ertainly, at trial or summary judgment, plaintiffs will need to provide proof that the individual defendants did in fact have ultimate authority over the statements in order to hold them liable."  *Id.*

Although this Court agrees with Judges Rakoff and Scheindlin that nothing in *Janus* dictates that only one person may have ultimate authority over a statement, the Court concludes that the group-pleading doctrine does not survive *Janus*.  First, the Court agrees with Judges Sullivan and Pauley that the holding in *Janus* is not limited to third parties that are legally separate from a corporate defendant.  The *Janus* Court did not so limit its rule expressly—a task that would have been quite simple—and it is difficult to understand why the Court would have referred to "the *person* or entity with ultimate authority" in fashioning its rule, 564 U.S. at 142 (emphasis added), if it had intended such a reading.  In this Court's view, the legal separateness of the investment adviser entity in *Janus* was merely the reason why, in that case, the Supreme Court held that it could not have exercised "ultimate authority" over the statements in the prospectuses—in other words, Janus Investment Fund could not have been the "maker" of the statements under the rule the Court had just set forth, because someone else (in that case, a legally separate entity) had the ultimate say on what statements were or were not included.  But it did not limit its rule to such circumstances.

49

More basically, the decision in *Janus* turned on the Court's interpretation of the statutory word "make," and the Court expressly rejected the notion that it was sufficient for a defendant to have been involved in "creating" the challenged statement by "participating in the drafting of" the statement or by "prepar[ing] or publish[ing] a statement on behalf of another." *Id.* at 144-46. The group-pleading doctrine significantly predates *Janus*, and it was not designed to create a presumption of ultimate authority. Instead, it creates a presumption that group-published documents are "the collective work" of corporate insiders, *see In re Am. Int'l Grp.*, 741 F. Supp. 2d at 530. But in *Janus*, the Court held that participation in the creation of a statement was not enough. 564 U.S. at 144-45. If undeniable proof that an individual worked on a statement does not meet *Janus*'s requirement that the individual have "ultimate authority over the statement, including its content and whether and how to communicate it," *id.* at 142, a mere presumption that a person worked on a statement by virtue of his or role within the company must also fall short.

The group-pleading doctrine has also been described as creating a presumption that group-published documents "are attributable" to corporate insiders. *See, e.g.*, *In re Barrick Gold*, 2015 WL 3486045, at *2. But a presumption that corporate insiders, as a group, are "makers" of a statement because the statement is deemed to be attributed to those insiders would be inconsistent with *Janus*'s description of attribution as a limiting mechanism. *See* 564 U.S. at 142-43 ("[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—*and only by*—the party to whom it is attributed." (emphasis added)). In other words, while under *Janus* attribution can be a means of determining who among the many who participated in creating and disseminating a statement had the ultimate authority over what the statement said and whether and how it was communicated, group pleading would simply sweep in that entire group, if not an even larger one.

For those reasons, and especially in light of the particularity requirements imposed on securities fraud pleadings by Rule 9(b) and the PSLRA,[8] the Court concludes that the group-pleading/group-published documents doctrine is insufficient to meet the requirements of *Janus*, and is thus no longer viable. Instead of relying on the presumption created by that doctrine, a securities fraud plaintiff must allege facts showing, either directly or circumstantially, that the individual defendants named in the complaint possessed ultimate authority over the statements at issue. That burden may be satisfied most easily by allegations that a given statement was attributed to a particular defendant, but other allegations may suffice. *See, e.g., In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012) (explaining that, "[i]n the post-*Janus* world," an executive may be held accountable where he "signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive").

### B. Personal Jurisdiction over Defendant Abreu

Defendant Abreu contends that the claims against him should be dismissed for lack of personal jurisdiction. Because Abreu challenges the assertion of personal jurisdiction based solely on the allegations in the amended complaint, the Court's task is to determine whether Plaintiff has established a *prima facie* showing of personal jurisdiction over him. *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673 (stating that the complaint "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant").

---

[8] "The Second Circuit has never squarely addressed whether the [group-pleading] doctrine survives the PSLRA, although, prior to *Janus*, a majority of district courts in this district held that it did." *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *10 (collecting cases); *see also In re Refco, Inc. Sec. Litig.*, 503 F Supp. 2d 611, 642 (S.D.N.Y. 2007) ("[T]his Court joins the majority of district courts in this district and others in holding that the group pleading doctrine has survived the PSLRA."); *but see, e.g., Bond Opportunity Fund v. Unilab Corp.*, 99-cv-11074 (JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) ("[T]he PSLRA has eliminated the 'group pleading' doctrine."). A number of other circuits have held that the group-pleading doctrine was eliminated by the PSLRA. *See Wilner Family Tr. v. Queen*, 503 F.3d 319, 336-37 (3d Cir. 2007) ("[T]he group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA."); *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 363-65 (5th Cir. 2004) (rejecting group-pleading doctrine as inconsistent with the PSLRA); *Makor Issues & Rights Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602-03 (7th Cir. 2006) (same), *rev'd on other grounds*, 551 U.S. 308 (2007). The Court does not reach the question here of whether the PSLRA abrogated the group-pleading doctrine on its own, because it is unnecessary for the Court to do so. Rather, the Court points to the PSLRA and Rule 9(b) as further support for the conclusion that the doctrine is insufficient under the rule set forth in *Janus*.

### 1. Personal Jurisdiction Under the Exchange Act

In determining whether it may exercise personal jurisdiction over a defendant, the Court must conduct a two-step inquiry. First, the Court must determine whether there is a "statutory basis for exercising personal jurisdiction." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013) (citation omitted). A federal court applies the forum state's personal jurisdiction rules unless a federal statute "specifically provide[s] for national service of process." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016) (quoting *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997)). Second, the Court must determine whether the exercise of personal jurisdiction over the defendant would comport with due process under the Constitution. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012).[9]

The statutory basis for personal jurisdiction in securities cases involving securities listed on domestic exchanges is found in Section 27 of the Exchange Act, 15 U.S.C. § 78aa, which "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (citing *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1339 (2d Cir. 1972), *abrogated on other grounds by Morrison v. Nat'l Aust. Bank Ltd.*, 561 U.S. 247 (2010); *see also S.E.C. v. Straub*, 921 F. Supp. 2d 244, 252 (S.D.N.Y. 2013) ("In securities cases like this one involving securities listed on domestic exchanges, Section 27 . . . establishes the exclusive basis for personal jurisdiction."); 15 U.S.C. §§ 77v, 78aa (providing for worldwide service of process). Thus, the sole question here is whether due process permits the exercise of jurisdiction over Abreu.

Due process requires that if a defendant is "not present within the territory of the forum, he [must] have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

---

[9] The defendant must also have been properly served. *Licci*, 673 F.3d at 59. Abreu does not assert that he was not properly served with a summons and complaint in this action.

(1945) (citation omitted).  The analysis consists of two components:  the "minimum contacts" analysis and the "reasonableness" inquiry.  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (citations omitted).

To establish the minimum contacts necessary to satisfy due process with respect to a nonresident defendant, the plaintiff must show that its "claim arises out of, or relates to, the defendant's contacts with the forum . . . [and that] the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (citation omitted).  Although foreseeability is a component of the minimum contacts analysis, "foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause."  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980).  Because the Exchange Act authorizes worldwide service of process, the relevant contacts for purposes of the "minimum contacts" analysis are those with the United States as a whole.  *See, e.g. Straub*, 921 F. Supp. 2d at 253 ("When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, . . . the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." (quoting *SEC v. Morton*, No. 10-cv-1720 (LAK)(MHD) (S.D.N.Y. Mar. 31, 2011), *adopted*, *id.*, ECF No. 102 (S.D.N.Y. Nov. 3, 2011)); *see In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d at 207 (2d Cir. 2003) (discussing analogous service of process provision in the Clayton Act); *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998) (stating that "under the Fifth Amendment the court can consider the defendant's contacts throughout the United States"); *accord In re Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1294 (7th Cir. 1992) ("When the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation.  [T]he due process clause requires only that the defendant possess sufficient contacts with the United States.").

"The second part of the jurisdictional analysis asks 'whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert*, 305 F.3d at 129 (citations omitted). If the defendant's contacts with the forum rise to the level of "minimum contacts," a defendant may defeat jurisdiction only by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). In determining whether the exercise of personal jurisdiction over a particular defendant would be reasonable, the court must evaluate "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metro. Life Ins.*, 84 F.3d at 568 (citing *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 113-14 (1987)).

### 2. Analysis

Abreu argues that the amended complaint fails to allege that he purposefully directed any suit-related activities toward the United States. Defs.' Mem. of Law in Supp. of Mot. to Dismiss (ECF No. 64) ("Defs.' Mem.") at 49-50. In short, he argues that, even accepting the allegations that he was involved in a bribery scheme, that scheme occurred entirely in, and was directed at, Brazil, and thus does not establish minimum contacts with the United States. *Id.* at 50. Abreu further contends that Plaintiff has not alleged any connection between him and any of the allegedly false or misleading statements contained in documents that were filed in the United States with the SEC. *Id.*

The Court agrees that Abreu's alleged involvement in bribery schemes aimed at the Brazilian government is insufficient, on its own, to permit the exercise of personal jurisdiction against him in the United States. *See, e.g.*, *S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 547 (S.D.N.Y. 2013) ("If this Court were to hold that [the German executive's] support for the bribery scheme satisfied the minimum

contacts analysis, even though he neither authorized the bribe, nor directed the cover up, much less played any role in the falsified filings, minimum contacts would be boundless. . . . [U]nder the SEC's theory, *every* participant in illegal action taken by a foreign company subject to U.S. securities laws would be subject to the jurisdiction of U.S. courts no matter how attenuated their connection with the falsified financial statements. This would be akin to a tort-like foreseeability requirement, which has long been held to be insufficient."). However, courts have found personal jurisdiction to exist where "an executive of a foreign securities issuer, wherever located, participates in a fraud *directed to* deceiving United States shareholders." *Id.* (quoting *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 256-57 (S.D.N.Y. 2013)); *see also J. McIntrye Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) ("The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct."). "[I]t is by now well-established that signing or directly manipulating financial statements to cover up illegal foreign action, with knowledge that those statements will be relied upon by United States investors satisfies this test." *Sharef*, 924 F. Supp. 2d at 547.

In keeping with the above principles, courts have exercised personal jurisdiction over individuals who orchestrated bribery schemes aimed at foreign governments *and* as part of that scheme signed off on misleading management representations to company auditors and signed false SEC filings. *See Straub*, 921 F. Supp. 2d at 257-58 ("Although Defendants' alleged bribes may have taken place outside of the United States . . . , their concealment of those bribes, in conjunction with [the company's] SEC filings, was allegedly directed toward the United States."). Here, in addition to the allegations that Abreu played a significant role in the alleged bribery schemes, Plaintiff alleges that Abreu was a member of Bradesco's Board of Executive Officers, which signed a press release on July 30, 2014 that was then filed with the SEC on a Form 6-K on August 8, 2014. AC ¶¶ 31, 148. The release, entitled "Financial Statements, Independent Auditors' Report, Summary of the Audit

Committee's Report and Fiscal Council's Report," Barton Decl., Ex. I, at 2, contains a portion entitled "Management Report." That portion describes Bradesco's "formal and effective process for preventing and combating corruption and bribery" and its "effective monitoring of risks and controls," AC ¶ 148, statements that Plaintiff challenges as misleading in light of Abreu's and others' contemporaneous involvement in a bribery scheme, and the Company's failure to detect it through its system of internal controls.[10] The Management Report was signed by the "Board of Directors" and the "Board of Executive Officers," the latter of which included Abreu. In addition, although Plaintiff does not allege that Abreu signed any of the other challenged statements, the amended complaint alleges that Abreu "was involved in the preparation and review of the false and misleading statements in Bradesco's SEC and CVM filings." AC ¶ 31.

In light of those allegations, the Court has little trouble concluding that, at least in signing off on the August 8, 2014 press release while allegedly participating in the bribery scheme, Abreu "participated in a fraud *directed to* deceiving United States shareholders." *See Sharef*, 924 F. Supp. 2d at 547. Plaintiff's allegations that Abreu was involved in preparing SEC filings are sufficient to create the inference that he knew Bradesco had securities listed and traded on a U.S. exchange, and that its management reports would be filed with the SEC. And the allegations that Abreu served on the Company's "Statutory Committees for Ethical Conduct and Internal Controls and Compliance and its Executive Committees for Disclosure and Corporate Governance" at the time of the press release, AC ¶ 31, only provide additional support for that inference. As a result, even if the allegedly false or misleading press release signed by Abreu was not principally directed toward the United States, Plaintiff has adequately alleged that Abreu signed off on the press release with knowledge that it would be filed with the SEC and be given to prospective American purchasers and sellers of

_____

[10] The question whether the statements in the August 8, 2014 press release are actionable, or are materially false or misleading, under the securities laws is a separate question, which the Court will address later in this opinion. The same is true with respect to whether Plaintiff has adequately alleged that Abreu made this statement with the requisite scienter.

its PADS, and that is enough to establish minimum contacts with the United States. *See Straub*, 921 F. Supp. 2d at 255-56 ("Indeed, during the period of the alleged violations, Straub allegedly signed false management representation letters to Magyar's auditors, and Balogh and Morvai signed allegedly false management sub-representation letters for quarterly and annual reporting periods in 2005. Therefore, it is not only that Magyar traded securities through ADRs listed on the NYSE that satisfies the minimum contacts standard but also that Defendants allegedly engaged in a cover-up through their statements to Magyar's auditors knowing that the company traded ADRs on an American exchange, and that prospective purchasers would likely be influenced by any false financial statements and filings. The Court thus has little trouble inferring from the SEC's detailed allegations that, even if Defendants' alleged primary intent was not to cause tangible injury in the United States, it was nonetheless their intent, which is sufficient to confer jurisdiction."); *cf. In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 305 (E.D.N.Y. 2002) (upholding exercise of personal jurisdiction over Canadian general counsel because, as general counsel, he "must have known that the Statement was released in connection with a secondary stock offering designed to attract American investment," and "must have known that the Statement was made to comply with the laws governing securities offerings in American markets and, as such, it would be used and relied upon by American investors"). Moreover, in challenging the statements contained within the August 8, 2014 release as false or misleading, this litigation arises out of Abreu's contacts with the United States.

As noted, the second prong of the Due Process analysis is whether the exercise of jurisdiction over the defendant is reasonable under the five-factor test described in *Asahi*. "This prong of the inquiry rarely defeats jurisdiction where a defendant has sufficient forum contacts, and is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process." *S.E.C. v. Softpoint, Inc.*, No. 95-cv-2951, 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001) (Lynch, J.); *see also Asahi*, 480 U.S. at 116 (Brennan, J., concurring) (noting that only in "rare cases" will inconvenience "defeat the reasonableness of jurisdiction"). Furthermore, once the

minimum contacts standard has been satisfied, a defendant may defeat jurisdiction only by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

Here, Abreu makes no argument whatsoever that jurisdiction over him would be unreasonable, and so he has failed to present the "compelling case" necessary to defeat jurisdiction. Nevertheless, the Court has evaluated the factors underlying the reasonableness inquiry and does not find any compelling basis to conclude that the exercise of jurisdiction over Abreu would be unreasonable. In evaluating the reasonableness of jurisdiction, the Court is required to consider: "(1) the burden that the exercise of jurisdiction will impose of the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metro. Life Ins.*, 84 F.3d at 568 (citing *Asahi*, 480 U.S. at 113-14.

Because Abreu has not provided the Court with any argument on these factors, the only potential burden the Court can imagine the litigation to impose on him is the inconvenience of litigating in a foreign forum. In the absence of some particular argument by Abreu about the inconvenience this litigation would pose, the Court cannot conclude that this is the "rare case" in which inconvenience is "so substantial as to achieve constitutional magnitude." *See Asahi*, 480 U.S. at 116 (Brennan, J., concurring); *Burger King*, 471 U.S. at 484. With respect to the second factor, because this is a case brought under U.S. federal law, the judicial system has a strong interest in resolving it here. *See Straub*, 921 F. Supp. 2d at 259. Additionally, Plaintiff's interest in obtaining a convenient and efficient resolution of this dispute is self-evidently strong. [11] The Court therefore finds that the exercise of jurisdiction over Abreu is not unreasonable. *See id.* ("Like each and every

---

[11] The Court does not understand the fourth and fifth factors of the reasonableness inquiry to be relevant in this case.

court in this Circuit to have applied the reasonableness standard after determining that a given defendant has the requisite minimum contacts, this Court finds that this is not the rare case where the reasonableness analysis defeats the exercise of personal jurisdiction.").

Accordingly, the Court concludes that Plaintiff has met its burden at this stage of the litigation of establishing a *prima facie* case of personal jurisdiction over Abreu.

### C. The Section 10(b)/Rule 10b-5 Claim

Defendants challenge the sufficiency of Plaintiff's allegations as to only two elements of their Section 10(b) claim: (i) Defendants' materially false or misleading statements or omissions and (ii) Defendants' scienter.

#### 1. Materially False or Misleading Statements or Omissions

Because the Court has already dismissed Plaintiff's claims as they pertain to statements made prior to March 24, 2014, the Court proceeds in this section of the opinion to analyze only those statements or omissions alleged to have been made after that date. As summarized earlier, the challenged statements and omissions include: (i) statements about the Company's internal controls over financial reporting; (ii) statements about and related to the Company's Anti-Corruption Policy; (iii) statements about the Company's Code of Ethical Conduct, as well as the Code itself; (iv) statements regarding the Company's disclosure controls and procedures; (v) statements in Trabuco's SOX certifications; (vi) the alleged failure to make disclosures required by Item 3 of Form 20-F; (vii) statements regarding the accuracy of Reference Forms filed with the Brazilian CVM; and (viii) allegedly false denials related to Operation Zealots.

"A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (citation omitted). "In other words, in order for the misstatement to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made available." *ECA, Local 134 IBEW Joint Pension Tr. Of Chi. V. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988))). Because the determination of whether a false or misleading statement is material requires courts to "engage in a fact-specific inquiry" that "depends on all relevant circumstances," and because "materiality is a mixed question of law and fact," a complaint "may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (citations omitted); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (stating that the determination of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact").

Notwithstanding the ordinarily fact-intensive nature of the materiality inquiry, courts have recognized that certain kinds of statements are inactionable as a matter of law because they are "too general to cause a reasonable investor to rely upon them." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (citation omitted). The quintessential examples of such inactionable "puffery" are "general statements about reputation, integrity, and compliance with ethical norms," particularly when such statements are "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *Id.* In addition, "[s]tatements of general corporate optimism . . . do not give rise to securities violations" unless "they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *IBEW Local*, 783 F.3d at 392 (citations omitted).

"Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *see also Novak*, 216 F.3d at 315 (finding general statements that inventory was "in good shape" and "under control" actionable

where defendants knew contrary was true); *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) ("[W]hile a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless . . . ."). It is possible, therefore, that while challenged statements are mere puffery when viewed in isolation, the context in which they were made could lead a reasonable investor to "rely on them as reflective of the true state of affairs at the [c]ompany." *Petrobras*, 116 F. Supp. 3d at 381.

### a. Statements About Bradesco's ICFR and Disclosure Controls[12]

Plaintiff challenges statements relating to Bradesco's internal controls over financial reporting made in the Company's Forms 20-F and Reference Forms (which were then filed with the SEC on Forms 6-K). With only minor variations in wording, the challenged statements in the Forms 20-F were essentially identical throughout the relevant period. In the section of the Company's 2015 Form 20-F (filed April 15, 2016) entitled "Management's annual report on internal control over financial reporting," for example, the Company stated that "[o]ur internal control was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles," and that "[o]ur management . . . has concluded that our internal control over financial reporting was effective." AC ¶ 142. Bradesco's May 2015 Reference Form, by way of further example, stated:

> [T]he Administration has assessed the effectiveness of internal controls related to the consolidated financial statements closed in December 31, 2014, and concluded, with reasonable certainty, that the internal controls are effective and efficient in order to ensure the completeness of the information, whereas no significant deficiencies or material weaknesses have been identified.

AC ¶ 143. Plaintiff also challenges the statement made in each of Bradesco's Forms 20-F that, after

---

[12] The Court addresses these two categories of statements together because the parties have done so in their briefs.

an evaluation, the Company's CEO and CFO "concluded . . . that . . . our disclosure controls and procedures were adequate and effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act of the SEC is recorded, processed, summarized and disclosed within the time periods specified in the applicable rules and forms." AC ¶ 159.

Plaintiff does not adequately allege why those statements were false or misleading at the time they were made. As an initial matter, the statements do not purport to guarantee that Bradesco's controls will perform perfectly in every instance; instead, they speak to "reasonable assurance" or "reasonable certainty." Thus, allegations that those controls must have been deficient because they may have failed to detect some weaknesses in its financial reports or disclosures in some instances, are not sufficient. *See, e.g., Janbay v. Canadian Solar, Inc.*, No. 10-cv-4430 (RWS), 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012) ("Plaintiffs rely solely on general assertions regarding the existence of deficient controls, which fall far short of satisfying the exacting pleading requirements of Rule 9(b) and the PSLRA."); *cf. Barrett v. PJT Partners Inc.*, No. 16-cv-2841 (VEC), 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017) ("Plaintiff appears to be proceeding on the premise that because Caspersen did bad things while employed by PJT, its statements regarding the existence of its internal controls that are designed and intended to prevent fraud are per se false. That is simply not the case."). Plaintiff has not alleged that Bradesco management did not, in fact, conduct the evaluations described in those statements, that its internal controls were not "designed" to provide reasonable assurance regarding the reliability of financial reporting, that the Company did not have internal controls or did not execute them, or that the Company had identified but not disclosed significant deficiencies or material weaknesses. In fact, Plaintiff alleges nothing about the design of the Company's ICFR structure or processes at all, nor does Plaintiff allege anything about the management or execution of those processes. *See, e.g., Janbay*, 2012 WL 1080306, at *9 (finding plaintiffs' allegations concerning internal and disclosure controls insufficient because they "failed to

allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 371 (E.D.N.Y. 2013) ("Plaintiff has not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that [it] lacked adequate internal controls.").

Even if it were sufficient for Plaintiff to allege that a failure in internal controls occurred, the amended complaint fails to allege any such failure with respect to the Company's financial reporting. Plaintiff attempts to draw a link between the alleged bribery and Bradesco's financial reporting by alleging, and arguing, that the bribery had a direct impact on the Company's financial statements in the following manner:

> Defendants' early scheme to illegally obtain IRPJ and CSLL tax credits directly impacted Bradesco's financial statements, as the illegally-obtained . . . tax credits allowed the Company to either reduce its current tax liabilities (increasing its net income), or record a deferred tax asset on its balance sheet (increasing in total assets). Between 2004 and 2007, the Company received more than R$260,250,000 in illegally-obtained tax credits, which it used to strengthen its reported financial condition. In exchange for these credits, the Company paid at least R$2,717,000. These bribe payments (which were not accounted for as such) had a direct impact on the Company's reported financial condition . . . .

Pl.'s Mem. at 32-33; *see also* AC ¶¶ 64, 72, 146. Plaintiff adds that, "[f]urthermore, Bradesco's tax bribery scheme continued from 2007 to 2015, with bribe payments totaling more than R$15 million." Pl.'s Mem. at 33; *see also* AC ¶¶ 73-76.

To be sure, that is a coherent theory of how the alleged bribery was linked to Bradesco's financial statements. Indeed, it is the only argument that Plaintiff makes in its opposition brief with respect to this category of alleged misstatements. *See* Pl.'s Mem. at 32-36. It fails, however, because, as the Court has already explained, Plaintiff fails adequately to allege that anyone within the Company was aware that tax credits obtained prior to March 24, 2014 were in any way unlawful, *see supra* Part III.A.1.a, a deficiency that precludes both a finding of scienter and the Company's ability to have accounted for its payments as "bribes," as Plaintiff asserts should have been done. Similarly, the Court has already concluded that Plaintiff has failed adequately to allege that the payments made

to Pagnozzi and Victor between 2007 and 2015 were bribes. *Id.* Moreover, the amended complaint itself concedes that no other payments were exchanged, and that the other alleged bribery schemes were never consummated. *See* AC ¶ 82 (alleging, with respect to 2014 scheme to influence adjudication of tax compensation request, that "the scheme was never completed due to the announcement of Operation Zealots in the spring of 2015"); AC ¶ 89 (alleging, with respect to 2014 scheme to obtain PIS and COFINS credits, that "[t]he credit request and related bribe payments were never completed due to the announcement of Operation Zealots in Spring of 2015"); AC ¶ 90, 113 (alleging, with respect to 2014-2015 scheme to influence CARF appeal, that Angelotti and Abreu "agreed to pay bribes," but that "the Company abandoned its CARF appeal" when Operation Zealots was disclosed in Spring of 2015, and nowhere alleging that any bribe payments were made). For those reasons, even if it were sufficient to allege that the controls were not in fact effective, the Court concludes that Plaintiff has failed to allege that Bradesco's internal controls relating to financial reporting were ineffective.[13] *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 286, 402 (S.D.N.Y. 2016) (holding SOX certifications about internal controls not actionable because "plaintiffs fail to allege any facts pertaining to Sanofi's internal structure for financial reporting, much less that Sanofi lacked adequate internal controls" (citation and alterations omitted)); *In re PetroChina*, 120 F. Supp. 3d at 359-60 ("Even if PetroChina officials were engaging in bribery, the SAC does not make any allegations that would imply that the Company had flawed internal controls over *financial reporting.* Therefore, Plaintiffs have not established that the Company's statements concerning its internal control over financial reporting were false.").

---

[13] That conclusion also disposes of Plaintiff's challenge to management's "conclusions" in its 20-Fs that its ICFR "was effective." *See, e.g.*, AC ¶ 142. Although that statement, as described in the amended complaint, was not accompanied by a "reasonable assurance" qualifier, Plaintiff has nevertheless failed to allege that the Company's internal controls over *financial reporting*—the subject of those statements—were ineffective.

For the reasons stated above, Plaintiff has failed to allege with requisite specificity why the Company's statements concerning its ICFR and disclosure controls were false or misleading.[14]

**b. Risk Factors in Forms 20-F and in Reference Forms**

Plaintiff also alleges that the risk factor disclosures made in Item 3.D of Bradesco's Forms 20-F were materially false or misleading because the Company failed to disclose "(i) the risk that public disclosure of the bribery scheme would result in Bradesco's executives facing criminal charges in Brazil; (ii) the risk that public disclosure of the bribery scheme would result in the Company and/or its executives incurring fines and penalties related to the tax credits that Bradesco illegally obtained; (iii) the risk that public disclosure of the bribery scheme would result in the Company's liability pursuant to the Foreign Corrupt Practices Act of 1977 and/or other criminal or civil penalties in the United States; and (iv) the risk that public disclosure of the bribery scheme would result in a loss of investor confidence and a corresponding decline in the price of Bradesco PADS." AC ¶ 167.

As noted, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). "Such a duty may arise when there is a corporate insider trad[ing] on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Id.* (citation omitted) (alteration in original).

Item 3.D of Form 20-F requires a filing company to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk, in a section headed 'Risk Factors.'" Int'l Disclosure Standards, SEC Release No. 1205 (Sept. 28, 1999).

---

[14] To the extent that Plaintiff contends that the Company's statements related to its disclosure controls were false or misleading because those controls failed to result in disclosure of the alleged bribery schemes, that contention fails. First, as explained above, those statements did not purport to guarantee that the controls would be successful in all instances. And, in any event, the securities laws do not create a free-standing duty for a company to disclose uncharged wrongdoing. *See City of Pontiac*, 752 F.3d at 184 ("As we have explained, [d]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." (alteration in original)). The Court will address Plaintiff's contention that Item 3.D of Form 20-F created such a duty in a later portion of this opinion.

The instructions to Item 3.D state that "[r]isk factors should be concise and explain clearly how the risk affects the issuer or the securities." *Id.* As an initial matter, while Item 3.D appears to create some sort of disclosure duty, the scope of that duty is not well defined. In fact, Form 20-F states that the "Risk Factors" section described in Item 3.D "is intended to be a summary of more detailed discussion contained elsewhere in the document," yet Plaintiff does not point to any other portion of Form 20-F (or any other specific statute or regulation) that creates a more fulsome and detailed affirmative disclosure obligation. *Id.* Form 20-F provides several examples of the kinds of risk factors that may be included, none of which describe, or even encompass or approximate, uncharged and/or unadjudicated illegal conduct. *See id.*

It is well established that "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac*, 752 F.3d at 184; *see also In re UBS*, 2012 WL 4471265, at *31 ("[A]bsent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoing or mismanagement."); *In re Citigroup*, 330 F. Supp. 2d at 377 ("[F]ailure to disclose that . . revenues were derived from 'unsustainable and illegitimate sources'" did not violate Section 10(b) because "the federal securities laws do not require a company to accuse itself of wrongdoing."); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 678 (S.D.N.Y. 1990) (stating, in response to plaintiff's argument that company should have disclosed "the profound harmful effect that the public disclosure and/or termination of the bribery scheme would have on [the company's] sales, profit margins and earnings," that "the company was not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the bribery scheme was discovered, disclosed or terminated"); *cf. GAF Corp. v. Heyman*, 724 F.2d 727, 740 (2d Cir. 1983) (stating, in a case involving alleged violations of Exchange Act § 14(a) and SEC Rule 14a-9(a) through allegedly material omissions, that the "proxy rules simply do not require management to accuse itself of antisocial or illegal policies"). That well-established principle would be entirely meaningless if every reporting company were

required to disclose uncharged, unadjudicated conduct in the risk-factors sections of its filings. In the absence of more particularized language in Item 3.D, or case law interpreting Item 3.D in that way (Plaintiff provides none), the Court declines to read Item 3.D to affirmatively require disclosure of uncharged illegal conduct in all instances.

Moreover, Bradesco's disclosures during the relevant period did address the risks that could result from unlawful conduct. In its 2014 and 2015 Forms 20-F, the company cautioned that "[o]perational risk is represented by the possibility of incurring losses arising from failure, deficiencies or the inadequacy of internal processes, people, systems and external events," adding that "[t]his includes legal risk associated with the activities we carry out." *E.g.*, Barton Decl., Ex. A (2015 Form 20-F) at 55. Bradesco also directly addressed the risks that could result from various corruption investigations, including that "our subsidiary Banco Bradesco BBI S.A. . . . is a party to certain legal and administrative proceedings filed against Petrobras and other defendants" and that "[w]e or our subsidiaries may become a party to other legal and/or administrative proceedings against Petrobras or other companies which have not yet been filed." *E.g.*, *Id.* at 8-9. The Company added that "[a] negative outcome of these ongoing legal proceedings or any new legal proceedings may harm our reputation and may adversely affect our financial condition and our results of operations." *Id.* at 9. Accordingly, even assuming that Item 3.D creates a duty for companies to disclose the risks of uncharged illegal conduct, but in light of the fact that Bradesco had no affirmative duty to specifically accuse itself of wrongdoing, the Court finds those disclosures sufficient to satisfy that duty.

In reaching that conclusion, the Court finds guidance in the Second Circuit's decision in *City of Pontiac*, 752 F.3d 173. There, the plaintiffs argued that the defendants' failure to disclose an unlawful tax scheme violated Item 503(c) of Regulation S-K, which (like Item 3.D) "requires registrants to include in offering materials 'a discussion of the most significant risk factors that make the offering speculative or risky.'" *City of Pontiac*, 752 F.3d at 183-84. In failing to disclose the

scheme, the plaintiffs contended, the defendants also "rendered materially incomplete those disclosures UBS made concerning" a DOJ investigation into "whether, from 2000-2007, UBS client advisors entered the United States to help U.S. clients evade their tax obligations, in violation of U.S. law." *Id.* at 183-84. As the Circuit explained, the plaintiffs "argue[d], in effect, that, in addition to disclosing the existence of an investigation, defendants were required to disclose that UBS was, in fact, engaged in an ongoing tax evasion scheme." *Id.* at 184. The court reiterated the principle that "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing," and concluded that, "[b]y disclosing its involvement in multiple legal proceedings and government investigations and indicating that its involvement could expose UBS 'to substantial monetary damages and legal defense costs,' as well as 'injunctive relief, criminal and civil penalties, and the potential for regulatory restrictions,' UBS complied with its disclosure obligations under our case law." *Id.*

So too, here, though the circumstances are somewhat different than those at play in *City of Pontiac*. Here, Plaintiff does not challenge Defendants' failure to disclose the existence of any investigations. That is because, with the exception of the investigations disclosed in its Forms 20-F and described above, there is no allegation or indication that the Company or any of its personnel were aware of any investigations before they were announced to the public. *See* AC ¶ 2 (describing Operation Zealots as a "clandestine investigation"); *id.* ¶¶ 82, 113 (alleging that Defendants abandoned the bribery schemes when the investigation was announced in Spring 2015). By the time the investigation was announced and covered by U.S. and Brazilian news outlets (including an article by "a major Brazilian news outlet" that "confirmed that Bradesco was one of the large banks being investigated in Operation Zealots"), AC ¶¶ 114-115, Bradesco no longer had a duty (if one ever would have existed) to disclose the investigation to the public. *See, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) ("[T]here is no duty to disclose information to one who reasonably should be aware of it." (quoting *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d

243, 249-50 (S.D.N.Y. 2003) ("[T]he Defendants cannot be held liable for failing to disclose . . . publicly available information."); *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Where allegedly undisclosed material information is in fact readily accessible in the public domain, . . . a defendant may not be held liable for failing to disclose this information.").

The facts before the Circuit in *City of Pontiac* are also distinguishable in another manner from those alleged here. UBS, the defendant company in *City of Pontiac*, had entered into a deferred prosecution agreement with the Department of Justice and the Internal Revenue Service, which "revealed that UBS had violated United States tax laws, and disclosed that UBS had paid a $780 million fine and admitted participation in a conspiracy to defraud the IRS." 752 F.3d at 178. Here, by contrast, Plaintiff does not allege that Bradesco or any of its agents (including the Individual Defendants) have admitted any unlawful conduct, that the Company has paid any fines or been subjected to any other sanctions, that the Company has entered into any deferred prosecution agreements or settlements, or that the Company or any individuals have been adjudicated guilty of any charges. At this point, there are only charges, some of which have been dismissed. Thus, the Court does not find the fact that Bradesco's risk factors were less specific than those made by UBS—*i.e.*, that UBS could be subject "to substantial monetary damages and legal defense costs," and well as "injunctive relief, criminal and civil penalties, and the potential for regulatory restrictions," *id.* at 184—to be dispositive here, since while the risks disclosed by UBS in that case had materialized, no such risks have materialized with respect to Bradesco.

In the end, therefore, Plaintiff's argument here is largely the same as the plaintiff's argument in *City of Pontiac*, namely, that instead of (or in addition to) disclosing to its investors that adverse consequences *could* befall Bradesco as the result of investigations or legal proceedings, the Company should have disclosed that it *was* engaged in an unlawful bribery scheme. However, as the Court has

already explained, and as *City of Pontiac* further supports, what Bradesco disclosed was enough.[15]  The fact that Plaintiff has not alleged that any particular adverse consequences have befallen Bradesco to date from the bribery charges only makes the conclusion here easier to reach than in *City of Pontiac*.

Separate and apart from the allegation that Bradesco breached an affirmative duty imposed by Item 3.D to disclose particular risk factors, Plaintiff appears to allege that the risk factors that *were* disclosed were rendered misleading by the underlying bribery schemes.[16]  That argument, to the extent it is a distinct one, was also addressed and rejected in *City of Pontiac* for the same reasons described above.  *See id.* at 183-84; *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365-66 (2d Cir. 2010) (rejecting argument that company's disclosures about their funds and investment strategy "triggered a clear duty to disclose all material information on the same or related subjects," and explaining that the "disclosures did not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding" the company).  Courts have held, moreover, that in order for a prior statement to give rise to a duty to disclose uncharged wrongdoing, "there must be a connection between the illegal conduct and the [prior] misleading statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or the bottom line."  *Menaldi*, 164 F. Supp. 3d at 581 (citation omitted).  As the court in *Menaldi* explained:

> District courts have identified such a connection in three circumstances.  First a duty to disclose uncharged wrongdoing can arise when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices.  Second, a duty to disclose may arise when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring.  Third, a

---

[15] This section of the Court's opinion deals only with Bradesco's purported duty to disclose its wrongdoing as a risk factor.  To the extent that the amended complaint alleges that particular statements made by Bradesco or its agents were rendered inaccurate, incomplete, or misleading by the failure to disclose the alleged bribery, the Court addresses those allegations elsewhere.

[16] As the Court in *In re FBR* explained, "[t]hough ubiquitous in securities filings, cautionary statements of potential risk have only rarely been found to be actionable by themselves.  Rather, courts generally assess cautionary language to determine whether that language insulates a defendant from liability under the 'bespeaks caution' doctrine."  544 F. Supp. 2d at 360-61.

> duty to disclose can arise when a defendant states an opinion that, absent
> disclosure, misleads investors about material facts underlying that belief.

*Id.* (internal citations omitted). None of those connections exist between Bradesco's alleged bribery scheme and the risk factors that the Company did disclose.

Finally, to the extent that Plaintiff also challenges the risk factors disclosed in the Company's Reference Forms, the above analysis applies equally to that challenge. The Reference Forms contained the same disclosures concerning investigations and legal proceedings that the Company included in its Forms 20-F. *See, e.g.*, Barton Decl., Ex. H (May 2015 Reference Form) at 14. Because Plaintiff does not identify any duty for a company to disclose in its Reference Forms information that it need not disclose in its Forms 20-F, the Court's analysis above leads to the same conclusion here: Plaintiff has not pleaded any actionable misstatements or omissions related to risk factors.

### c. SOX Certifications

The Court next addresses Plaintiff's allegations that Trabuco's SOX certifications were false or misleading. Plaintiff challenges several portions of those certifications, which the Court will consider in turn. First, Plaintiff challenges as false or misleading Trabuco's certification pursuant to SOX Section 906 that, to his knowledge, the annual reports presented on Forms 20-F "fully compl[y] with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 20-F fairly presents, in all material respects, the financial condition and results of operations of the Company." AC ¶ 163. Plaintiff has failed to plead that that certification was false or misleading because, as already explained, the amended complaint does not adequately allege a nexus between the alleged bribery schemes and Bradesco's financial condition or results of operations, or that the Company's *financial reports* contained inaccuracies. *See supra* Part III.C.1.a.

Plaintiff also challenges the portion of Trabuco's SOX Section 302 certification that states that "[t]he company's other certifying officer and I have disclosed . . . to the company's auditors and

the audit committee of the company's board of directors . . . [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." AC ¶ 162. As an initial matter, the Court notes that that language could fairly be read to encompass only fraud that is related to ICFR. *See In re FBR*, 544 F. Supp. 2d at 363 (acknowledging, but declining to reach, that question). In any event, the certification refers specifically to disclosure of fraud *to the Company's auditors or audit committee*. Plaintiff does not allege that either Trabuco or the other certifying officer concealed any fraud from Bradesco's auditors or audit committee, and as a result, Plaintiff has failed to allege why that portion of the certification was false or misleading. *See In re PetroChina*, 120 F. Supp. 3d at 359 (stating that complaint "does not assert that the certifying officers neglected to inform PetroChina's auditor of any relevant fraud"); *See also In re FBR*, 544 F. Supp. 2d at 363 ("The fundamental problem with plaintiffs' claim is that they do not allege with particularity the basis for their belief that the individual defendants did not disclose the insider trading fraud to FBR's auditors and its audit committee."). Plaintiff may not simply assume that Bradesco's certifying officers failed to disclose fraud to its auditors and audit committee because they failed to disclose it to investors.

Next, Plaintiff challenges that portion of Trabuco's Section 302 certification that stated that he and the other certifying officer "have . . . [d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared." AC ¶ 162. As already explained, the amended complaint contains no allegations concerning the design or structure of Bradesco's internal controls. *See supra* Part III.C.1.a. Accordingly, Plaintiff has failed to plead why this statement—which concerns the "design" of controls and does not purport to guarantee that those controls will perform perfectly in every instance—was false or misleading.

Finally, Plaintiff challenges as false or misleading Trabuco's Section 302 certification that, "based on [his] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by this report." AC ¶ 162. Plaintiff contends that that statement was false or misleading because Bradesco's Forms 20-F "did, in fact, omit material facts." Pl.'s Mem. at 38. This statement, and Plaintiff's corresponding argument, merely beg the question that is the entire subject of this opinion. To the extent that the Court finds Plaintiff to adequately have alleged that Trabuco made any actionable misstatements or omissions in Bradesco's Forms 20-F with the requisite scienter in other portions of this opinion, Plaintiff may proceed both on any such misstatement or omission and this portion of Trabuco's SOX certification. *See In re Ramp Corp. Sec. Litig.*, No. 05-cv-6521 (DLC), 2006 WL 2037913, at *13 (S.D.N.Y. July 21, 2006).

### d. Reference Form Certifications

Plaintiff further challenges statements made by Trabuco and Angelotti[17] in Bradesco's Reference Forms that "the set of information contained therein is a true, accurate, and complete description of the issuer's economic financial outcomes and of the risks inherent to its activities and securities issued." AC ¶ 168. Because, as already explained and reiterated, Plaintiff has not alleged any inaccuracy or material omission with respect to Bradesco's "economic financial outcomes," the Court will focus here on that portion of the statement that concerns "the risks inherent to [the Company's] activities and securities issued." Bradesco's Reference Forms contained the same disclosures concerning investigations and legal proceedings that the Company included in its Forms 20-F. *See, e.g.*, Barton Decl., Ex. H ("May 2015 Reference Form") at 14; *see also supra* Part III.C.1.b.

---

[17] Both Trabuco and Angelotti are identified in the Reference Forms as "person[s] in charge of the form's contents," and the forms say that Trabuco and Angelotti "hereby state" the challenged statement. *See e.g.*, Barton Decl., Ex. H (May 2015 Reference Form) at 7. The Court considers this sufficient to show, at the pleading stage, that Trabuco and Angelotti had ultimate authority over the statement, and therefore "made" the statement within the meaning of *Janus*.

But, as with the Forms 20-F, Plaintiff contends that they should have disclosed the following more specific risks: "(i) the risk that public disclosure of the bribery scheme would result in Bradesco's executives facing criminal charges in Brazil; (ii) the risk that public disclosure of the bribery scheme would result in the Company and/or its executives incurring fines and penalties related to the tax credits that Bradesco illegally obtained; (iii) the risk that public disclosure of the bribery scheme would result in the Company's liability pursuant to the Foreign Corrupt Practices Act of 1977 and/or other criminal or civil penalties in the United States; and (iv) the risk that public disclosure of the bribery scheme would result in a loss of investor confidence and a corresponding decline in the price of Bradesco PADS." AC ¶ 169.

The Court acknowledges at the outset that, unlike the Company's other risk-related statements, this statement by Trabuco and Angelotti represents that the Company's risk disclosures were "complete." Nevertheless, for substantially the same reasons described in Part III.C.1.b of this opinion, the Court finds that Plaintiff has not adequately pleaded that this statement was false or misleading. As discussed, Bradesco's Reference Forms did disclose the risks that Plaintiff contends they should have disclosed, albeit in more general terms. The Company disclosed, for instance, the existence of anti-corruption investigations, and cautioned that "our subsidiary Banco Bradesco BBI S.A. . . . is a party to certain legal and administrative proceedings filed against Petrobras and other defendants" and that "[w]e or our subsidiaries may become a party to other legal and/or administrative proceedings against Petrobras or other companies which have not yet been filed." May 2015 Reference Form at 8. The Company added that "[a] negative outcome of these ongoing legal proceedings or any new legal proceedings may harm our reputation and may adversely affect our financial condition and our results of operations." *Id.* The Company also cautioned that a "reduction in investor confidence" in relation to anti-corruption investigations "may adversely affect the results of our operations." *Id.*

The Court is mindful again here of the maxim that, "absent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoing or mismanagement." *In re UBS*, 2012 WL 4471265, at *31. Plaintiff contends, in essence, that Trabuco's and Angelotti's statement that its risk disclosures were "complete" constituted an express prior disclosure that gave rise to such a duty. *See* Pl.'s Mem. at 39 ("By choosing to speak on the subject of 'the risks inherent to [Bradesco's] activities,' Defendants had a duty to speak fully and accurately and disclose the risks stemming from the bribery scheme."). As explained above, however, the Reference Forms did disclose the risks stemming from the bribery scheme; they simply did in so in a less detailed and specific manner than Plaintiff would have liked. Because Plaintiff provides the Court with no case law stating that a generalized statement that a company's risk disclosures were "complete" gives rise not only to a duty to disclose the risks that could ensue from uncharged conduct, but also to effectively disclose the uncharged conduct itself, the Court concludes that Bradesco's risk disclosures were sufficiently "complete." Accordingly, Plaintiff has not adequately alleged that Trabuco's and Angelotti's Reference Form certifications were false or misleading.

### e. Code of Ethical Conduct and Anti-Corruption Statements

The Court now turns to those allegedly false or misleading statements that bear a more direct nexus to the alleged bribery schemes, namely, Bradesco's Code of Ethical Conduct, statements made in Bradesco's Forms 20-F about the Code of Ethical Conduct (which incorporated the Code itself into the Company's filings), and statements made in Forms 20-F as well as an August 8, 2014 press release about the Company's approach to preventing and fighting corruption.

During the period after March 24, 2014 (the earliest date on which Plaintiff has adequately alleged that Bradesco was knowingly involved in a bribery scheme), the Company's Forms 20-F state:

We have adopted a Code of Ethics and Sectorial Codes of Ethics under the Securities Exchange Act of 1934, as amended. Our Codes of Ethics apply to our Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and persons performing similar functions, to our directors, other officers, employees, business partners, suppliers and service providers. Our Code of Ethics Conduct are available on our website at www.bradesco.com.br/ir.

AC ¶ 152. During the period between January 27, 2014 and June 28, 2015, Bradesco's Code of Ethical Conduct stated, in relevant part: "is [sic] unacceptable any conduct that configure in attempt or practice of bribery or corruption, including concealment or dissimulation of the occurrence of such acts," "it is forbidden to accept, obtain, finance, fund, grant, pay, promise, sponsor or authorize, directly or indirectly, any benefit, monetary or otherwise, in any way whatsoever, in favor or whoever that may represent improper relationship," "it is prohibited to promise, offer or give, directly or indirectly, benefit to the public servant or to a third-party related to him, as well as to receive, whether on behalf of the Organization or whoever," "[w]e must ensure compliance with our policies, rules and controls for the prevention and combating of . . . corruption and unlawful acts of any nature," and "[f]acts related to any accounting aspects or frauds committed by managers and employees of the Bank . . . must be brought to the attention of the Audit Committee." AC ¶ 155. The version of Bradesco's Code of Ethical Conduct applicable from June 29, 2015 through end of the alleged class period contained substantially the same provisions. *See* AC ¶ 156.

On August 8, 2014, Bradesco issued a press release, which was filed with the SEC on Form 6-K. In the Management Report section of the release, under the heading "Preventing and Combating Corruption and Money Laundering and the Financing of Terrorism," the Company's Board of Directors and Board of Executive Officers states:

Bradesco adopts a formal and effective process for preventing and combating corruption and bribery, supported by the Code of Ethical Conduct and by the Corporate Anti-Corruption Policy. Cultural adaptation is accomplished through institutional communication and training programs, providing an effective monitoring of risks and controls. Bradesco also has a complaint channel, whose actions configured as violations are subject to applicable disciplinary measures, regardless of hierarchical level, and without prejudice to appropriate legal penalties.

AC ¶ 148.  In its 2014 Form 20-F (filed with the SEC on April 30, 2015), the Company stated, in

relevant part:  "[w]e carry out procedures to prevent and fight any corruption acts on an ongoing

and permanent basis," "[o]ur Board of Directors approved the Corporate Anti-Corruption Policy,

which establishes guidelines for the prevention and fight against corruption, applicable to

management and employees of the Group," "[t]he Board of Directors also established the Corporate

Anti-Corruption Rule, with rules and procedures aimed at preventing and fighting corruption and

bribes," "[t]he Anti-Corruption Program is supported by the Code of Ethics and by the Corporate

Anti-Corruption Policy, and the actions developed also comprise . . . raising awareness in employees

and partners through remote and in-person training as well as internal and external communications,

thus, providing an effective monitoring of risks and controls," and "[w]e also make available

reporting channels in which any actions being construed as violations are subject to proper

disciplinary measures, regardless of the hierarchy level involved."  AC ¶ 149.  Bradesco's 2015 Form

20-F (filed April 15, 2016), stated, in part:

> We continuously seek to enforce measures with a view to preventing and fighting
> corruption and bribery, thus demonstrating our commitment towards operating
> our business and building and maintaining relationships in an ethical manner.
> The Program of Prevention and Fight against Corruption is supported by the
> Code of Ethical Conduct, by the Corporate Anti-corruption Policy and by the
> Ethical Conduct Committee, all approved by the Board of Directors.  The Anti-
> Corruption Corporate Standard, with rules and procedures are aimed at the
> concession of gifts, sponsorships, donations, procurement and management of
> business partners, which aim to prevent and combat corruption and bribery, in
> compliance with the laws and regulations in force in Brazil and in the countries in
> which we have business units.

AC ¶ 150.

It is no surprise that Defendants attempt to paint all of the above statements as inactionable

"puffery" that is simply immaterial as a matter of law.  As the Court explained earlier, a statement

may be deemed "puffery," and therefore be held inactionable as a matter of law, when that

statement is "too general to cause a reasonable investor to rely upon them," and the quintessential

examples of such inactionable "puffery" are "general statements about reputation, integrity, and

compliance with ethical norms," particularly when such statements are "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *City of* Pontiac, 752 F.3d at 183; *cf. also U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, No. 12-cv-6811 (CM) (JCF), 2013 WL 791462, at *6 (S.D.N.Y. Mar. 5, 2013), *report and recommendation adopted*, ECF No. 197 (Apr. 24, 2013) ("'Puffing' has been described as making generalized or exaggerated statements such that a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely.").

Defendants cite, for example, the Sixth Circuit's decision in *Bondali v. Yum! Brands, Inc.*, which stated:

> [A] code of conduct is not a guarantee that a corporation will adhere to everything set forth in its code of conduct. Instead, a code of conduct is a declaration of corporate aspirations. To treat a corporate code of conduct as a statement of what a corporation will do, rather than what a corporation aspires to do, would turn the purpose of a code of conduct on its head.

620 F. App'x 483, 490 (6th Cir. 2015) (internal citation omitted). That general principle is well established in the Second Circuit, as well. *See City of Pontiac*, 752 F.3d at 183. As Defendants acknowledge, that principle inheres in the fact that codes of conduct and other aspirational statements concerning compliance with the law do not guarantee that compliance will occur in every instance. *See, e.g.*, *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-cv-4665 (PGG), 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014) ("The . . . statements from the Ethics Codes and the Corporate Responsibility Reports offer no assurance that Avon's compliance efforts will be successful . . . .").

For that reason, the Court concludes that Bradesco's Code of Ethical Conduct is not actionable. As another court in the district has stated, "[b]ecause a code of ethics is inherently aspirational, it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all." *In re Braskem*, 2017 WL 1216592, at *14 (citation and alteration omitted). As is typically the case, the Company's Code made no guarantee that it would be followed, nor did it contain any representations of historical fact to the effect that its officers had uniformly abided by it. Therefore, despite its relatively forceful wording,

it remains an aspirational and hortatory statement. *See, e.g., id.* (holding code of conduct stating that "[i]t is strictly forbidden to all Members of BRASKEM [to] offer or promise . . . payments, gifts or benefits to public officials . . . in order to obtain benefit for the company" inactionable, because "[t]here is an important difference between a company's announcing rules forbidding bribery and its factually representing that no officer has engaged in such forbidden conduct"); *In re PetroChina*, 120 F. Supp. 3d at 360 ("Although the Company's codes of ethics prohibit bribery and other forms of fraudulent conduct, they do not claim that PetroChina's officers are abiding by them.").

The Court does not reach the same conclusion, however, with respect to the statements made in Bradesco's Forms 20-F and the August 8, 2014 press release *about* the Code of Ethical Conduct or about the Company's anti-corruption policies and efforts. The principle that corporate statements about compliance with law, or statements of corporate optimism, are inactionable puffery, does have some acknowledged limits. "Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In Petrobras*, 116 F. Supp. 3d at 381; *see also Novak*, 216 F.3d at 315 (2d Cir. 2000) (finding general statements that inventory was "in good shape" and "under control" actionable where defendants knew contrary was true); *Arkansas Teacher Ret. Sys.*, 18 F. Supp. 3d at 485 ("[W]hile a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless."). Here, the context in which the statements about Bradesco's Code of Ethical Conduct and its other anti-corruption statements were made persuades the Court that they are not to be treated as immaterial as a matter of law at this stage of the litigation

In *In re Petrobras*, the court held that several statements substantially similar to the ones at issue here were not mere puffery when viewed in context. Those statements included statements that Petrobras had established a commission "aimed at assuring the highest ethical standards," and that it undertook to "conduct its business with transparency and integrity" and to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any

transgressions." *In re Petrobras*, 116 F. Supp. 3d at 381. The court rejected the defendants' argument

that those statements were inactionable puffery in light of the context in which they were made,

explaining:

> While some of the alleged statements, viewed in isolation, may be mere puffery,
> nonetheless, when (as here alleged) the statements were made repeatedly in an
> effort to reassure the investing public about the Company's integrity, a reasonable
> investor could rely on them as reflective of the true state of affairs at the
> Company. Accordingly, the Court cannot find that all of Petrobras' alleged
> statements regarding its general integrity and ethical soundness were immaterial as
> a matter of law.

*Id.* The Court finds that reasoning persuasive and applicable here. Bradesco did not make its

statements in a vacuum, and they should not be evaluated in one. *See* 17 C.F.R. § 240.10b-5(b)

(providing that it is unlawful to "make any untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statements made, *in the light of the circumstances under which*

*they were made*, not misleading" (emphasis added)).

The statements in this category were not merely about compliance with the law or ethical

norms, in general; rather, they spoke about bribery and corruption specifically. And at the time

these statements about compliance with the law, in general, and bribery, in specific, were made, the

public had learned of the vast bribery revelations stemming from Operation Car Wash. Bradesco

acknowledged in its own public filings the risks and uncertainties those high-profile investigations

could bring to its own operations and the confidence of its investors, cautioning investors that they

"may have momentarily harmed the reputation of Brazil, which could reduce investor confidence,"

and that, "[i]f uncertainty continues or a reduction in investor confidence as a result of these

investigations is material, it may adversely affect the results of our operations." AC ¶ 46. Additional

context is found in Brazil's passage in August 2013 of an anti-corruption law (Law No. 12,846/13), a

development that Bradesco saw fit to disclose to its investors in its 2013 Form 20-F, filed April 30,

2014. *See* Decl. of Johnston De F. Whitman, Jr. (ECF No. 70) ("Whitman Decl."), Ex. 1 (2013

Form 20-F). Fewer than four months later, the Company informed its investors in the August 8,

2014 press release that it had "adopt[ed] a formal and effective process for preventing and combating corruption and bribery," which included discipline for violations "regardless of hierarchical level." AC ¶ 148.

As in *Petrobras*, the Court concludes that, while at least some of the statements in this category may be mere puffery when viewed in isolation, context shows they were made in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern, and that therefore "a reasonable investor could rely on them as reflective of the true state of affairs at the Company." *See* 116 F. Supp. 3d at 381. In so concluding, the Court is guided by the Supreme Court's frequent admonition that the issue of materiality "requires delicate assessment of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus.*, 462 U.S. at 450.

The Court notes, in addition, that not all portions of these statements express mere aspiration. As noted, the August 8, 2014 represented to investors that Bradesco had "adopt[ed] an "effective" anti-corruption policy, which would subject violators to discipline "regardless of hierarchical level." AC ¶ 148. But Plaintiff has alleged that, by that date, at least Angelotti was fully aware that the policy was not effective, since he was knowingly involved in the scheme to bribe Leite. Moreover, as a member of the Company's Executive Board and a senior executive, he was aware that discipline was in fact not being imposed "regardless of hierarchical level." Similarly, Plaintiff adequately alleges that, by touting its Code of Ethical Conduct and its anti-corruption policy, Bradesco sought to reinforce and reassure its investors that bribery and corruption was "unacceptable" and "prohibited," that the Company "*must* ensure compliance with our policies, rules and controls for the prevention and combating of . . . corruption and unlawful acts of any nature," and that the Code applied to all levels, including the CEO and other management. AC ¶ 155 (emphasis added). But even the highest levels of management are alleged to have been involved in

bribery and corruption at the very same time. While it may not be reasonable for an investor to rely on those statements as ensuring that no employee of Bradesco will ever engage in bribery or corruption, the Court cannot conclude that reasonable investors could not at least rely on those statements as reflecting that Bradesco's senior-most officers—indeed, even the Vice President of the Company's Board of Directors in the case of Trabuco—were not simultaneously doing so.

Finally, even to the extent these statements were merely aspirational, investors could have relied at least on the notion that the Company held such aspirations. In alleging that executives in the highest echelons of the Company were actively involved in bribing a government official during the time these statements were made, Plaintiff has adequately alleged that no such aspirations were at play. *See Stream SICAV v. Wang*, 989 F. Supp. 2d 264, 274 (S.D.N.Y. 2013) ("It is well-settled that, when defendants knowingly or recklessly fail to follow policies announced in their public filings, they may cause those filings to be materially misleading in that the disclosed policy no longer reflects actual practice." (citation and alteration omitted)); *see also In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10-cv-3461 (PAC), 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (holding actionable statements that "we have extensive procedures and controls that are designed to . . . address conflicts of interest" and "we increasingly have to address potential conflicts of interest," because company's "representations about its purported controls for avoiding conflicts were directly at odds with its alleged conduct").[18]

As the Court has already explained several times in this opinion, the securities laws do not impose on corporations a general, free-standing duty to disclose uncharged illegal conduct. *E.g.*, *City*

---

[18] In arguing that claims relating to this category of statements should be dismissed, Defendants rely almost entirely on the argument that they constitute "puffery." To the extent that Defendants contend that these statements are immaterial for other reasons, such as that the alleged bribery scheme was not related to the core of Bradesco's business or did not result in material errors in its financial statements, *see* Defs.' Reply Mem. in Supp. of Mot. to Dismiss (ECF No. 73), at 8-10, the Court is not persuaded. The Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011). Here, it is sufficient that plaintiff has alleged misstatements that "call into question the integrity of the company as a whole." *See Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 (S.D.N.Y. 2015).

*of Pontiac*, 752 F.3d at 184. However, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer*, 761 F.3d at 250. "[C]ourts have found the requisite connection between improper activity and affirmative statements [such that a duty to disclose attached] where defendants made specific statements that could be interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs was not occurring." *In re FBR*, 544 F. Supp. 2d at 358. By choosing to speak to its investors on the topic of bribery and other corruption, and particularly by doing so in a manner that could be reasonably interpreted as suggesting at least that the Company's senior-most executives were not at the same time engaging in such activities, Bradesco was under a duty to speak the whole truth. Because the amended complaint asserts that it did not, the Court concludes that Plaintiff has adequately alleged that the statements about Bradesco's Code of Ethics, and its other anti-corruption statements made after March 24, 2014, were materially false or misleading.

Having determined that Plaintiff has adequately alleged that these statements were materially false or misleading, the Court must determine who "made" them within the meaning of *Janus*, as interpreted earlier in this opinion to preclude application of the group-pleading/group-published documents doctrine. First, because the Management Report section of the August 8, 2014 is expressly attributed to Bradesco's Board of Directors and Board of Executive Officers, AC ¶ 148, and because each of the Individual Defendants was a member of one of those boards, AC ¶¶ 29-31,[19] Plaintiff has adequately alleged that both the Company and each of the Individual Defendants made those statements. With respect to each of the other statements in this category, which are found in the Company's Forms 20-F, the Court concludes that only Bradesco and Trabuco are their "makers." Trabuco is the only Individual Defendant who signed the 20-Fs, and Plaintiff does not allege any other facts suggesting that Angelotti or Abreu had any form of ultimate authority over

---

[19] Angelotti also separately signed the Form 6-K on which the release was filed with the SEC. AC ¶ 148.

those statements.  *See, e.g., In re Smith Barney*, 884 F. Supp. 2d at 163-64 ("[C]ourts consistently hold that signatories of misleading documents 'made' the statements in those documents, and so face liability under Rule 10b-5(b).").

### f.    Affirmative Denials Related to Operation Zealots

Finally, Plaintiff challenges a series of statements made in 2015 and 2016 specifically about Operation Zealots after that investigation had been announced to the public.  First, in a March 31, 2015 press release, which was attached to a Form 6-K signed by Angelotti and filed with the SEC on April 10, 2015, Bradesco responded to an *O Estado* article reporting that Bradesco was one of the companies targeted by Operation Zealots by stating that the Company "does not know details concerning the investigative process related to the subject" and that the Company "adopts strict internal controls to ensure the compliance of its Anticorruption Corporate Policy and of its Code of Ethical Conduct, besides complying with the rules issued by Regulatory Bodies."  AC ¶ 171.  Second, *O Estado* published an article about Operation Zealots on December 4, 2015 and requested comment from Bradesco about whether it had committed any of the alleged misconduct.  AC ¶ 172.  In response to the request for comment, Bradesco stated that it "never conceded to, negotiated or had practiced acts in violation of the internal rules of compliance as well as the applicable laws of the Country."  *Id.*  As alleged, that comment was attributed only to the Company (or to an unidentified individual within the Company) in the *O Estado* article, and Plaintiff does not allege any facts concerning who made, or had ultimate authority over, the comment.  Finally, in a statement released by the Company on May 31, 2016—the date on which Trabuco, Angelotti, and Abreu were indicted on criminal charges—Bradesco issued a "Notice to the Market," stating that "[n]o proposal, hiring or payment have been implemented from these contacts [with the group]" and that Bradesco "has never promised, offered or gave undue advantage to any person, including public employees, for submission of tax affairs or of any other nature."  AC ¶ 173.  The Notice to the Market also reiterated Bradesco's "high standards of ethical conduct."  *Id.*  The Company subsequently filed the

Notice to the Market with the SEC on Form 6-K on June 1, 2016.  AC ¶ 174.  According to the

amended complaint, "Bradesco's denial of wrongdoing was picked up and repeated by several news

outlets, including *Reuters*, *The Wall Street Journal*, *Bloomberg* and *Financial Times*.  *Id.*  In a Form 6-K

filed with the SEC on June 9, 2016 and signed by Angelotti, Bradesco stated:  "We would like to

take this opportunity to reiterate the clarifications provided in the Notice to the Market of May 31,

2016."  AC ¶ 175.

Plaintiff has adequately alleged that each of the above statements was materially false or

misleading.  With respect to the March 31, 2015 press release, Defendants contend that Plaintiff

failed to allege that the Company's statement that it "does not know details concerning the

investigative process related to the subject" was false or misleading because Plaintiff "does not allege

any facts suggesting that Bradesco knew the details of the Federal Police's investigation in March

2015."  Defs.' Mem. at 33.  That argument relies on too narrow a reading of the Company's

statement.  While it is true that the amended complaint does not allege that Defendants knew details

about the investigation itself, the Court cannot conclude that a reasonable shareholder would not

interpret the statement to deny any knowledge of the *subject* of the investigation, and Plaintiff

certainly has alleged that such a denial would have been false or misleading.  And, in any event,

Plaintiff alleges that Abreu and Angelotti provided sworn statements to the Brazilian Federal Police

on April 1, 2015 (the very next day), AC ¶ 178, which adds plausible support to the inference that

they knew at least something about the investigation when the March 31 statement was issued.  For

the reasons explained in Part III.C.1.e, *supra*, the Court also concludes that Plaintiff has adequately

alleged that the comment regarding "strict internal controls" was materially false or misleading.

The remaining statements in this category—those made in the Company's comment in the

December 4, 2015 article and in the Notice to the Market and its subsequent "reiteration"—plainly

contain denials of misconduct.  Defendants do not contest that fact.  Instead, they attempt to split

hairs by arguing that "Plaintiff does *not* allege that Bradesco ever paid anything to a government

official." Defs.' Mem. at 34. That argument is unavailing. As alleged in the amended complaint, Bradesco's Code of Ethical Conduct expressly prohibited not only "any granting of advantage or privilege to public servants," but also any "*offer* . . . directly or indirectly" to give a "benefit to [a] public servant or to a third-party related to him," as well as "any conduct that configure in *attempt* . . . of bribery or corruption." AC ¶¶ 153, 155-156 (emphases added). Similarly, Plaintiff alleges that Article 333 of the Brazilian Criminal Code makes it illegal "to *offer or promise* an undue advantage to a public official, for him to conduct, omit or delay an official act." AC ¶ 119 (emphases added). Thus, Defendants' statements denying that they had ever "promised" or "offered" undue advantage to public employees and they had not violated Brazilian law or their internal policies are adequately alleged to have been false or misleading, even if Defendants had only negotiated and offered, but had not actually paid, bribes.

As with the previous category of alleged misstatements, the Court must determine which defendants are adequately alleged to have "made" these statements. Because the Form 6-K furnishing the March 31, 2015 press release to the SEC (and thereby to U.S. investors) was signed by Angelotti, Plaintiff has adequately alleged that both Bradesco and Angelotti "made" the statements contained within it. The same is true of the June 9, 2016 Form 6-K, also signed by Angelotti, stating that "we would like to take this opportunity to reiterate the clarifications provided in the Notice to the Market of May 31, 2016." By signing that statement, Angelotti also "ratified and approved" the Company's May 31, 2016 statement, which has been held sufficient to satisfy the *Janus* rule. *See In re Fannie Mae*, 891 F. Supp. 2d at 473. As a result, both the Company and Angelotti "made" that statement.

Finally, Plaintiff does not identify any individual responsible for the December 4, 2015 statement, which is attributed in the *O Estado* article to an unidentified speaker at Bradesco, and Plaintiff concedes that it "is seeking only to hold Bradesco . . . liable" for that statement. Pl.'s Mem. at 21 n.7. Defendants argue that claims based on this statement must be dismissed because Plaintiff

has not alleged the specific individual responsible for it.  At least to the extent that argument is based on the requirements of Rule 9(b) or *Janus*, the Court rejects it.[20]  The case law that Defendants cite does not support that proposition.  Defendants cite *Avila v. Lease Financial Group, LLC*, in which the court stated that Rule 9(b) "requires the plaintiff to state . . . the identities of the parties to the misrepresentations."  No. 11-cv-8125 (KBF), 2012 WL 3165408, at *6 (S.D.N.Y. July 31, 2012).  In attributing the statement to Bradesco, Plaintiff has fulfilled that requirement.  Defendants also cite *Janus*, but *Janus*'s rule itself acknowledges that an entity can "make" a statement.  *See* 564 U.S. at 143 ("For purposes of Rule 10b-5, the maker of a statement is the person *or entity* with ultimate authority over the statement . . . ." (emphasis added)).  Indeed, the *Janus* court did not concern itself with which individuals were responsible for the statements at issue, but only with which entity could be held liable.  Furthermore, Defendants' reading of *Janus* would lead to the absurd result that a corporate defendant could never be found liable for securities fraud so long as it took care to ensure that its statements were attributed only to the company and not to an individual.  The Court declines to endorse such a result.  Accordingly, Plaintiff has adequately alleged that the December 4, 2015 statement was "made" by Bradesco.

* * *

In sum, Plaintiff has adequately alleged that the following materially false or misleading statements were made by the following defendants:  (1) the August 8, 2014 press release (made by Bradesco, Trabuco, Angelotti, and Abreu); (2) statements about Bradesco's Code of Ethical Conduct in Forms 20-F, and anti-corruption statements in Forms 20-F filed after March 24, 2014 (made by Bradesco and Trabuco); (3) the March 31, 2015 press release filed with the SEC on April 10, 2015 (made by Bradesco and Angelotti); (4) the December 4, 2015 *O Estado* comment (made only by Bradesco); and (5) the May 31, 2016 "Notice to the Market" filed with the SEC on June 1, 2016, as

---

[20] The Court will address the effect this has on scienter in the following section of the opinion.

well as the June 9, 2016 "reiteration" of the "clarifications provided in" the May 31 Notice (made by Bradesco and Angelotti).

## 2. Scienter

Notwithstanding the above, no defendant may be held liable for any of the false or misleading statements unless Plaintiff has stated "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "Scienter" has been defined by the Supreme Court as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). "In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud in this circuit." *ECA*, 553 F.3d at 198 (citation omitted). "In the securities fraud context," the Second Circuit has "typically found it sufficient to state a claim based on recklessness if the complaint 'specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Novak*, 216 F.3d at 308. Both Rule 9(b) and the PSLRA require that "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009); *The Penn. Ave. Funds v. Inyx Inc.*, No. 08-cv-6857 (PKC), 2010 WL 743562, at *12 (S.D.N.Y. Mar. 1, 2010) ("[G]roup pleading of scienter . . . runs afoul of the PSLRA's requirement that a plaintiff 'state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind.'" (citation omitted)).

A plaintiff adequately alleges a "strong inference" of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "In determining whether this inference can be reasonably drawn, courts must consider both the inferences urged by the plaintiff

and any competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA*, 553 F.3d at 198.

A plaintiff may plead a strong inference of scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99 (citation omitted). "At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311). "Where the defendant at issue is a corporation, it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley*, 797 F.3d at 177 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008)).

Plaintiff does not allege the kind of motive that is recognized in this circuit as supporting a strong inference of scienter on the part of any of the Individual Defendants, namely, a concrete and *personal* benefit from the fraud. "In attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to . . . sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." *S. Cherry St.*, 573 F.3d at 109 (citation omitted). And while Plaintiff alleges that the Individual Defendants were personally motivated to "conceal the tax bribery scheme from the public in order to avoid potential criminal liability, prosecution and imprisonment," AC ¶ 183, the Second Circuit has held that "the avoidance

of personal liability motive is too speculative and conclusory to support scienter," *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001). Such a motive, if accepted as sufficient to allege a strong inference of scienter, would apply to every defendant in every case, effectively rendering the scienter requirement a nullity. Accordingly, the Court considers, in turn, whether Plaintiff has alleged that each defendant possessed scienter on the other recognized bases.

### a. Abreu

The Court concludes that Plaintiff has failed to allege a strong inference of scienter as to Abreu with respect to the August 8, 2014 press release—the only statement that he "made" within the meaning of *Janus*. The amended complaint simply contains no allegation that Abreu was involved in or knew of the alleged bribery scheme prior to his attendance at the October 9, 2014 meeting, or that he had access to facts about the alleged scheme before that time. Although Plaintiff makes a fleeting argument that Abreu failed to check information that he had a duty to monitor, Pl.'s Mem. at 50, that argument fails the particularity test because Plaintiff has not identified any specific information that could have been uncovered by Abreu in the course of a reasonable investigation at that time. *See Teamsters*, 531 F.3d at 196 (holding that plaintiffs' duty-to-monitor argument failed because "they have not specifically identified any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements").

Thus, although Abreu "made" the anticorruption statements contained in the August 8, 2014, and that statement is actionable, Plaintiff does not allege that Abreu made the statement with the requisite state of mind to sustain a claim against him under Section 10(b).

### b. Angelotti

By contrast, Plaintiff unquestionably pleads a strong inference of scienter as to Angelotti for all statements that he made after March 24, 2014. As described earlier, Plaintiff adequately alleges with particularity that Angelotti was knowingly involved in the scheme to bribe Leite and then to

influence CARF proceedings beginning on that date. That is all that is needed to allege a strong

inference of scienter. *See ECA*, 553 F.3d at 199 (holding that strong-inference standard may be

satisfied by alleging that a defendant engaged in deliberately illegal behavior or knew facts or had

access to information suggesting that their public statements were not accurate).

### c. Trabuco

Similarly, the Court concludes that Plaintiff has alleged a strong inference of scienter as to

Trabuco, but only for statements made after October 9, 2014, the date on which he first attended a

meeting with the Bribe Facilitation Group. First, with respect to any statements made before that

date, Plaintiff has not adequately alleged that Trabuco was aware of the bribery schemes or had any

involvement in them. He did not attend the March 24, 2014 meeting, and Plaintiff does not allege

that the "papers" provided to Angelotti around the time of that meeting were provided to Trabuco.

Nor does Plaintiff adequately allege—or even argue, for that matter—that Trabuco had a duty to

monitor what went on in that single meeting in the context of all of Bradesco's affairs.

With respect to statements made after October 9, 2014, however, Plaintiff adequately alleges

that Trabuco made them with the requisite scienter. As alleged in the amended complaint, Trabuco

attended meetings with the Bribe Facilitation Group (Pagnozzi, Tamazato, and Leite himself) on

October 9, 2014 and with Pagnozzi on November 12, 2014. The Court has considered the

alternative inference that Defendants ask the Court to adopt—namely, that because Trabuco

attended those meetings only briefly, he was not aware of the illicit dealings being discussed—but

the Court cannot conclude that the inference that Trabuco was aware of the subject of the meetings

is not at least as plausible. This is particularly so in light of the fact that Leite was in attendance

during the portion of the October 9, 2014 that Trabuco attended (why would he be there?), and that

Trabuco told Pagnozzi during the November 12, 2014 meeting to "tell our friend we are interested

in hiring you to do this." AC ¶ 86. To be sure, there could be alternate explanations for those facts,

but where, as here, the inculpatory inference is at least as compelling as any plausible opposing

inferences, the tie goes to the plaintiff. *See Lockheed Martin*, 875 F. Supp. 2d at 372 ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff.").

### d. Bradesco

As noted, a plaintiff may adequately plead scienter as to a corporate defendant "by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley*, 797 F.3d at 177 (citation omitted). "Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority." *Penn. Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) (quoting *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 265 (S.D.N.Y. 2010)); *see also In re Marsh & McLennan*, 501 F Supp. 2d at 481 ("[C]ourts have readily attributed the scienter of management-level employees to corporate defendants."). Because Trabuco and Angelotti were senior officers of Bradesco at the time they made the statements with scienter, and Plaintiff does not allege that they were acting outside the scope of their authority in making the statements, the Court concludes that their scienter should be imputed to Bradesco as a corporate entity.

The Court still must consider whether Plaintiff has adequately alleged scienter as to Bradesco with respect to the December 4, 2015 comment in the *O Estado* article. That comment was not attributed to any particular individual, and Plaintiff has not filled in that gap through the allegations in the amended complaint. As a result, it is impossible for the Court to impute any individual's scienter to Bradesco with respect to that statement. Moreover, the Court cannot conclude that Plaintiff has adequately alleged that the statement would have been approved by a corporate official knowledgeable enough about the company to know that the statement was misleading. Plaintiff alleges nothing about Bradesco's internal processes for making statements to the press. While it is certainly conceivable that Trabuco, Angelotti, or Abreu (the only officials alleged to have known

about the bribery scheme at that time) approved, or would have approved, the statement, mere possibility is insufficient to give rise to a strong inference of scienter. Accordingly, all claims relating to the December 4, 2015 comment made by Bradesco in the *O Estado* article are dismissed.

### 3. Summary of Section 10(b) Analysis

The Court concludes its discussion of Plaintiff's Section 10(b) claims by summarizing what has and has not survived Defendants' motion to dismiss.

### a. Summary of Dismissed Claims

First, because Plaintiff has failed adequately to allege a bribery scheme in which Bradesco or any of its agents were knowingly involved prior to March 24, 2014, all claims relating to statements made prior to that date are dismissed.

Second, because Plaintiff has not adequately alleged that they were materially false or misleading, all claims challenging the following categories of statements are dismissed: (1) statements in Bradesco's Forms 20-F and Reference Forms concerning the Company's ICFR and disclosure controls (*see supra* Part III.C.1.a); (2) the risk factors disclosed in the Company's Forms 20-F and its Reference Forms, as well as representations that the risk factors were "complete" (*see supra* Part III.C.1.b and d); (3) Trabuco's SOX certifications, except for any certifications made after October 9, 2014 attesting that Bradesco's reports "d[id] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by this report" (*see supra* Part III.C.1.c); and (4) Bradesco's Code of Ethical Conduct (*see supra* Part III.C.1.e).

Third, because Plaintiff has failed to allege a strong inference of scienter as to Abreu in connection with the only statement he made, Plaintiff's Section 10(b) claim against Abreu is dismissed.

Fourth, because Plaintiff has not adequately alleged that Trabuco possessed scienter prior to October 9, 2014, all claims against him for statements made prior to that date are dismissed.

Fifth, because Plaintiff has not alleged corporate scienter with respect to the December 4, 2015 *O Estado* comment, all claims related to that comment are dismissed.

Finally, because the Court has concluded that the group-pleading doctrine is inapplicable after *Janus*, all remaining claims survive only as against the defendants specifically identified in the following section.

### b. Summary of Surviving Claims

The following statements survive as against the following defendants: (1) the August 8, 2014 press release (as against Bradesco and Angelotti); (2), statements about Bradesco's Code of Ethical Conduct (but not the Code itself) and anti-corruption statements in Forms 20-F filed after October 9, 2014, and certifications made in post-October 9, 2014 filings attesting that the reports "d[id] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by this report" (as against by Bradesco and Trabuco); (3) the March 31, 2015 press release filed with the SEC on April 10, 2015 (as against by Bradesco and Angelotti); and (4) the May 31, 2016 "Notice to the Market" filed with the SEC on June 1, 2016, as well as the June 9, 2016 "reiteration" of the "clarifications provided in" the May 31 Notice (as against Bradesco and Angelotti).

### D. The Section 20(a) Claim

In addition to its claims for primary liability pursuant to Section 10(b) and Rule 10b-5, Plaintiff seeks to hold each of the Individual Defendants liable as "controlling persons" pursuant to Section 20(a) of the Exchange Act. As explained above, the requirements for pleading control person liability against a defendant under Section 20(a) are "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some

meaningful sense, a culpable participant in the controlled person's fraud." *Barclays*, 750 F.3d at 236. Plaintiff has pleaded certain primary violations of Section 10(b) and Rule 10b-5 by Bradesco, Trabuco, and Angelotti, as detailed above, thus meeting the first element. Accordingly, the remaining question is whether Plaintiff has adequately alleged the second and third elements of control person liability under Section 20(a) as to any of the defendants who did not make the statements underlying those primary violations. The Court need not determine whether Trabuco or Angelotti were controlling persons with respect to the statements they made, however, because "a party may not ultimately be held liable under both Section 10(b) and Section 20(a) for the same underlying conduct." *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 210-11 (S.D.N.Y. 2006).

Determining whether an individual defendant is a "controlling person" is "a fact-intensive inquiry that generally should not be resolved on a motion to dismiss." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 741 (S.D.N.Y. 2015) (citation and alteration omitted). "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). In order for an individual to incur Section 20(a) liability, he "must not only have control over the primary violator, but have control over the transaction in question." *In re Smith Barney*, 884 F. Supp. 2d at 166. "Thus, it is not sufficient for [a plaintiff] to allege that [a defendant] has control person *status*; instead, [the plaintiff] must assert that [the defendant] exercised *actual* control over the matters at issue." *Id.*; *see also In re Global Crossing, Ltd. Sec. Litig.*, No. 02-cv-910, 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005) (Lynch, J.) ("To be liable as a control person, the defendant must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person." (citation omitted)).

"Neither director status nor mere membership on an audit committee, standing alone, is sufficient to demonstrate actual control over a company or an allegedly fraudulent transaction." *City*

*of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 720-21 (S.D.N.Y. 2013) (citation omitted). However, corporate officers "usually are presumed to possess the ability to control the actions of their employees," and "directors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents." *In re Bioscrip*, 95 F. Supp. 3d at 741 (citation and alterations omitted).

### 1. Trabuco

Plaintiff has adequately alleged a Section 20(a) claim against Trabuco. The Court reaches this conclusion in recognition of the principle that control is a fact-intensive inquiry not generally suitable to resolution on a motion to dismiss, and in light of the fact that corporate officers "usually are presumed to possess the ability to control the actions of their employees." *See, e.g.*, *id.* As Bradesco's CEO, Trabuco may fairly be understood to be Angelotti's employer, giving rise to the presumption of control over Angelotti's actions. Additionally, as the Court has already concluded, Plaintiff has alleged culpable participation by Trabuco in the dissemination of many of the statements that have survived, on a primary-violation basis, Defendants' motion to dismiss. Plaintiff's Section 20(a) claim, therefore, survives as against Trabuco.

### 2. Angelotti

By contrast, the Court concludes that Plaintiff has not pleaded a viable Section 20(a) claim against Angelotti. As explained, Angelotti's position as an officer and a member of the Company's Executive Board is insufficient, on its own, to establish control in the relevant sense. And the only other primary violator, Trabuco, cannot be fairly characterized as (nor does Plaintiff allege that he is) Angelotti's employee. Moreover, Plaintiff's conclusory allegation that Angelotti was "in [a] position[ ] to control the contents of Bradesco's SEC and CVM filings," AC ¶ 180, is insufficient as a matter of law. *See, e.g.*, *In re Global Crossing*, 2005 WL 1907005, at *12 (Lynch, J.) ("Conclusory allegations of control are insufficient as a matter of law."). Plaintiff further attempts to allege control on the part of Angelotti by pleading that, as a member of Bradesco's Executive Disclosure

Committee, he "was charged with: (i) supporting Bradesco's senior management in appraising the disclosure of significant transactions and information relating to the Company; and (ii) examining reports in order to ensure that they are prepared in accordance with controls and procedures defined for their preparation." AC ¶ 181. But the allegation that Angelotti was charged, by virtue of his *status* as a member of a particular committee, with "supporting" senior management's appraisals of disclosures and with "examining" reports does not show that he exercised *actual control* over the dissemination of the alleged misstatements that he did not himself make or over the people who drafted or otherwise signed off on those misstatements.[21] As a result, Plaintiff's Section 20(a) claim is dismissed as against Angelotti.

### 3. Abreu

For similar reasons as those discussed immediately above with respect to Angelotti, Plaintiff has failed adequately to allege that Abreu was a "controlling person" within the meaning of Section 20(a). As with Angelotti, Abreu's mere status as a member of Bradesco's Executive Board and its committees is not sufficient to establish actual, *de facto*, control. *See In re Global Crossing*, 2005 WL 1907005, at *12 ("Because the power to direct the management and policies of a person must be a real, de facto power and not just de jure, officer or director status alone does not constitute control." (citation and alteration omitted)); *cf. also id.* at *13 ("Allegations that a person was one of multiple directors of the primary violator does not raise an inference of control over that entity."). Further, Plaintiff makes the same allegations concerning Abreu's responsibilities as a member of the Company's Disclosure Committee, and those allegations are as insufficient as to Abreu as they were with respect to Angelotti.

Plaintiff additionally alleges that, as a member of the Company's Ethics Committee, Abreu "was charged with . . . proposing actions to ensure the enforcement of Bradesco's Corporate and

---

[21] The fact that Angelotti signed some of Bradesco's statements is irrelevant to the Section 20(a) analysis, because the Court has already sustained claims for primary liability against Angelotti for those statements.

Sector Codes of Ethics, and of the corporate policies, especially the Corporate Anticorruption Policy." AC ¶ 181 (alterations omitted). The Court assumes the truth of that allegation, but even so, Abreu's alleged responsibility to "propos[e] actions" is a far cry from control over the misstatements that he did not himself make, or over the individuals who did make them. Finally, in the Court's view, neither Trabuco nor Angelotti can fairly be characterized as Abreu's employee, and therefore no presumption that Abreu exercises control over them is appropriate here.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

Plaintiff has pleaded a claim under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder with respect to the following statements and as against the following defendants: (1) the August 8, 2014 press release (as against Bradesco and Angelotti); (2) statements about Bradesco's Code of Ethical Conduct (but not the Code itself) and anti-corruption statements in Forms 20-F filed after October 9, 2014, and certifications made in post-October 9, 2014 filings attesting that the reports "d[id] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by this report" (as against by Bradesco and Trabuco); (3) the March 31, 2015 press release filed with the SEC on April 10, 2015 (as against by Bradesco and Angelotti); and (4) the May 31, 2016 "Notice to the Market" filed with the SEC on June 1, 2016, as well as the June 9, 2016 "reiteration" of the "clarifications provided in" the May 31 Notice (as against Bradesco and Angelotti).

Plaintiff has also pleaded a claim under Section 20(a) of the Exchange Act against Trabuco.

In all other respects, Defendants' motion to dismiss is granted. The dismissal includes all claims against Defendant Abreu.

Because the Court cannot conclude that further amendment of the complaint would be

futile, the Court grants Plaintiff leave to file a second amended complaint solely to cure the deficiencies identified in this opinion no later than 30 days from the date of this order. *See Loreley*, 797 F.3d at 191.

Discovery in this action will remain stayed until further order of the Court. If Plaintiff does not file a second amended complaint within 30 days from the date of this order, the Court expects to set a status conference to initiate discovery shortly thereafter.

The Clerk of Court is directed to terminate the motion pending at ECF No. 63.

SO ORDERED.

Dated: September 29, 2017
New York, New York

_____
GREGORY H. WOODS
United States District Judge